MICHAEL J. HADDAD (State Bar No. 189114)
JULIA SHERWIN (State Bar No. 189268)
T. KENNEDY HELM (State Bar No. 282319)
MAYA SORENSEN  (State Bar No. 250722)
HADDAD & SHERWIN LLP
505 Seventeenth Street
Oakland, California 94612
Telephone: (510) 452-5500
Facsimile:   (510) 452-5510

Attorneys for Plaintiffs
H.R.M., Jr.; A.M.; and
Jamie Ann Cox

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HUMBERTO MARTINEZ, Deceased, through his Co-Successors in Interest, H.R.M., Jr., a minor through his mother and Next Friend Priscilla Sandoval Vanarendonk, individually and as successor in interest for HUMBERTO ROSARIO MARTINEZ, Deceased, and A.M., a minor, through her mother and Next Friend Tina Anglin, individually and as successor in interest for HUMBERTO ROSARIO MARTINEZ, Deceased; and JAMIE ANN COX, individually,<br><br>　　　　　　Plaintiffs,<br><br>vs.<br><br>CITY OF PITTSBURG, a public entity; CITY OF PITTSBURG POLICE CHIEF BRIAN ADDINGTON, in his individual and official capacities; PITTSBURG POLICE OFFICERS ERNESTO MEJIA, JASON WAITE, WILLIE GLASPER, GABRIEL PALMA, JONATHAN ELMORE, PATRICK BERHAN, and DOES 1–10, Jointly and Severally<br><br>　　　　　　Defendants. | Case No.:<br><br>**COMPLAINT FOR DAMAGES, DECLARATORY, AND INJUNCTIVE RELIEF, AND DEMAND FOR JURY TRIAL** |

Plaintiffs, by and through their attorneys, HADDAD & SHERWIN LLP, for their Complaint against Defendants, state as follows:

## JURISDICTION

1.      This is a civil rights, wrongful death, and survival action arising from Defendants' wrongful use of recklessly provocative tactics, deadly force—an improper carotid hold, effectively a choke hold—and significant intermediate force, including gunpoints, control holds, TASER deployments, punches, elbow strikes, and knee strikes, resulting in the death of HUMBERTO MARTINEZ, Deceased, on or about July 26, 2016, in Contra Costa County, California.  This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988; and the First, Fourth, and Fourteenth Amendments to the United States Constitution, as well as the laws and Constitution of the State of California, including but not limited to California Civil Code §§ 52.1 and 52, and California common law.  Jurisdiction is founded upon 28 U.S.C. §§ 1331 and 1343(a)(3) and (4), and the aforementioned statutory and constitutional provisions.  Plaintiffs further invoke the supplemental jurisdiction of this Court pursuant to 28 U.S.C. § 1367 to hear and decide claims arising under state law

## INTRADISTRICT ASSIGNMENT

2.      A substantial part of the events and/or omissions complained of herein occurred in Contra County, California, and pursuant to Northern District Civil Local Rule 3-2(d), this action is properly assigned to either the Oakland Division or the San Francisco Division of the United States District Court for the Northern District of California.

## PARTIES AND PROCEDURE

3.      Plaintiff H.R.M., Jr., a minor, is the son of HUMBERTO MARTINEZ and a resident of the State of Washington.  Plaintiff H.R.M., Jr., by and through his mother and Next Friend Priscilla Vanarendonk, brings these claims individually for wrongful death and violation of his personal rights, and as successor in interest for Decedent HUMBERTO MARTINEZ, asserting survival claims for HUMBERTO MARTINEZ.  He brings these claims under state and federal law.

4.      Plaintiff A.M., a minor, is the daughter of HUMBERTO MARTINEZ and a resident of the State of California.  Plaintiff A.M., by and through her mother and Next Friend Tina Anglin, brings these claims individually for wrongful death and violation of her personal rights, and as successor in interest for Decedent HUMBERTO MARTINEZ, asserting survival claims for HUMBERTO MARTINEZ.  She brings these claims under state and federal law.

5.      Plaintiff JAMIE ANN COX is the mother of Decedent HUMBERTO MARTINEZ and a resident of the State of California.  Plaintiff JAMIE ANN COX brings these claims individually for violation of her personal rights.

6.      Plaintiffs H.R.M., Jr. and A.M. bring these claims individually and on behalf of Decedent HUMBERTO MARTINEZ pursuant to California Code of Civil Procedure §§ 377.20 *et seq.* and 377.60 *et seq.*, which provide for survival and wrongful death actions.  All Plaintiffs also bring their claims on the basis of 42 U.S.C. §§ 1983 and 1988, the United States Constitution, and federal civil rights law.  Plaintiffs also bring these claims as Private Attorneys General, to vindicate not only their rights, but others' civil rights of great importance.

7.      Defendant CITY OF PITTSBURG is a public entity established by the laws and Constitution of the State of California, and owns, operates, manages, directs, and controls the Pittsburg Police Department (PPD) which employs other defendants in this action.

8.      Defendant Chief of Police of the PPD, BRIAN ADDINGTON, at all material times was employed as Chief of Police of the PPD by Defendant CITY OF PITTSBURG, and he was acting within the course and scope of that employment.  As Chief of Police of the PPD, Defendant ADDINGTON was a policy-making official for Defendant CITY OF PITTSBURG with the power to make official and final policy for the PPD.  Defendant ADDINGTON is being sued in his individual and official capacities.

9.      Defendant ERNESTO MEJIA at all material times was employed as a police officer by Defendant CITY OF PITTSBURG, and he was acting within the course and scope of that employment.

1        10      Defendant JASON WAITE at all material times was employed as a police officer by

2  Defendant CITY OF PITTSBURG, and he was acting within the course and scope of that

3  employment.

4        11.     Defendant WILLIE GLASPER at all material times was employed as a police officer

5  by Defendant CITY OF PITTSBURG, and he was acting within the course and scope of that

6  employment.

7        12.     Defendant GABRIEL PALMA at all material times was employed as a police officer

8  by Defendant CITY OF PITTSBURG, and he was acting within the course and scope of that

9  employment.

10       13.     Defendant JONATHAN ELMORE at all material times was employed as a police

11  officer by Defendant CITY OF PITTSBURG, and he was acting within the course and scope of that

12  employment.

13       14.     Defendant PATRICK BERHAN at all material times was employed as a police

14  officer by Defendant CITY OF PITTSBURG, and he was acting within the course and scope of that

15  employment.

16       15.     Despite Plaintiffs' multiple requests for records—and while Defendants' counsel did

17  allow Plaintiffs' counsel on one occasion to view some of the body camera video capturing this

18  incident, along with some of the police reports—Defendants have not provided Plaintiffs or their

19  representatives with copies of documents concerning this incident, including but not limited to, any

20  police reports, records of any internal affairs investigations, dispatch audio, or body-camera video

21  recordings of this incident.

22       16.     As a result, the true names and capacities of Defendants sued herein as DOES 1–10

23  ("DOE Defendants") are unknown to Plaintiffs, who therefore sue said Defendants by such

24  fictitious names, and Plaintiffs will seek leave to amend this Complaint to show their true names

25  and capacities when the same are ascertained.  Each DOE Defendant was an employee/agent of the

26  CITY OF PITTBURG and the PPD, and at all material times acted within the course and scope of

27  that relationship.

28

17.     Plaintiffs are informed and thereon allege that each of the Defendants sued herein was negligently, wrongfully, and otherwise responsible in some manner for the events and happenings as hereinafter described, and proximately caused injuries and damages to Plaintiffs. Further, one or more DOE Defendants was at all material times responsible for the hiring, training, supervision, and discipline of other defendants, including DOE Defendants.

18.     Plaintiffs are informed and believe, and thereon allege, that each of the Defendants was at all material times an agent, servant, employee, partner, joint venturer, co-conspirator, and/or alter ego of the remaining Defendants, and in doing the things herein alleged, was acting within the course and scope of that relationship.  Plaintiffs are further informed and believe, and thereon allege, that each of the Defendants herein gave consent, aid, and assistance to each of the remaining Defendants, and ratified and/or authorized the acts or omissions of each Defendant as alleged herein, except as may be hereinafter otherwise specifically alleged.  At all material times, each Defendant was jointly engaged in tortious activity, resulting in the deprivation of Plaintiffs' and Decedent's constitutional rights and other harm.  Each Defendant was an integral participant, and was fundamentally involved, in the events described herein, including seizing and using excessive force against Decedent, and violations of Plaintiffs' and Decedent's rights.

19.     The acts and omissions of all Defendants as set forth herein were at all material times pursuant to the actual customs, policies, practices and procedures of the PPD.

20.     At all material times, each Defendant acted under color of the laws, statutes, ordinances, and regulations of the State of California.

21.     Plaintiffs timely and properly filed tort claims pursuant to California Government Code § 910 *et seq.*, and this action is timely filed within all applicable statutes of limitation.

22.     This Complaint may be pled in the alternative pursuant to Federal Rule of Civil Procedure 8(d)(2).

**GENERAL ALLEGATIONS**

23.     Plaintiffs reallege each and every paragraph in this Complaint as if fully set forth here.

24.     At about 2:30 p.m. on July 26, 2016, Defendants MEJIA, GLASPER, and WAITE—partners in a PPD "Street Crimes Unit" engaged in aggressive, "proactive policing"—patrolled together in an unmarked white Ford Taurus in the vicinity of Hillview Drive, Pittsburg, CA, 94565. Defendants MEJIA and GLASPER had each only worked for the PPD for about two and a half years, while Defendant WAITE had worked for the PPD for about nine and a half years.  Defendant MEJIA was driving; Defendant GLASPER sat in the front passenger seat; and Defendant WAITE sat in the back seat.

25.     Meanwhile, HUMBERTO MARTINEZ had been visiting friends, including but not limited to Jeff Wachtler, at Mr. Watchler's single-family home at 4289 Hillview Drive.  On information and belief, HUMBERTO MARTINEZ had been playing video games with Mr. Watchler, and helping him with a pool filter.  Defendants MEJIA, GLASPER, and WAITE drove by 4289 Hillview Drive, and saw a tan-colored car parked along the side of the street, partially blocking the driveway of 4289 Hillview Drive.  HUMBERTO MARTINEZ walked out of the house at 4289 Hillview Drive, got into the tan-colored car, and drove away, on information and belief, to pick up a friend from work.

26.     Without any facts particularized to HUMBERTO MARTINEZ that would constitute either reasonable suspicion or probable cause to believe that HUMBERTO MARTINEZ was involved in any criminal activity, Defendants MEJIA, and/or GLASPER, and/or WAITE ran a license-plate check through the radio to dispatch on the tan-colored car that HUMBERTO MARTINEZ was driving.  On information and belief, dispatch informed Defendants MEJIA, GLASPER, and/or WAITE that the car's registration had expired.  Under California Vehicle Code § 4000(a)(1), however, driving a vehicle with an expired registration constitutes a mere infraction, a correctable "fix-it" ticket.  Defendants MEJIA, GLASPER, and WAITE had no other information constituting either reasonable suspicion to detain HUMBERTO MARTINEZ or probable cause to arrest HUMBERTO MARTINEZ.

27.     Further, Defendants MEJIA, GLASPER, and WAITE could not have effected the custodial arrest of HUMBERTO MARTINEZ for an infraction of California Vehicle Code §

4000(a)(1), because under California law, "[i]n any case . . . in which a person is arrested for an offense declared to be an infraction," custodial arrest is authorized "[o]nly if the arrestee refuses to sign a written promise [to appear], has no satisfactory identification, or refuses to provide a thumbprint or fingerprint." Cal. Penal Code § 853.5(a).

28.     Defendant MEJIA initiated a traffic enforcement stop on the car driven by HUMBERTO MARTINEZ, and he has claimed that he activated his unmarked car's light and siren. HUMBERTO MARTINEZ, however, kept driving. Because they were driving an unmarked car, Defendants MEJIA, GLASPER, and WAITE lacked probable cause to arrest HUMBERTO MARTINEZ for the misdemeanor offense of evading a peace officer under California Vehicle Code § 2800.1, which requires the police vehicle to be "distinctively marked." Cal. Vehicle Code § 2800.1(a)(3).

29.     Further, even if Defendants MEJIA, GLASPER, and/or WAITE had probable cause to believe that HUMBERTO MARTINEZ had violated California Vehicle Code § 2800.1, California law requires a person arrested without a warrant for such a misdemeanor offense to be cited and released. Cal. Penal Code § 853.6(h). Defendants MEJIA, GLASPER, and WAITE lacked probable cause to arrest HUMBERTO MARTINEZ for any other crimes.

30.     Defendants MEJIA, GLASPER, and WAITE pursued HUMBERTO MARTINEZ for only about a minute or a minute and a half, and HUMBERTO MARTINEZ drove in a circle back to his friends' house at 4289 Hillview Drive. HUMBERTO MARTINEZ got out of the car, and ran towards the house at 4289 Hillview Drive. HUMBERTO MARTINEZ—dressed in a sleeveless t-shirt and shorts—was visibly unarmed.

31.     Defendants MEJIA, GLASPER, and WAITE got out of the car, and ran after HUMBERTO MARTINEZ. While running, Defendant MEJIA pulled out his TASER and, without warning, and in the absence of any immediate threat posed by HUMBERTO MARTINEZ or anyone else, and the absence of any serious crime, aimed his TASER at HUMBERTO MARTINEZ's back and fired his TASER in probe mode. One of the probes tipped with a razor

1  sharp dart hit HUMBERTO MARTINEZ in the upper left buttock.  HUMBERTO MARTINEZ

2  ducked down underneath the partially opened garage door to the house at 4289 Hillview Drive.

3        32.     Defendant MEJIA, followed by Defendant GLASPER, followed HUMBERTO

4  MARTINEZ into the garage.  Defendants MEJIA and GLASPER lacked a search or arrest warrant,

5  probable cause, or any emergency or exigency that would have justified their warrantless entry into

6  a private home.  Defendants MEJIA and GLASPER saw that HUMBERTO MARTINEZ had

7  stumbled and was sitting down on the ground; they also saw two other people in the garage.  In the

8  absence of any immediate threat from anyone, including HUMBERTO MARTINEZ, Defendants

9  GLASPER and MEJIA both drew their firearms and pointed them at HUMBERTO MARTINEZ

10  and the two other people and told them to put their hands in the air.

11        33.     HUMBERTO MARTINEZ got up and went through a doorway into the kitchen.

12  Defendant MEJIA pursued him, with Defendant GLASPER following behind.  HUMBERTO

13  MARTINEZ was not acting aggressive or threatening in any way, and he posed no immediate threat

14  to anyone.  Defendant MEJIA and/or Defendant GLASPER then grabbed HUMBERTO

15  MARTINEZ's arm, and Defendant MEJIA and/or Defendant GLASPER tackled HUMBERTO

16  MARTINEZ to the floor.  Defendant MEJIA and HUMBERTO MARTINEZ, along with Defendant

17  GLASPER, ended up on the kitchen floor, with HUMBERTO MARTINEZ in a face-down, prone

18  position, and Defendant MEJIA choking him with his arm around his neck.

19        34.     Defendant MEJIA weighed 198 lbs.  Defendant GLASPER weighed 195 lbs.

20  Defendant MEJIA got on top of the upper half of HUMBERTO MARTINEZ's body, and

21  Defendant GLASPER got on top of the lower half, and both placed their combined weight on

22  HUMBERTO MARTINEZ, who was lying prone, face-down, on the kitchen floor.

23        35.     Defendants MEJIA and GLASPER began beating HUMBERTO MARTINEZ.

24  Defendant MEJIA punched HUMBERTO MARTINEZ in the face with a closed fist at least once.

25  Defendant GLASPER punched HUMBERTO MARTINEZ with a closed fist in the torso at least

26  three times.  Then, Defendant GLASPER began delivering elbow strikes to HUMBERTO

27

28

1   MARTINEZ's abdomen. Defendant GLASPER also began delivering knee strikes to HUMBERTO

2   MARTINEZ's torso.

3         36.     From the time they first went to the ground, Defendant MEJIA had put his left arm

4   around HUMBERTO MARTINEZ's neck and—without any warning that he was about to use

5   deadly force—applied an improper carotid hold, effectively an arm-bar choke hold, to

6   HUMBERTO MARTINEZ's neck, severely impairing his ability to breathe.

7         37.     It is well known in law enforcement that a choke hold—or an improperly performed

8   carotid hold—constitutes deadly force because it can cause death by obstructing the person's ability

9   to breathe.  As Justice Marshall observed in his dissent in *City of Los Angeles v. Lyons*, 461 U.S. 95

10   (1983):

> It is undisputed that chokeholds pose a high and unpredictable risk of serious injury or
> death.  Chokeholds are intended to bring a subject under control by causing pain and
> rendering him unconscious.  Depending on the position of the officer's arm and the force
> applied, the victim's voluntary or involuntary reaction, and his state of health, an officer
> may inadvertently crush the victim's larynx, trachea, or hyoid.  The result may be death
> caused by either cardiac arrest or asphyxiation . . . The victim experiences extreme pain.
> His face turns blue as he is deprived of oxygen, he goes into spasmodic convulsions, his
> eyes roll back, his body wriggles, his feet kick up and down, and his arms move about
> wildly.

*Id.* at 116–118 (Marshall, J. dissenting).  The inappropriate use of a carotid hold "'can result in

stroke, heart attack, crushing of the trachea, and death.'"  *Knapps v. City of Oakland*, 647 F. Supp.

2d 1129, 1165 (N.D. Cal. 2009).  In 2015, the International Association of Chiefs of Police (IACP),

a professional association for law enforcement worldwide, explained:

> Federal agreements and use-of-force policies that address choke holds acknowledge the
> seriousness of this use-of-force option.  The use of choke holds—or similar procedures such
> as carotid control holds—has long been a topic of debate.  The purpose of the technique is to
> incapacitate an aggressive subject temporarily to gain control of the situation.  **But because
> of the risk involved with these techniques—they are intended to restrict the airflow
> through the windpipe or the flow of blood to the brain—some departments have
> prohibited them outright, while others have narrowly defined the circumstances under
> which they can be used.  Most departments that allow this option classify the choke
> hold as deadly force.**  Federal agreements underscore this definition and advocate the
> restrictive use of choke holds.  In relevant consent decrees and MOAs, the Department of
> Justice states that departments' policies should 'explicitly prohibit the use of choke holds
> and similar carotid holds except where deadly force is authorized.'

1    *Testimony of the International Association of Chiefs of Police—Task Force on 21st Century*

2    *Policing Listening Session on Policy and Oversight, January 30, 2015*, p. 129 (emphasis added).

3         38.     Accordingly, many law enforcement agencies categorize the carotid hold/choke hold

4    as deadly force.  For example, the Oakland Police Department, since at least 2014, has categorized

5    the carotid restraint as lethal force, on the same level as a firearm, an intentional impact weapon

6    strike to the head, or the use of a vehicle to strike a person.  The Alameda County Sheriff's Office

7    includes the carotid restraint at the "lethal force level" in its Use of Force-Continuum Matrix.  Since

8    at least 2012, the California Highway Patrol policy categorizes a carotid neck restraint, along with

9    use of a firearm, as deadly force.  Likewise, the California Department of Justice has classified the

10    carotid restraint as a deadly force application.  The San Mateo County Sheriff's Office forbids the

11    use of the carotid restraint unless "there is a substantial and immediate risk that death or great

12    bodily injury will result from the actions of the suspect."  The Salinas Police Department only

13    authorizes the carotid control hold "as an alternative to lethal force, and the carotid control hold

14    may only be used in those situations where the use of deadly force is justified.  All other uses of the

15    carotid control hold are unauthorized."  As of 2008, the Tulare County Sheriff's Office's policy

16    specified that "[t]he carotid restraint may only be used when the deputy reasonably believes that

17    such a hold appears necessary to prevent serious injury or death to a deputy or other person."

18    *Atkinson v. Cnty. of Tulare*, 790 F. Supp. 2d 1188, 1197 (E.D. Cal. 2011).  The San Francisco

19    Police Department prohibits its officers from using either the "carotid restraint" or the choke hold.

20         39.     On information and belief, the PPD classifies the carotid hold and choke hold not as

21    deadly force, but as the same level of force as a Taser or a fist strike – intermediate force – and

22    trains its officers accordingly, in violation of widely accepted law enforcement standards.

23         40.  While Defendant MEJIA was on top of HUMBERTO MARTINEZ's torso maintaining

24    the choke hold around HUMBERTO MARTINEZ's neck, severely impairing his ability to breathe,

25    and while Defendant GASPER was on the lower half of HUMBERTO MARTINEZ's body

26    delivering fist, elbow, and knee strikes to his torso, Defendant WAITE entered the kitchen and

27    observed the unreasonable force used by Defendants MEJIA and GASPER.  Despite his duty to do

28

1    so and the opportunity, Defendant WAITE did not intervene to stop either Defendant MEJIA's or

2    Defendant GASPER's uses of excessive force.

3         41.    Within minutes, Defendants PALMA, BERHAN, and ELMORE arrived and entered

4    the kitchen. While HUMBERTO MARTINEZ lay prone, face down on the ground, with Defendant

5    MEJIA still applying the carotid hold/choke hold, Defendant PALMA began punching

6    HUMBERTO MARTINEZ's torso with a closed fist.

7         42.    Defendant BERHAN then shot HUMBERTO MARTINEZ with a TASER in probe

8    mode in the back of the left thigh.  On information and belief, Defendant BERHAN Tased

9    HUMBERTO MARTINEZ multiple times without justification.  It is well known in law

10   enforcement that a TASER causes a person to require more oxygen—but Defendant MEJIA's

11   application of the improper carotid hold/choke hold severely limited HUMBERTO MARTINEZ's

12   access to oxygen.  At some point, Defendant ELMORE delivered multiple punches to HUMBERTO

13   MARTINEZ's upper body, in addition to at least two knee strikes.

14        43.    Defendants WAITE and PALMA handcuffed HUMBERTO MARTINEZ.  After

15   HUMBERTO MARTINEZ had been handcuffed, Defendant ELMORE placed his right knee on

16   HUMBERTO MARTINEZ's upper back and his hand on HUMBERTO MARTINEZ's head.

17   Defendants WAITE, PALMA, BERHAN, and ELMORE all put their combined weight on top of

18   HUMBERTO MARTINEZ's back, and they maintained this position for minutes while

19   HUMBERTO MARTINEZ was lying handcuffed on his stomach.

20        44.    HUMBERTO MARTINEZ had turned blue (cyanic) and had become unresponsive.

21   Emergency Medical Technicians arrived and brought HUMBERTO MARTINEZ out on a stretcher.

22   Following the use of extreme and deadly force against HUMBERTO MARTINEZ by Defendants

23   MEJIA, WAITE, GLASPER, PALMA, ELMORE, BERHAN, and possibly DOE Defendants, he

24   was transferred by ambulance to John Muir Health Concord Hospital in Concord, California, where

25   his death was pronounced at 4:13 p.m.

26        45.    Defendants MEJIA, GLASPER, WAITE, PALMA, BERHAN, and ELMORE,

27   acting as integral participants, used or caused the use of a high level of injurious force against

28

1   HUMBERTO MARTINEZ that was sufficient to cause his death.  Defendants MEJIA, GLASPER,

2   WAITE, PALMA, BERHAN, and ELMORE killed HUMBERTO MARTINEZ, who never posed

3   an immediate threat to anyone to justify the high level of injurious force used and permitted against

4   him.  Further, despite their knowledge of proper safety procedures regarding control holds,

5   Defendants MEJIA, GLASPER, WAITE, PALMA, BERHAN, and ELMORE held HUMBERTO

6   MARTINEZ on his stomach for the duration of HUMBERTO MARTINEZ's arrest and custody—

7   even after he was handcuffed and fully restrained—restricting his ability to breathe.

8      46.    At all material times, HUMBERTO MARTINEZ posed no significant or immediate

9   threat of death or serious bodily harm to anyone else at any time.  HUMBERTO MARTINEZ's

10   light clothing—shorts and a sleeveless tank top—revealed that he was not armed with any firearm.

11   HUMBERTO MARTINEZ had not made any movement or gesture under the circumstances that a

12   reasonable officer would have perceived as posing an immediate threat of death or serious bodily

13   injury to justify the use of deadly force.  HUMBERTO MARTINEZ never attempted to strike, and

14   never struck, any officer in any manner.  HUMBERTO MARTINEZ was obese, 6' 2" and 286.5

15   lbs., was vastly outnumbered by at least five Defendant officers, and was wanted for—at most—a

16   traffic infraction and a misdemeanor, both non-serious, non-violent offenses, and Defendants failed

17   to use available less-forceful alternatives to the force and restraints used.

18      47.    HUMBERTO MARTINEZ merely tried to protect himself from the extreme,

19   excessive, and unlawful force officers were using against him. Any alleged "resistance"

20   HUMBERTO MARTINEZ may have offered was involuntary, caused by the choke hold:

> [The] pressure exerted in an arm bar control . . . can result in a laryngeal spasm or seizure which simply shuts off the trachial air passage, leading to death by asphyxiation.  Also, it must result in transmission to the brain of nerve messages that there is immediate, acute danger of death.  This transmission immediately sets up a 'flight or flee' syndrome wherein the body reacts violently to save itself or escape.  Adrenalin output increases enormously; blood oxygen is switched to muscles and strong, violent struggle ensues which is to a great extent involuntary.  **From a medical point of view, there would be no way to distinguish this involuntary death struggle from a willful, voluntary resistance.  Thus, an instruction to cease applying the hold when 'resistance ceases' is meaningless**.

*Lyons*, 461 U.S. at 118 (emphasis added).  Defendants MEJIA, WAITE, GLASPER, PALMA, ELMORE, BERHAN, and DOES 1–10 unlawfully seized and used excessive force against HUMBERTO MARTINEZ, including but not limited to applying a choke hold, without warning and without legal justification, causing great pain and suffering to HUMBERTO MARTINEZ and causing his death.

48.     The type and amount of force Defendants used against HUMBERTO MARTINEZ as described above, including multiple TASER shocks; multiple blows to HUMBERTO MARTINEZ's body; improper control, carotid, and choke holds; and the restriction of HUMBERTO MARTINEZ's airway, neck, and back areas, amounted to the use of deadly force under the circumstances.  The use of deadly force was not justified or lawful under the circumstances.

49.     In addition to the foregoing evidence of the use of unjustified, injurious force on HUMBERTO MARTINEZ, Defendants MEJIA, GLASPER, WAITE, PALMA, BERHAN, and ELMORE, and possibly DOE Defendants, also caused further trauma to HUMBERTO MARTINEZ as noted in the autopsy performed on or about July 27, 2016, the day after the incident, by the Contra Costa Sheriff Coroner, all evidence of these Defendants' use of a very high degree of unnecessary force on HUMBERTO MARTINEZ:

- **Blunt force injuries of head, neck, torso, and extremities (abrasions, contusions, abraded contusions and lacerations)**.  Specifically:
  - The right temple showed a 2.5" x 2" reddish, swollen contusion;
  - The lower lip showed a ¼" to ½" contusion;
  - The left side of the face showed a ½" linear and horizontal laceration, exposing the underlying temporal bone;
  - The mid chest showed a 3" x 3" abraded contusion;
  - The left shoulder (and back) showed a 3" diameter abraded contusion;
  - The left side of the back and flank was covered by a 9" x 6" abraded contusion;

- o The lower mid back showed a 3" x 1" contusion;
- o The left hip showed a ½" shallow laceration, consistent with the deployment of a TASER lead;
- o The posterior left thigh showed two ½" shallow lacerations consistent with the deployment of a TASER lead;
- o The left wrist showed 3 linear (horizontal) abrasions with contusion, ranging from ¼" to ½";
- o The back of the left small finger showed a ¼" laceration;
- o The back of the left hand showed a 1" laceration imposed on the proximal phalanx of the right ring finger;
- o The anterior upper left thigh showed two ¼" abrasions;
- o The left knee showed multiple (3) abrasions measuring ½" (1) and ¼" (2);

- **Internal Soft Tissue Injuries**
  - o The right frontotemporal scalp showed a 3" contusion;
  - o The left frontotemporal scalp showed a 2" diameter contusion;
  - o The left temporalis muscle (left side of head) showed a contusion measuring 3" in diameter;
  - o The right parieto-occipital scalp showed a 1" diameter contusion;

- **Evidence of mechanical obstruction of respiration, with**:
  - o The right side of the neck (mastoid head of the sternocleidomastoid muscle) showed a 2" x ½" abraded contusion;
  - o Both eyes showed petechiae, which were significantly worse on the left eye.
  - o The right sclerum showed 3 petechiae;
  - o The left sclerum showed diffuse ecchymotic hemorrhages (multiple);

- o  A layer-by-layer neck dissection revealed 2" diameter hemorrhages into the underlying right sternocleidomastoid muscle, and a 1" hemorrhage in the midline of the platysma muscle.
- o  Reflection of the strap muscles also confirmed extensive hemorrhages surrounding the upper larynx, the tracheal rings, and the thyroid cartilage;
- o  The upper thyroid cartilage was fractured;
- o  Multiple hemorrhages into the tissues around the larynx were noted;
- o  The pleura also revealed petechial and ecchymotic hemorrhages on the visceral pleural surfaces, the epicardium and the adventitia of the aortic root;
- o  The inferior capsular surface of the liver, near the falciform ligament, showed supcapsular hemorrhages and contusions (1" to 2");
- o  Bilateral anterior rib fractures (clinical "flail chest");
- o  Soft-tissue injuries on exterior of neck and of strap muscles;
- o  Contusions and hemorrhages into neck soft tissues, with fractured thyroid cartilage;
- o  Bilateral scleral petechiae and ecchymoses (significantly worse on left eye);
- o  Scalp contusions;
- o  Horizontal fracture of sternum;
- o  Bilateral anterior rib fractures (Left, 1–9th; Right, 1–7th)
- o  Liver contusions

- **Evidence of Taser deployments, with**:
  - o  Two electrodes embedded in skin of back of left thigh;
  - o  Shallow laceration due to deployed but pulled-out Taser lead, from left flank.

50.     The Contra Costa County Sheriff-Coroner found injuries in HUMBERTO MARTINEZ's eyes, neck, and the pleural hemorrhages were "consistent with mechanical obstruction of respiration" and with "choke hold."  The Sheriff-Coroner determined that HUMBERTO MARTINEZ's cause of death was "Probable Mechanical Obstruction of Respiration Complicated by Carotid Sinus Reflex Stimulation" lasting for "minutes," due to "Carotid Choke Hold Deployed During Arrest."

51.     Defendants MEJIA, WAITE, GLASPER, PALMA, ELMORE, BERHAN, and possibly DOE Defendants, grossly violated the generally accepted training and standards for proper and safe restraint of a person, and for use of force, in their misconduct against HUMBERTO MARTINEZ.  Plaintiffs also allege that the extreme physical injuries to HUMBERTO MARTINEZ—especially the injuries to his torso and neck—are all evidence of an extremely high degree of force, of improper restraint, and of wanton and willful violations of HUMBERTO MARTINEZ's and Plaintiffs' constitutional rights.

52.     Defendants MEJIA, WAITE, GLASPER, PALMA, ELMORE, BERHAN, and possibly DOE Defendants, on information and belief, were present and integral participants in their joint conduct to severely beat, punch, choke, improperly restrain, contort, threaten, and brutalize HUMBERTO MARTINEZ, and under federal law and generally accepted law enforcement standards and training, each was responsible for the totality of the force used in each Defendant's presence.  On information and belief, Defendants' uses of unnecessary and excessive force against HUMBERTO MARTINEZ lasted over five minutes.  Each Defendant officer used, or caused the use of, extreme and/or deadly force against HUMBERTO MARTINEZ, causing severe injuries and deadly trauma to him, including but not limited to as described above.  Further, each of these Defendant officers failed to intervene to stop, prevent, or report the use of excessive and unreasonable force and restraint by other officers, in violation of the law and generally accepted law enforcement standards and training.

53.     Alternatively, or concurrently, the excessive, unreasonable, reckless, and provocative actions of Defendants MEJIA, WAITE, GLASPER, PALMA, ELMORE, BERHAN, and possibly

DOE Defendants, created a risk of harm to HUMBERTO MARTINEZ, created the situation in which Defendants used extreme and otherwise unnecessary force, and caused an escalation of events leading to HUMBERTO MARTINEZ's death.

54.     During and after their uses of excessive force and violation of HUMBERTO MARTINEZ's rights, Defendants MEJIA, WAITE, GLASPER, PALMA, ELMORE, BERHAN, and possibly DOE Defendants, violated their duty to intervene to stop such violations of HUMBERTO MARTINEZ's rights, and they engaged in a code of silence to cover up such violations of rights—including during the Contra Cost County Sheriff-Coroner's inquest—by not reporting the force that they and other officers inflicted on HUMBERTO MARTINEZ.  The Ninth Circuit has explained that a law enforcement "code of silence" consists of a single rule: "an officer does not provide adverse information against a fellow officer."  *Blair v. City of Pomona*, 223 F.3d 1074, 1081 (9th Cir. 2000) (taking judicial notice of the *Report of the Independent Commission on the Los Angeles Police Department* 168 (1991) (also known as the "Christopher Commission Report").  Defendants MEJIA, WAITE, GLASPER, PALMA, ELMORE, BERHAN, and possibly DOE Defendants, failed to report their own and other officers' uses of force both in their written reports and when interviewed in official investigations of this incident.  Further, Defendants' official accounts of this incident, and the uses of force deployed or observed, fail to account for the severe and widespread physical injuries and trauma found on HUMBERTO MARTINEZ's body.

55.     Defendants' unlawful and provocative tactics and collective use of force were totally unnecessary and unreasonable under the circumstances; caused the use of unnecessary and excessive deadly force; were conscience shocking; and were done without a legitimate law enforcement purpose.

56.     At all material times, and alternatively, the actions and omissions of each defendant were intentional; wanton and/or willful; conscience shocking; reckless; malicious; deliberately indifferent to Decedent's and Plaintiffs' rights; done with actual malice; grossly negligent; negligent; and objectively unreasonable.

57.     As a direct and proximate result of each Defendant's acts and/or omissions as set forth above, Plaintiffs sustained the following injuries and damages, past and future, among others:

a.      Wrongful death of HUMBERTO MARTINEZ;

b.      Hospital and medical expenses (Survival claims) (Plaintiffs H.R.M., Jr.; and A.M.);

c.      Coroner's fees, funeral, and burial expenses (Survival claims) (Plaintiffs H.R.M., Jr.; and A.M.);

d.      Loss of familial relationships, including loss of love, companionship, comfort, affection, consortium, society, services, solace, and moral support (All Plaintiffs, based on wrongful death and loss of familial association);

e.      Loss of economic support (Plaintiffs H.R.M., Jr.; and A.M., based on wrongful death and loss of familial association);

f.      HUMBERTO MARTINEZ's severe and painful physical injuries, including as described in the autopsy report, pursuant to federal civil rights law (Survival claims) (Plaintiffs H.R.M., Jr.; and A.M.);

g.      HUMBERTO MARTINEZ's loss of life, pursuant to federal civil rights law (Survival claims) (Plaintiffs H.R.M., Jr.; and A.M.);

h.      HUMBERTO MARTINEZ's conscious pain and suffering, pursuant to federal civil rights law (Survival claims) (Plaintiffs H.R.M., Jr.; and A.M.);

i.      Violation of constitutional rights;

j.      Pain and Suffering, including emotional distress (All Plaintiffs, based on individual § 1983 claims for loss of familial association);

k.      All damages, penalties, and attorneys' fees and costs recoverable under 42 U.S.C. §§ 1983, 1988, 12205; California Civil Code §§ 52, 52.1, California Code of Civil Procedure § 1021.5, and as otherwise allowed under California and United States statutes, codes, and common law.

**COUNT ONE**
**—42 U.S.C. § 1983—**
**ALL PLAINTIFFS AGAINST DEFENDANTS MEJIA, WAITE, GLASPER, PALMA, ELMORE, BERHAN, AND DOES 1–10**

58.     Plaintiffs reallege each and every paragraph in this Complaint as if fully set forth here.

59.     By the actions and omissions described above, Defendants MEJIA, WAITE, GLASPER, PALMA, ELMORE, BERHAN, and DOES 1–10 violated 42 U.S.C. § 1983, depriving Plaintiffs H.R.M., Jr. and A.M.; and/or Decedent HUMBERTO MARTINEZ of the following clearly established and well-settled constitutional rights protected by the First, Fourth and Fourteenth Amendments to U.S. Constitution:

    a.     HUMBERTO MARTINEZ's right to be free from unreasonable searches and seizures, including unlawful detention and arrest, as secured by the Fourth Amendment (Plaintiffs H.R.M., Jr. and A.M.; survival and wrongful death claims);

    b.     HUMBERTO MARTINEZ's right to be free from excessive and unreasonable force in the course of arrest or detention as secured by the Fourth Amendment (Plaintiffs H.R.M., Jr. and A.M.; survival and wrongful death claims);

    c.     HUMBERTO MARTINEZ's right to be free from the use of unlawful deadly force as secured by the Fourth Amendment (Plaintiffs H.R.M., Jr. and A.M.; survival and wrongful death claims);

    d.     The right to be free from wrongful government interference with familial relationships, and Plaintiffs' and Decedent's right to companionship, society and support of each other, as secured by the First and Fourteenth Amendments (Plaintiffs H.R.M., Jr. and A.M.'s individual claims).

60.     By the actions and omissions described above, Defendants MEJIA, WAITE, GLASPER, PALMA, ELMORE, BERHAN, and DOES 1–10 violated 42 U.S.C. § 1983, depriving Plaintiff JAMIE ANN COX of the following clearly established and well-settled constitutional rights protected by the First and the Fourteenth Amendments to the U.S. Constitution:

    a.     The right to be free from wrongful government interference with familial

relationships, and Plaintiff's and HUMBERTO MARTINEZ's right to companionship, society and support of each other, as secured by the First and Fourteenth Amendments.

61.     Defendants subjected Plaintiffs and Decedent to their wrongful conduct, depriving Plaintiffs and Decedent of rights described herein, knowingly, maliciously, and with conscious and reckless disregard for whether the rights and safety of Plaintiffs (individually and on behalf of HUMBERTO MARTINEZ, Deceased) and others would be violated by their acts and/or omissions.

62.     As a direct and proximate result of Defendants' acts and/or omissions as set forth above, Plaintiffs sustained injuries and damages as set forth at ¶ 57, above.

63.     The conduct of Defendants MEJIA, WAITE, GLASPER, PALMA, ELMORE, BERHAN, and DOES 1–10 entitles Plaintiffs to punitive damages and penalties allowable under 42 U.S.C. § 1983 and California law. Plaintiffs do not seek punitive damages against either the CITY OF PITTSBURG or Defendant CHIEF ADDINGTON in his official capacity.

64.     Plaintiffs are also entitled to reasonable costs and attorneys' fees under 42 U.S.C. § 1988 and applicable federal and California codes and laws.

**COUNT TWO**
**—42 U.S.C. § 1983 (Municipal and Supervisory Liability)—**
**ALL PLAINTIFFS AGAINST DEFENDANTS CITY OF PITTSBURG,**
**CHIEF OF POLICE BRIAN ADDINGTON, AND DOES 1–10**

65.     Plaintiffs reallege each and every paragraph in this Complaint as if fully set forth here.

66.     The unconstitutional actions and/or omissions of Defendants MEJIA, WAITE, GLASPER, PALMA, ELMORE, BERHAN, and DOES 1–10 and other officers employed by or acting on behalf of Defendant CITY OF PITTSBURG, on information and belief, were pursuant to the following customs, policies, practices, and/or procedures of the PPD, stated in the alternative, which were directed, encouraged, allowed, and/or ratified by policy making officers for the CITY OF PITTSBURG and the PPD, including but not limited to Defendant ADDINGTON:

a.     To use or tolerate the use of excessive and/or unjustified force;

b.  To use or tolerate the use of unlawful deadly force including permitting and training officers (i) to use deadly force when faced with less than an immediate threat of death or serious bodily injury; (ii) to use deadly force prematurely, or as a "first resort," or when facing a mere potential threat; and (iii) to use deadly force without giving a proper warning when one would be feasible;

c.  To fail to institute, require, and enforce proper and adequate training, supervision, policies, and procedures concerning seizures and the use of control holds, carotid holds, choke holds, and arrest techniques;

d.  To fail to train and instruct officers regarding the proper circumstances in which to use the carotid hold or choke hold;

e.  To fail to train and instruct officers regarding the dangers of positional asphyxia associated with the use of the carotid hold or choke hold;

f.  To fail to train and instruct officers on the TASER's effect of causing a person to require more oxygen;

g.  To cover-up violations of constitutional rights by any or all of the following:

    i.   by failing to properly investigate and/or evaluate complaints or incidents of excessive and unreasonable force, unlawful seizures, and/or handling of mentally ill or emotionally disturbed persons;

    ii.  by ignoring and/or failing to properly and adequately investigate and discipline unconstitutional or unlawful police activity; and

    iii. by allowing, tolerating, and/or encouraging police officers to: fail to file complete and accurate police reports; file false police reports; make false statements; intimidate, bias and/or "coach" witnesses to give false information and/or to attempt to bolster officers' stories; and/or obstruct or interfere with investigations of unconstitutional or unlawful police conduct, by withholding and/or concealing material information;

h.  To allow, tolerate, and/or encourage a "code of silence" among law enforcement officers and police department personnel, whereby an officer or member of the department does not provide adverse information against a fellow officer or member of the department;

i.  To use or tolerate inadequate, deficient, and/or improper procedures for handling, investigating, and reviewing complaints of officer misconduct made under California Government Code § 910 *et seq.*; and

j.  To fail to have and enforce necessary, appropriate, and lawful policies, procedures, and training programs to prevent or correct the unconstitutional conduct, customs, and procedures described in this Complaint and in

subparagraphs (a) through (h) above, with deliberate indifference to the rights and safety of Plaintiff and the public, and in the face of an obvious need for such policies, procedures, and training programs.

67.     Defendants Chief ADDINGTON, and DOES 1–10, failed to properly hire, train, instruct, monitor, supervise, evaluate, investigate, and discipline Defendants MEJIA, WAITE, GLASPER, PALMA, ELMORE, BERHAN, and DOES 1–10, and other PPD personnel, with deliberate indifference to Plaintiffs' and Decedent's constitutional rights, which were thereby violated as described above.

68.     Defendant ADDINGTON and DOES 1–10 ratified and approved the unconstitutional actions and conduct of Defendants MEJIA, WAITE, GLASPER, PALMA, ELMORE, BERHAN, DOES 1–10, and other PPD personnel, as described above.  Plaintiffs are informed and believe, and thereupon allege, that the details of this incident have been revealed to Defendants ADDINGTON, CITY OF PITTSBURG, and DOES 1–10, and that they had direct knowledge of the fact that the killing of HUMBERTO MARTINEZ was not justified, but represented an unconstitutional use of unreasonable, excessive, and deadly force.  Notwithstanding this knowledge, Defendants ADDINGTON, DOES 1–10, and authorized policymakers within Defendant CITY OF PITTSBURG, approved of the actions and/or omissions of Defendants MEJIA, WAITE, GLASPER, PALMA, ELMORE, BERHAN, and DOES 1–10 that resulted in the death of HUMBERTO MARTINEZ, and they have made a deliberate choice to endorse the actions of Defendants MEJIA, WAITE, GLASPER, PALMA, ELMORE, BERHAN, and DOES 1–10, and the bases for those actions, that resulted in the death of HUMBERTO MARTINEZ.  By so doing, the authorized policy makers within the CITY OF PITTSBURG and the PPD, including Defendant ADDINGTON and DOES 1–10, have shown affirmative agreement with the individual defendant officers' actions, and have ratified the unconstitutional acts of the individual defendant officers.

69.     The aforementioned customs, policies, practices and procedures; the failures to properly and adequately hire, train, instruct, monitor, supervise, evaluate, investigate, and discipline; as well as the unconstitutional orders, approvals, ratification and toleration of wrongful conduct of Defendants ADDINGTON, CITY OF PITTSBURG, and DOES 1–10; were a moving force and a proximate cause of the deprivations of Plaintiffs' and HUMBERTO MARTINEZ's clearly established and well-settled constitutional rights in violation of 42 U.S.C. § 1983, as more fully set forth in ¶¶ 59–60, above.

70.     Defendants subjected Plaintiffs and HUMBERTO MARTINEZ to their wrongful conduct, depriving Plaintiffs and HUMBERTO MARTINEZ of rights described herein knowingly, maliciously, and with conscious and reckless disregard for whether the rights and safety of Plaintiffs, HUMBERTO MARTINEZ, and others would be violated by their acts and/or omissions.

71.     As a direct and proximate result of the unconstitutional actions, omissions, customs, policies, practices, and procedures of Defendants CITY OF PITTSBURG, CHIEF ADDINGTON, DOES 1–10, as described above, Plaintiffs sustained serious and permanent injuries and are entitled to damages, penalties, costs and attorneys' fees as set forth in ¶¶ 62–64, above, and punitive damages against CHIEF ADDINGTON in his individual capacity.

### COUNT THREE
### —VIOLATION OF CIVIL CODE §52.1—
### ALL PLAINTIFFS AGAINST DEFENDANTS MEJIA, WAITE, GLASPER, PALMA, ELMORE, BERHAN, DOES 1-10, AND CITY OF PITTSBURG

72.     Plaintiffs reallege each and every paragraph in this Complaint as if fully set forth here.

73.     Plaintiffs bring this "Bane Act" claim individually for direct violation of their own rights, and as a survival claim pursuant to California Code of Civil Procedure § 377.20 *et seq.* for violation of HUMBERTO MARTINEZ's and their own rights.  By their acts, omissions, customs, and policies, each Defendant, acting in concert/conspiracy as described above, interfered with,

attempted to interfere with, and violated Plaintiffs' and HUMBERTO MARTINEZ's rights under California Civil Code §52.1, and the following clearly established rights under the United States Constitution and the California Constitution:

    a.  HUMBERTO MARTINEZ's right to be free from unreasonable searches and seizures as secured by the Fourth Amendment to the United States Constitution and by Article I, § 13 of the California Constitution (Survival claims only of H.R.M., Jr. and A.M.);

    b.  HUMBERTO MARTINEZ's right to be free from excessive and unreasonable force in the course of arrest or detention, as secured by the Fourth Amendment to the United States Constitution and by Article 1, § 13 of the California Constitution (Survival claims only of H.R.M., Jr. and A.M.);

    c.  HUMBERTO MARTINEZ's right to be free from the unreasonable use of deadly force as secured by the Fourth Amendment to the United States Constitution and by Article 1, § 13 of the California Constitution (Survival claims only of H.R.M., Jr. and A.M.);

    d.  All Plaintiffs' and HUMBERTO MARTINEZ's right to be free from wrongful government interference with familial relationships, and Plaintiffs' right to companionship and society with each other, as secured by the First and Fourteenth Amendments to the United States Constitution (all Plaintiffs' individual claims); and

    e.  The right to protection from bodily restraint, harm, or personal insult, as secured by Cal. Civil Code § 43 (All Plaintiffs' individual claims).

74.    Unlawful deadly force which violates the Fourth Amendment violates the Bane Act.[1] Defendants' use of unlawful deadly force against HUMBERTO MARTINEZ in and of itself constitutes threat, intimidation, or coercion.  Additionally, Defendants violated Plaintiffs' and HUMBERTO MARTINEZ's rights by the following conduct constituting threat, intimidation, or coercion:

    a.  Threatening HUMBERTO MARTINEZ in the absence of any threat presented by HUMBERTO MARTINEZ, or any justification whatsoever;

---

[1] *See Chaudhry v. City of Los Angeles*, 751 F.3d 1096, 1105 (9th Cir. May 19, 2014) (citing *Cameron v. Craig*, 713 F.3d 1012, 1022 (9th Cir. 2013)).

b. Using deliberately reckless and provocative tactics to apprehend HUMBERTO MARTINEZ in violation of generally accepted law enforcement training and standards, and in violation of HUMBERTO MARTINEZ's rights;

c. Pointing guns and causing officers to point guns at HUMBERTO MARTINEZ, threatening the use of deadly force, without justification;

d. Threatening violence against HUMBERTO MARTINEZ, with the apparent ability to carry out such threats, in violation of Civ. Code § 52.1(j);

e. Causing HUMBERTO MARTINEZ to be asphyxiated, without warning and without justification;

f. Violating HUMBERTO MARTINEZ's rights to be free from unlawful seizures by both wrongful arrest and excessive force;

g. Causing and permitting the infliction of repeated applications of unnecessary force on HUMBERTO MARTINEZ, by multiple officers, using multiple modalities of force, using force that was severe and/or deadly, over several minutes;

h. Violating Plaintiffs' and HUMBERTO MARTINEZ's rights to familial association by their use of conscience-shocking excessive force and provocative tactics.

75.     Alternatively or concurrently, the threat, intimidation, and coercion described herein were not necessary or inherent to Defendants' violations of Plaintiffs' rights, or to any legitimate and lawful law enforcement activity.

76.     Further, all of Defendants' violations of duties and rights, and coercive conduct described herein, were volitional acts; none was accidental or merely negligent.

77.     As a direct and proximate result of Defendants' violation of California Civil Code §52.1 and of Plaintiffs' and HUMBERTO MARTINEZ's rights under the United States and California Constitutions, Plaintiffs sustained injuries and damages, and against each and every Defendant is entitled to relief as set forth above at ¶¶ 62–64, above, and punitive damages against Defendants MEJIA, WAITE, GLASPER, PALMA, ELMORE, BERHAN, and DOES 1–10 in their

Case 3:17-cv-04246-LB   Document 1   Filed 07/26/17   Page 26 of 29

individual capacities, including all damages allowed by California Civil Code §§ 52, 52.1 and California law, not limited to costs, attorneys' fees, three times actual damages, and civil penalties.

78.     Defendant CITY OF PITTSBURG is vicariously liable, pursuant to California Government Code § 815.2, for the violation of rights by its employees and agents.

### COUNT FOUR
### —NEGLIGENCE; PERSONAL INJURIES—
### PLAINTIFFS H.R.M., Jr. and A.M. AGAINST ALL DEFENDANTS

79.     Plaintiffs reallege each and every paragraph in this Complaint as if fully set forth here.

80.     At all times, each Defendant owed Plaintiffs H.R.M., Jr.; A.M.; and HUMBERTO MARTINEZ the duty to act with due care in the execution and enforcement of any right, law, or legal obligation.

81.     At all times, each Defendant owed Plaintiffs H.R.M., Jr.; A.M.; and HUMBERTO MARTINEZ the duty to act with reasonable care.

82.     These general duties of reasonable and due care owed to Plaintiffs H.R.M., Jr. and A.M. and HUMBERTO MARTINEZ by all Defendants include but are not limited to the following specific obligations:

a.     to refrain from using excessive and/or unreasonable force against HUMBERTO MARTINEZ;

b.     to refrain from unreasonably creating the situation where force, including but not limited to deadly force, is used;

c.     to refrain from unnecessarily restricting HUMBERTO MARTINEZ's breathing, including failing to follow generally accepted law enforcement standards to prevent positional asphyxia;

d.     to refrain from abusing their authority granted them by law;

e.     to refrain from violating Plaintiffs' rights guaranteed by the United States and California Constitutions, as set forth above, and as otherwise protected by law.

83.     Additionally, these general duties of reasonable care and due care owed to Plaintiffs

H.R.M., Jr.; A.M. and HUMBERTO MARTINEZ by Defendants CITY OF PITTSBURG (acting

through its responsible employees and agents including CHIEF ADDINGTON and DOES 1–10),

CHIEF ADDINGTON, and DOES 1–10, include but are not limited to the following specific

obligations:

    a.    to properly and adequately hire, investigate, train, supervise, monitor, evaluate, and discipline PPD officers under their supervision (including MEJIA, WAITE, GLASPER, PALMA, ELMORE, BERHAN, and DOES 1–10) to ensure that those employees/agents/officers act at all times in the public interest and in conformance with law;

    b.    to make, enforce, and at all times act in conformance with policies, training, and customs that are lawful and protective of individual rights, including Plaintiffs';

    c.    to refrain from making, enforcing, and/or tolerating the wrongful procedures, training, and customs set forth at ¶ 66, above.

84.     Defendants, through their acts and omissions, breached each and every one of the

aforementioned duties owed to Plaintiffs.  Defendant CITY OF PITTSBURG is vicariously liable

pursuant to California Government Code § 815.2

85.     As a direct and proximate result of Defendants' negligence, Plaintiffs and

HUMBERTO MARTINEZ sustained injuries and damages, and against each and every Defendant

is entitled to relief as set forth above at ¶¶ 62–64, above, and to punitive damages against

Defendants MEJIA, WAITE, GLASPER, PALMA, ELMORE, BERHAN, and DOES 1–10.

**COUNT FIVE**
**—ASSAULT AND BATTERY—**
**PLAINTIFFS H.R.M., JR., and A.M. AGAINST DEFENDANTS MEJIA, WAITE,**
**GLASPER, PALMA, ELMORE, BERHAN, DOES 1-10, AND THE CITY OF PITTSBURG**

86.     Plaintiffs reallege each and every paragraph in this Complaint as if fully set forth

here.

87.     The actions and omissions of Defendants MEJIA, WAITE, GLASPER, PALMA, ELMORE, BERHAN, and DOES 1–10 as set forth above constitute assault and battery.  Defendant CITY OF PITTSBURG is vicariously liable pursuant to California Government Code § 815.2.

88.     As a direct and proximate result of Defendants' assault and battery of HUMBERTO MARTINEZ, Plaintiffs sustained injuries and damages, and are entitled to relief as set forth above at ¶¶62–64, above, and to punitive damages against Defendants MEJIA, WAITE, GLASPER, PALMA, ELMORE, BERHAN, and DOES 1–10.

WHEREFORE, Plaintiffs respectfully requests the following relief against each and every Defendant herein, jointly and severally:

a.      compensatory and exemplary damages in an amount according to proof and which is fair, just and reasonable;

b.      punitive damages under 42 U.S.C. § 1983 and California law in an amount according to proof and which is fair, just, and reasonable (punitive damages are not sought against Defendant CITY OF PITTSBURG);

c.      all other damages, penalties, costs, interest, and attorneys' fees as allowed by 42 USC §§ 1983, 1988; California Code of Civil Procedure §§ 377.20 et seq., 377.60 et seq., and 1021.5; California Civil Code §§ 52 et seq., 52.1, and as otherwise may be allowed by California and/or federal law;

d.      Injunctive relief, including but not limited to the following:

i.      an order prohibiting Defendants from engaging in the unconstitutional or unlawful customs, policies, practices, procedures, training and supervision as may be determined and/or adjudged by this case;

ii.     an order requiring Defendants to institute and enforce appropriate and lawful policies and procedures for the use of deadly force and carotid holds;

iii.    an order prohibiting Defendants and their police officers from engaging in the "code of silence" as may be supported by the evidence in this case;

iv.     an order requiring Defendants to train all PPD officers concerning generally accepted and proper tactics and

procedures and this Court's orders concerning the issues raised in injunctive relief requests i-iii, above;

e.      such other and further relief as this Court may deem appropriate.


DATED: July 26, 2017                    HADDAD & SHERWIN LLP


                                        /s/ *Michael J. Haddad*

                                        Michael J. Haddad
                                        Attorneys for Plaintiffs


## JURY DEMAND

Plaintiffs hereby request a trial by jury.


DATED: July 26, 2017                    HADDAD & SHERWIN LLP

                                        /s/ *Michael J. Haddad*

                                        Michael J. Haddad
                                        Attorneys for Plaintiffs