1   NOAH G. BLECHMAN (State Bar No. 197167)
    noah.blechman@mcnamaralaw.com
2   CAMEREN N. RIPOLI (State Bar No. 318045)
    cameren.ripoli@mcnamaralaw.com
3   McNAMARA, NEY, BEATTY, SLATTERY,
    BORGES & AMBACHER LLP
4   3480 Buskirk Avenue, Suite 250
    Pleasant Hill, CA 94523
5   Telephone: (925) 939-5330
    Facsimile:  (925) 939-0203
6
7   Attorneys for Defendants
    CITY OF PITTSBURG, CITY OF PITTSBURG POLICE
    CHIEF BRIAN ADDINGTON, PITTSBURG POLICE
8   OFFICERS ERNEST MEJIA, JASON WAITE, WILLIE
    GLASPER, GABRIEL PALMA, JONATHAN ELMORE,
9   PATRICK BERHAN

10                  UNITED STATES DISTRICT COURT

11               NORTHERN DISTRICT OF CALIFORNIA

12

13

14  HUMBERTO MARTINEZ, Deceased,          Case No. C17-04246 RS
    through his Co0Successors in Interest,
15  H.R.M., Jr., a minor through his mother and   **NOTICE OF MOTION AND**
    Next Friend Priscilla Sandoval                **MEMORANDUM OF POINTS AND**
16  Vanarendonk, individually and as successor   **AUTHORITIES IN SUPPORT OF**
    in interest for HUMBERTO ROSARIO             **DEFENDANTS' MOTION FOR**
17  MARTINEZ, Deceased, and A.M., a minor,       **SUMMARY JUDGMENT/PARTIAL**
    through her mother and Next Friend Tina      **SUMMARY JUDGMENT**
18  Anglin, individually and as successor in
    interest for HUMBERTO ROSARIO                Date:   February 7, 2019
19  MARTINEZ, Deceased; and JAMIE ANN            Time:   1:30 p.m.
    COX, individually,                           Dept:   Courtroom 3, 17th Fl. (USDC-SF)
20                                               Judge: Hon. Richard Seeborg
                   Plaintiff,
21                                               Trial Date:   May 6, 2019
               vs.
22
    CITY OF PITTSBURG, a public entity;
23  CITY OF PITTSBURG POLICE CHIEF
    BRIAN ADDINGTON, in his individual
24  and official capacities; PITTSBURG
    POLICE OFFICERS ERNEST MEJIA,
25  JASON WAITE, WILLIE GLASPER,
    GABRIEL PALMA, JONATHAN
26  ELMORE, PATRICK BERHAN, and
    DOES 1-10, Jointly and severally,
27
                   Defendant.
28

DEFENDANTS' MEMORANDUM OF POINTS AND
AUTHORITIES FOR MSJ/PARTIAL SJ – C17-04246 RS

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

# **TABLE OF CONTENTS**

I. INTRODUCTION ..................................................................................................1

II. ISSUES PRESENTED ..........................................................................................1

III. RELEVANT FACTS ............................................................................................2

    A.    PPD Officers Mejia, Glasper and Waite Attempt to Stop HM's Vehicle
        Due to Expired Registration..................................................................2

    B.    HM Physically Resists Arrest for Over Two and a Half Minutes In the
        Kitchen Until He is Finally Controlled/Handcuffed...............................5

    C.    Assisting PPD Officers Palma, Elmore and Berhan Respond to the Active
        and Prolonged Struggle in the Kitchen Area .......................................8

    D.    Medical Response to HM's Sudden Medical Emergency .......................9

    E.    Coroner's Report and Findings...........................................................10

    F.    The PPD Had Relevant Use of Force Policies and Procedures That
        Allowed Force Options to Control Resistive and Combative Suspects..........12

    G.    The Investigation of the Incident Showed No PPD Policy Violations ..................13

    H.    Other Relevant Exhibits In Support of Motion.....................................13

IV. LEGAL ARGUMENTS ......................................................................................14

    A.    Legal Standards..................................................................................14

        1.    Summary Judgment Standards...............................................14

        2.    Qualified Immunity Standards..............................................15

    B.    Plaintiffs Cannot Demonstrate that the Officers Violated the Fourth
        Amendment by Unlawfully Seizing HM ...............................................16

        1.    Officers Had Reasonable Suspicion to Detain and/or Probable
            Cause to Arrest HM for the Registration and Other Violations.................17

        2.    The Officers are Clearly Entitled to Qualified Immunity............................18

    C.    Plaintiffs Cannot Demonstrate that the Officers Violated the Fourth
        Amendment by Using Unreasonable Force Against HM .......................19

        1.    Plaintiffs Cannot Demonstrate Evidence that the Force Used by
            Officers was Objectively Unreasonable....................................19

            a.    Mejia and Glasper Used Objectively Reasonable Force.................21

b. Officer Waite's Limited Force was Appropriate ...........................22

c. Officer Elmore's Use of Force Was Appropriate ..........................23

d. Officer Palma's Limited Force Was Justified and Lawful .............24

e. Officer Berhan's Taser Deployment was Justified and Lawful .......................................................................................24

D. Plaintiffs Cannot Demonstrate A Claim for Wrongful Government Interference with Familial Relationship (14th Amendment) ...................................25

E. Plaintiffs Cannot Demonstrate a Viable *Monell* Claim Against the City of Pittsburg or Chief Addington.........................................................................26

1. Plaintiffs Cannot Show a Custom or Policy Led to Any Constitutional Violation (Count 2(a)(g)-(j)) ...............................................26

2. Plaintiffs Cannot Show a Failure to Train Led to Any Constitutional Violation (Count 2(b)-(f)(j)) ......................................................27

3. Plaintiffs' Ratification Theory Fails As Well (Count 2(g)-(i)) ...................29

F. Plaintiffs' Related State Law Claims Also Fail ........................................29

V. CONCLUSION.............................................................................................................30

McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

**TABLE OF AUTHORITIES**

**Cases**

*A.D. v. Cal. Highway Patrol, 712 F.3d 446, 454* (9th Cir. 2013)......................................................26

*Addisu v. Fred Meyer Inc.,* 198 F.3d 1130, 1134 (9th Cir. 2000)..............................................15

*Aleghretti v. City & County of San Francisco*, U.S. Dist. LEXIS at 30-31 (N.D. Cal. 2014)........29

*Alexander v. Cty. of L.A.,* 64 F.3d 1315, 1322 (9th Cir. 1995)................................................16, 18

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) .................................................14, 15

*Arpin v. Santa Clara Valley Transp. Agency,* 261 F.3d 912, 922 (2000) .................................23

*Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) ....................................................................15

*Ashcroft v. Iqbal,* 556 U.S. 662, 677 (2009)......................................................................15, 20

*Atwater v. City of Lago Vista,* 532 U.S. 318, 354 (2001) ..........................................17, 18, 19

*Ayala v. City of S. San Francisco*, U.S. Dist. LEXIS 54051 at 32-33 (N.D. Cal. 2007) ...............28

*Bhan v. NME Hospitals, Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991) ...................................14, 15

*Blankenhorn v. City of Orange,* 485 F.3d 463, 484 (9th Cir. May 8, 2007)................................28

*Board of the County Comm'rs v. Brown*, 520 U.S. 397, 409 (1997) .......................................28

*Brosseau v. Haugen*, 543 U.S. 194, 197 (2004) ..............................................................16, 19

*Brown v. Ransweiler,* 171 Cal. App. 4th 516, 537-538 (2009)..............................................30

*Bryan v. MacPherson*, 630 F.3d 805, 825 (9th Cir. 2010) ..................................................25

*Cabrera v. City of Huntington Park*, 159 F.3d 374, 380 (9th Cir. 1998) .............................17

*California v. Hodari D.*, 499 U.S. 621, 626-28 (1991)......................................................18

*Cameron v. Craig*, 713 F.3d 1012, 1022 (9th Cir. 2013) ..................................................30

*Carlo v. City of Chino*, 105 F.3d 493, 500 (9th Cir. 1997)...............................................16

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).................................................14, 15

*City and County of San Francisco v. Sheehan,* 135 S. Ct. 1765, 1774 n.3 (2015) .....................15

*City of Canton v. Harris,* 489 U.S. 378, 388 (1989)......................................................27

*City of Oklahoma City v. Tuttle,* 471 U.S. 808, 823-24 (1985) ......................................26, 27

*City of St. Louis v. Praprotnick,* 485 U.S. 112, 127 (1988).............................................29

*Clouthier v. County of Contra Costa*, 591 F.3d 1232, 1249 (9th Cir. 2010) ..........................27

McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

1  *Edgerly v. City & Cty. of San Francisco*, 599 F.3d 946, 956 (9th Cir. 2010); ...............................19

2  *Franklin v. Fox*, 312 F.3d 423, 437 (9th Cir. 2002) ..........................................................15

3  *Gillette v. Delmore,* 979 F.2d 1342, 1348 (9th Cir. 1992)......................................................27, 29

4  *Gonzalez v. City of Anaheim,* 747 F.3d 789, 793 (9th Cir. 2014)..............................................26

5  *Graham v. Connor*, 490 U.S. 386, 388 (1989) ...................................................................... passim

6  *Gregory v. Maui*, 523 F. 3d 1103, 1107 (9th Cir. 2008)........................................................19

7  *Hayes v. Cnty. of San Diego*, 57 Cal. 4th 622, 629, 160 (2013) ...............................................30

8  *Hopkins v. Bonvicino*, 573 F.3d 752, 769-70 (9th Cir. 2009)..................................................20

9  *Hunter v. Bryant*, 502 U.S. 224, 228 (1991)........................................................................18

10  *Isayeva v. Sacramento Sheriff's Dep't*, 872 F.3d 938, 951 (9th Cir. 2017)............................16

11  *Johnson v. Bay Area Rapid Transit Dist.,* 724 F.3d 1159, 1168-69 (9th Cir. 2013) ...............25

12  *Lee v. City of Los Angeles*, 250 F.3rd 668, 685 (9th Circuit 2001) ........................................25

13  *Lynn v. Sheet Metal Workers Int'l Ass'n*, 804 F.2d 1472, 1478 (9th Cir. 1986) .....................14

14  *M.H. v. Cty. of Alameda*, 62 F. Supp. 3d 1049, 1093-94 (N.D. Cal. 2014)..............................16

15  *Malley v. Briggs*, 474 U.S. 335, 341 (1986) .........................................................................16

16  *Mendez v. Montour*, U.S. Dist LEXIS 39453 at. 3-4 (N.D. Cal. 2014) ....................................20

17  *Menuel v. City of Atlanta*, 25 F.3d 990, 995 (11th Cir. 1994) ...........................................20, 21

18  *Messerschmidt v. Millender*, 132 S.Ct. 1235, 1244-1245 (2012) ............................................16

19  *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) ......................................................................16

20  *Monell v. Dep't of Soc. Servs. of the City of New York*, 436 U.S. 658, 694 (1978) ............... passim

21  *Montez v. City of Stockton,* U.S. Dist. LEXIS 94180 (2017)..............................................29, 30

22  *Moore v. City of Berkeley*, U.S. Dist. LEXIS 142710 (N.D. Cal. 2016) ..................................23

23  *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015)....................................................................15, 22

24  *Nelson v. City of Davis*, 709 F. Supp. 2d 978, 992 (E.D. Cal. 2010)........................................30

25  *People v. Castellon,* 76 Cal.App.4th 1369, 1373 (1999) .........................................................17

26  *Picket v. Nguyen*, U.S. Dist LEXIS 177752 at 11 (N.D. Cal. 2016)........................................17

27  *Plumeau v. Sch. Dist. No. 40 Cnty. of Yamhill*, 130 F.3d 432, 438 (9th Cir. 1997) .....................26

28  *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008) .........................................................25

McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

*Redmond v. San Jose Police Department*, U.S. Dist. LEXIS 190087 (N.D. Cal. 2017) ...............36

*Richardson v. McKnight*, 521 U.S. 399, 408 (1997)..................................................................15

*Roy v. Inhabitants of City of Lewiston*, 42 F.3d 691, 695 (1st Cir. 1994) .............................22

*Santiago v. Fenton*, 891 F.2d 373, 382 (1st Cir. 1989)............................................................29

*Saucier v. Katz*, 533 U.S. 194, 206 (2001) .............................................................................16

*Scott v. Harris*, 550 U.S. 372, 386 (2007) .............................................................................20

*T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) ........14

*Tennessee v. Garner*, 471 U.S. 1, 8–9 (1985).........................................................................16

*Terry v. Ohio*, 392 U.S. 1, 30 (1968) .....................................................................................17

*United States v. Al Nasser*, 555 F.3d 722, 729 (9th Cir. 2009)..............................................18

*United States v. Choudhry*, 461 F.3d 1097, 1100 (9th Cir. 2006) .........................................17

*United States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007) ...............................................17

*United States v. Santana*, 427 U.S. 38, 43 (1976) .................................................................19

*United States v. Smith*, 790 F.2d 789, 792 (9th Cir. 1986) ...................................................17

*United States v. Sokolow*, 490 U.S. 1, 7 (1989) .....................................................................17

*United States v. Williams*, 419 F.3d 1029, 1032-33 (9th Cir. 2005).....................................17

*Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002)...........................14

*Weishaar v. Cnty. of Napa*, 2016 U.S. Dist. LEXIS 173833, at *37 (N.D. Cal. 2016) .................29

*White v. Pauly*, 137 S. Ct. 548, 552 (2017) .......................................................................15, 16

*Whren v. United States*, 517 U.S. 806, 810 (1996) ...............................................................17

*Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010) ........................................................26

*Zion v. County of Orange*, 874 F.3d 1072, 1077 (9th Cir. 2017) ...........................................26

**Statutes**

42 U.S.C. § 1983...........................................................................................................16, 17, 29

California Civil Code § 52.1 ......................................................................................................29

California Penal Code § 69 .........................................................................................................21

California Penal Code § 245(c).....................................................................................................21

California Penal Code § 835a ....................................................................................................12

McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

California Vehicle Code § 4000(a) ...................................................................................3, 17, 18

Federal Rule of Civil Procedure 56 ........................................................................................1, 14

McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

1

### NOTICE

2    TO PLAINTIFFS' COUNSEL, PLEASE TAKE NOTICE that on February 7, 2019, at

3    1:30 p.m., in Courtroom 3, 17th Floor, located at 450 Golden Gate Ave., San Francisco,

4    California, or as soon thereafter as this matter can be heard, Defendants will and do move for

5    Summary Judgment and/or Partial Summary Judgment in relation to <u>Plaintiffs' Complaint</u>, **<u>Ex. A</u>**

6    (ECF 1) in this case.  This Motion is made pursuant to FRCP 56 on the grounds that there are no

7    genuine issues of material fact and Defendants are entitled to judgment as a matter of law as to

8    Plaintiffs' claims.  This Motion is based on this Notice, Memorandum of Points and Authorities,

9    the supporting Declaration of Noah G. Blechman and attached exhibits (all attached to Blechman

10   Decl.) and such further evidence and oral argument as may be presented on this matter.

### MEMORANDUM OF POINTS AND AUTHORITIES

11

### I. INTRODUCTION

12

13   On the afternoon of July 26, 2016, Decedent Humberto Martinez ("HM"), while under the

14   influence of methamphetamines and alcohol, failed to stop for a routine traffic stop, instead fled

15   in his vehicle, then fled on foot and ran into a garage and then into a house, not his house, leading

16   to a prolonged struggle (**<u>over two and a half minutes</u>**) with uniformed officers of the Pittsburg

17   Police Department (PPD) until officers were finally able to get HM controlled and handcuffed.

18   <u>The evidence is undisputed that the PPD officers were solely trying to get HM into handcuffs, as</u>

19   <u>can be seen in the various body camera videos and video matrixes.</u>  After he was handcuffed, HM

20   had a medical emergency and later died at a hospital.  The crux of this case relates to Plaintiffs'

21   allegations that the six officers used excessive force and caused HM's death, among other related

22   claims.  However, video and testimonial evidence in this case demonstrates that the involved

23   officers acted in an objectively reasonable manner and/or are entitled to qualified immunity for

24   their actions in this rapidly dynamic struggle with the very large (<u>286.5 pounds</u>), combative and

25   resistive HM.  Defendants should prevail on this Motion, either in full or in part, per below.

### II. ISSUES PRESENTED

26

27   A.  Whether PPD Officers unlawfully seized HM in violation of the 4th Amendment?

28   B.  Whether PPD Officers used excessive force on HM in violation of the 4th Amendment?

C. Whether the individual PPD Officers are entitled to qualified immunity?

D. Whether Plaintiffs' have any viable claim for a violation of their rights to familial relationship in violation of the 14th Amendment?

E. Whether Plaintiffs' have any viable *Monell* claim(s) against the City Pittsburg or Chief Brian Addington?

F. Whether Plaintiffs' have any viable related state law claims against the PPD Officers for violations of the Bane Act, Negligence, and Battery?

## III. **RELEVANT FACTS**

### A. **PPD Officers Mejia, Glasper and Waite Attempt to Stop HM's Vehicle Due to Expired Registration**

On July 26, 2016, PPD Officers Mejia, Glapser and Waite (hereafter only referred to by last name) were on patrol as a part of the PPD Street Crimes Unit (SCU), driving a white, unmarked patrol vehicle equipped with flashing emergency lights and sirens. **Ex. B**, Mejia Depo, 52:15-25,54:20-55:5,56:4-8; **Ex. C**, Sgt. Law Decl., ¶ 5 (see also **Ex. V** (photos and video of SCU car)). The officers wore full PPD police uniforms, their duty belts, service firearms, police vests and clothing with "police" written on them. **Ex. B**, 56:18-57:7; **Ex. D**, Glasper Depo, 39:24-40:12; **Ex. E**, Waite Depo, 27:12-14. The SCU is a part of the PPD patrol division where PPD officers conduct proactive enforcement and traffic stops for violators of the law. **Ex. B**, 52:15-53:11. At approximately 2:30 p.m., the officers were driving on Hillview Dr., a known narcotics area, in Pittsburg, when their attention was drawn to the residence located at 4289 Hillview Dr.. **Ex. B**, 62:2-14,59:18-60:8; **Ex. E**, 27:15-22. The officers' saw a 1998 four-door Infiniti ("Infiniti") vehicle parked in front of 4289 Hillview Dr., with an unidentified subject leaning in through the front passenger window. **Ex. B**, 62:5-14; **Ex. D**, 48:1-10. It was later determined that HM was the driver of the Infiniti and he was on probation. **Ex. C**, ¶ 9; **Ex. F**, Plaintiffs' Responses to Defendants' Requests for Admissions, Set One, Requests 1, 3. The Infiniti was owned by Plaintiff Jaime Cox, HM's mother, but she lent the Infiniti to HM. **Ex. G**, Cox Depo, 38:17-21. It was also determined later that HM had a felony "no bail" warrant out for his arrest as of early July of 2016, which was outstanding at the time of this incident of July 26th. **Ex. C**, ¶

McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

9.

Suspecting HM might have been involved in illegal activity, the officers parked their patrol vehicle on the side of Hillview Dr. to monitor the area. **Ex. B**, 62:25-63:14; **Ex. D**, 49:14-24. Moments later, HM drove away and passed the officers' vehicle so the officers then began to follow HM's vehicle, though no emergency lights or sirens were yet activated. **Ex. B**, 63:15-18, 67:13-23; **Ex. D**, 51:6-24. Glasper used his radio to call into dispatch to conduct a records check on the license plate of the Infiniti. **Ex. B**, 64:20-65:2; **Ex. D**, 53:15-54:8. Dispatch informed the officers that <u>the Infinity's registration was expired</u>. *Id*; **Ex. F**, Request 4; **Ex. G**, 40:22-41:20. <u>Plaintiff Ms. Cox, the registered owner of the vehicle, admitted that the Infiniti's registration was</u> <u>expired at the time of this incident</u>. *Id*. The officers then attempted to conduct a traffic stop for a violation of California Vehicle Code ("CVC") 4000(a), expired vehicle registration. **Ex. B**, 67:13-23; **Ex. D**, 57:7-25; **Ex. F**, Request 5.

Mejia activated the patrol vehicle's emergency lights and sirens, but HM failed to yield and instead HM accelerated through residential streets away from the officers. **Ex. B**, 67:24-68:10; **Ex. D**, 58:12-60:15; **Ex. E**, 29:21-30:24. A brief vehicle pursuit then ensued through the residential neighborhood near Hillview Dr. *Id*; **Ex. F**, Requests 8, 10-11. The pursuit lasted approximately two minutes and both vehicles travelled at approximately 30-50 mph, above the speed limit, through the residential streets. **Ex. B**, 67:24-68:10; **Ex. D**, 58:12-60:15; **Ex. E**, 30:1-24. HM showed a complete disregard for the safety of the officers and the community during the pursuit by committing multiple CVC violations (running stop signs, driving on the wrong side of the roadway) while fleeing. **Ex. D**, 59:5-18. HM drove around the neighborhood and retuned back to the front of 4289 Hillview Dr.. **Ex. B**, 68:11-18; **Ex. D**, 62:16-20; **Ex. E**, 30:14-19.

HM abruptly stopped the car in front of 4289 Hillview Dr. and fled on foot towards the residence. **Ex. F**, Requests 14-15. Surveillance video from a neighbor across the street, as well as body camera video of most of the involved officers, captured footage of HM's flight on foot from his Infiniti towards the house and then the struggle. **Ex. H**, Expert Schott's Rule 26 Report and Demonstrative Exhibits (*see* MATRIX 1.1 REAL TIME ("MATRIX RT"), running time 1:12; *see also* MATRIX 1.1 SLO-MO ("MATRIX SM") for a slower motion version). Note, **Ex.**

McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

**H** includes a folder (Source Videos - Body Camera Videos) for all eleven body camera videos regarding the incident and the surveillance video from the neighbor, including the ones included the video matrixes, if any of those want to be viewed individually by the Court, as well as other relevant demonstrative exhibits.

At the time HM fled on foot, HM had not been checked for weapons by officers. **Ex. F**, Request 17.  HM ran around the front of the car's hood and continued up the driveway and towards the half opened garage door. **Ex. B**, 76:17-77:10; **Ex. D**, 62:16-63:5; **Ex. E**, 33:8-15; **Ex. F**, Request 15.  It was unknown if HM was armed because he exited his vehicle rapidly and was wearing cargo shorts and a large white t-shirt that hung down and obstructed his waist. **Ex. B**, 77:11-25; **Ex. H**, MATRIX RT, 1:12.  Additionally, HM's back was to the officers and his arms were kept low by his waist. **Ex. B**, 78:1-8; **Ex. D**, 63:9-19; **Ex. H**, MATRIX RT, 1:12-1:18.  As HM ran towards the garage, he looked over his left shoulder and made eye contact with Mejia who was dressed in his uniform. **Ex. B**, 78:9-20; **Ex. F**, Request 20.  As HM fled on foot, had his arms by his waist and was not responding to commands, Mejia deployed his Taser towards HM's back, near the front lawn of the residence, but <u>this was ineffective as one probe missed HM altogether</u>. **Ex. B**, 81:5-82:12.  Instead of stop or comply, HM then ran into the garage of the residence. **Ex. B**, 82:13-17; **Ex. F**, Request 21; **Ex. H**, MATRIX RT, 1:20.

Without knowing the dangers lurking, per their sworn duty, Mejia and Glasper pursued HM into the garage. **Ex. B**, 83:13-24; **Ex. D**, 65:7-66:2.  After the officers' eyes adjusted from the summer sunlight to the darkness of the garage, HM could be seen on the ground, on his buttocks, on the far left side of garage, crawling backwards. **Ex. B**, 83:13-24; **Ex. H**, MATRIX RT, 1:24.  HM was given additional commands to get his hands up and to stop, but did not comply. *Id*; **Ex. D**, 69:1-16.  Mejia noticed at least two other occupants on the right side of the garage, later determined to be Tiffany DeWolfe and Jeffrey Wachtler. **Ex. B**, 84:9-85:9.  Mejia drew his service firearm and commanded everyone not to move. *Id*.  Officers had still not been able to check HM for any weapons.   **Ex. F**, Request 32.  HM continued to escalate the situation by failing to abide by commands and then dashed towards and through a door leading into the kitchen of the residence.   **Ex. B**, 89:21-90:8; **Ex. D**, 78:15-18; **Ex. F**, Request 33; **Ex. H**,

McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

1   MATRIX RT, 1:28.  An extended physical struggle then ensued inside the kitchen of the house.

2   **Ex. H**, MATRIX RT, 1:28-4:08 (**over two and a half minutes long**).

3         **B.**     **HM Physically Resists Arrest for Over Two and a Half Minutes In the**
             **Kitchen Until He is Finally Controlled/Handcuffed**

4

5         Mejia re-holstered his firearm and he and Glasper pursued HM into the kitchen.  **Ex. B**,

6   89:23-90:12; **Ex. D**, 78:14-22.  Around that time, Waite had entered the garage and was covering

7   the two occupants while Mejia/Glasper were in the kitchen.  **Ex. E**, 33:16-35:5, 38:8-16.  Once in

8   the kitchen, HM stopped and turned to face off with Mejia.  **Ex. B**, 90:13-17.  Mejia immediately

9   grabbed for HM's arm to place him under arrest, but HM vigorously pulled away several times.

10  **Ex. B**, 91:11-22, 92:3-8; **Ex. D**, 79:5-17, 80:10-14.  As Mejia and Glasper struggled with HM

11  over control of HM's hands, the struggle continued and then all three ended up on the kitchen

12  floor.  **Ex. B**, 92:25-93:19, 95:13-96:4; **Ex. D**, 78:23-80:14; **Ex. F**, Request 37. Officers had still

13  not been able to check HM for weapons up to that point.  **Ex. F**, Request 35.

14        The struggle on the floor occurred between the door from the garage to the kitchen and the

15  center island of the kitchen, a small, confined area.[1]  **Ex. B**, 93:20-94:5; **Ex. I**, Photos of Kitchen

16  Area.  **Two knives** can be clearly seen on the island countertop, close to the area of the struggle.

17  **Ex. I**.  Once on the floor, HM was lying down on his right-hand side, Mejia was kneeling facing

18  HM's back, while Glasper attempted to gain control of HM's lower half and one arm, though

19  HM's body was rigid, including his arms.  **Ex. B**, 92:25-93:19; **Ex. D**, 80:10-82:17,83:1-19.  HM

20  kicked Glasper in his legs which cause Glasper to lose control of HM's arm.  *Id*.  Officers could

21  not see what was in HM's hands or waistband.  *Id*.  HM continued to resist on the floor by sliding

22  and pulling away from officers and refused to give up his hands.  **Ex. B**, 95:1-8.

23        At this point, Mejia was exhausted from the prolonged struggle, after chasing HM into the

24  house and now being in a physical altercation with a significantly larger man (286.5 pounds and

25  who was on methamphetamines).  **Ex. B**, 96:16-97:21.  During the struggle, HM displayed

26  exceptional strength and was able to break free from both officers and turn his body so he was

27

28  _____

[1] Due to the violence of the struggle, Ofc. Mejia's body camera was inadvertently shut off during
much of the struggle in the kitchen.  (**Ex. B**, 94:6-25; **Ex. G**, MATRIX RT, 1:52 (shuts off)).

McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

1  face-to-face with Mejia on the floor. *Id*. Mejia took this opportunity to issue two compliance

2  strikes to HM's face. *Id*. Glasper delivered 3-5 strikes to HM's left torso area once he lost

3  control of HM's arm. **Ex. D**, 86:11-87:1, 89:5-90:12. This was a very high stress situation for

4  officers who were dealing with a reckless and potentially armed individual who was violently

5  resisting arrest. **Ex. B**, 97:22-98:16; **Ex. D**, 87:17-88:4. HM continued to show no signs of

6  slowing down and was successfully resisting both officers' efforts to detain him. *Id*. HM

7  continued to resist by attempting to stand up. **Ex. B**, 98:22-99:23. By this point, HM's body had

8  shifted again so his back was to Mejia and the two were in a lying down, spooning type position.

9  *Id*. Due to HM's incredible strength and size, HM was able to lift Mejia's body off the ground as

10  HM attempted to stand up. *Id*. In order to avoid being placed in an extremely vulnerable position

11  where HM would have access to a number of potentially deadly items within the kitchen (like

12  knives on the kitchen island in **Exh. I**), Mejia wrapped his left arm around HM's upper

13  chest/neck area and pulled HM back to the ground. **Ex. B**, 99:18-100:10. Glasper continued to

14  deliver compliance strikes to HM's torso, to no avail in gaining compliance. **Ex. D**, 90:13-91:8,

15  94:23-95:13. HM continued thrashing around violently and both officers' combined efforts were

16  still not enough to contain HM's movements. *Id*. Glasper continued to give commands for HM

17  to "show us your hands," but HM ignored all commands and continued to resist. *Id*. As a result

18  of the striking HM, Glasper injured his hand so he had to transition to elbow strikes and knee

19  strikes to seek compliance. *Id*. Glasper delivered the elbow and knee strikes to HM's left torso in

20  an attempt to gain control, but this had no visible effect on HM and did not gain control. *Id*.

21  HM was so combative that Mejia believed that he and Glasper were being overpowered

22  and would not be able to successfully detain HM. **Ex. B**, 100:24-101:4. Mejia quickly then

23  decided to attempt a <u>carotid restraint hold</u> ("carotid hold") in order to gain control of HM and end

24  the struggle. **Ex. B**, 101:4-25. Mejia attempted to apply the carotid hold by placing his left bicep,

25  Mejia's weak hand, around HM's neck area and his right forearm on the right side of HM's neck.

26  *Id*. Mejia was unable to fully apply the carotid hold because he lost his balance as HM

27  continually tried to lift Mejia off of the ground. *Id*. HM almost rolled on top of Mejia several

28  times which required Mejia to plant his right hand on the floor in order to not to be overpowered.

McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

*Id*. While Mejia was attempting the carotid hold, <u>HM struck Mejia by head-butting Mejia's chest and chin area</u>. **Ex. B**, 102:25-103:6. Additionally, while attempting to apply the carotid hold, Mejia's left leg got caught underneath HM's large body and caused painful pressure on Mejia's left knee, so Mejia screamed out in pain, "my leg!," causing Glasper to believe Mejia was unable to continue to assist. **Ex. D**, 97:12-20,100:2-7. After the pain to his knee, <u>Mejia heard HM snoring and felt him momentarily stop resisting</u> so Mejia told Glasper that HM was unconscious. **Ex. B**, 106:1-107:3; **Ex. D**, 104:3-9. Glasper then frantically attempted to handcuff HM's hands while Mejia tried to assist. *Id*. As Mejia reached for HM's left hand, which now had one handcuff secured to it, he was face-to-face with HM.[2] *Id*. While face-to-face with Mejia, <u>HM then deviously smiled and shockingly reignited his resistance by pulling his left hand away from Mejia so the struggle continued, now with one handcuff on HM</u>. **Ex. B**, 107:4-12,108:5-8; **Ex. D**, 103:22-104:18. <u>HM turned his head and bit Mejia's hand,</u> planted on the floor, breaking the skin and causing some bleeding. **Ex. B**, 111:6-112:24; **Ex. D**, 108:15-22. <u>Mejia only attempted the carotid hold once,</u> causing HM to go unconscious initially, but did not apply it again and only held onto HM to keep him down. **Ex. B**, 108:19-109:10, 116:13-17.

Around the time Mejia was bitten by HM, Mejia began to call for Waite to come and assist. **Ex. B**, 113:17-20; **Ex. E**, 38:5-21. Waite had been in the garage keeping an eye on the two individuals inside. **Ex. E**, 38:22-39:16. After hearing Mejia plead for assistance, Waite entered into the house through the same door connecting the garage and kitchen.[3] **Ex. E**, 38:22-39:13. When Waite entered the house, he saw Mejia attempting to control HM's upper body and Glasper around HM's lower body. **Ex. E**, 39:25-40:25, 42:2-7. Waite's objective was to secure

---

[2] HM's left hand had one handcuff on it (from Mejia and Glasper following the successful carotid hold restraint initially). Officers know that a loose handcuff could be used as a weapon to inflict serious injury. **Ex. B**, 106:19-107:10. This lone handcuff on the left arm can be seen on the video (and Waite's body camera video) as officers are attempting to attach a second set of handcuffs to the lone handcuff due to HM's size and the extended struggle to make it easier to ultimately handcuff and secure him. **Ex. H**, MATRIX RT, 3:21-3:27.

[3] Waite entered the house <u>approximately **75 seconds** after Mejia and Glasper</u> pursued HM into the house. *See* **Ex. H**, MATRIX RT, HM enters house with officers at 1:28, Waite enters house at 2:43. Other officers (Elmore, Berhan and Palma) then arrive and enter at 3:43 (**135 seconds** after the struggle started in the house).

1    both of HM's hands in handcuffs and bring this struggle to a conclusion as quickly as possible.

2    **Ex. E**, 44:4-17.  Waite assisted Glapser, who was holding HM's left hand behind his back, by

3    holding onto the loose end of the handcuffs that was attached to HM's left wrist.  **Ex. H**,

4    MATRIX RT, 3:15-3:33.  As Waite felt that it would be quicker and easier for the officers to

5    obtain the second arm needed to complete the handcuffing process if he used multiple pairs of

6    handcuffs, Waite chained two handcuffs by connecting the pair previously connected to HM's left

7    wrist and a new pair that he removed from his duty belt.  **Ex. E**, 46:6-18.  HM continued to resist,

8    despite commands to stop resisting, which prevented officers from successfully handcuffing HM

9    at that point.  **Ex. E**, 43:16-24; **Ex. H**, MATRIX RT, 3:15-3:33.  <u>At no point did Ofc. Waite</u>

10   <u>deliver any strikes or blows to HM</u>.  **Ex. E**, 47:9-18; **Ex. H**, MATRIX RT.  As HM continued to

11   struggle, and the officers began to fatigue, it felt like an eternity had passed before additional PPD

12   officers arrived as backup in the kitchen.  **Ex. E**, 45:6-14; **Ex. H**, MATRIX RT, 3:43 (*see*

13   <u>Footnote 3</u>).

14        C.   **<u>Assisting PPD Officers Palma, Elmore and Berhan Respond to the
           Active and Prolonged Struggle in the Kitchen Area</u>**

15

16        PPD Officers Palma, Elmore, and Berhan responded to the scene around the same time

17   and entered the house together through the front door.  **Ex. J**, <u>Palma Depo</u>, 32:3-12;33:2-17.

18   Prior to arriving, these officers received a radio communication indicating that there were officers

19   actively involved in a physical altercation with a suspect.  **Ex. K**, <u>Elmore Depo</u>, 25:6-24.  As the

20   officers entered, they saw Mejia, Glasper, and Waite involved in a physical struggle with HM.

21   **Ex. J**, 32:3-12; **Ex. K**, 32:19-33:2; **Ex. L**, <u>Berhan Depo</u>, 33:10-23.  At this time, HM was on his

22   side, Mejia was low to the ground and around HM's upper torso, Glasper was near HM's legs and

23   Waite was trying to grab an arm in order to handcuff HM.  **Ex. J**, 32:13-33:1; **Ex. K**, 32:19-

24   33:10; **Ex. L**, 33:10-18.  The officers' first priority was to get control of HM's hands.  **Ex. J**,

25   35:20-36:16; **Ex. K**, 32:19-33:10.  Palma and Elmore joined the struggle and wrestled with HM

26   in an attempt to pull both arms behind his back and handcuff him.  *Id*.  While Palma and Elmore

27   attempted to get control of HM's arms, Berhan assisted by deploying his Taser in the probe mode,

28   from about one to two feet away, for a five second cycle, to HM's left thigh because HM was still

McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

actively resisting. **Ex. L**, 35:11-15, 46:19-24. Elmore noted that Mejia appeared to be caught underneath HM's body which caused Mejia to cringe in pain. **Ex. K**, 35:10-23. Officers then heard Mejia say "he's biting me, he's biting me!" **Ex. J**, 41:1-42:9; **Ex. K**, 35:10-23; **Ex. L**, 46:7-24. Elmore saw Palma using both of his arms to try to secure HM's arms, but was unable to get HM's arms free. **Ex. J**, 35:12-25. Elmore then delivered several closed fist strikes to HM's lower back/torso area. **Ex. J**, 36:1-20. After the strikes, HM was rolled onto his stomach where Elmore and Palma were finally able to secure both of HM's hands behind his back in handcuffs. **Ex. K**, 37:5-38:15. While Palma and Elmore were completing the handcuffing process, Mejia stated that HM was still trying to actively bite Mejia. **Ex. K**, 39:5-8; **Ex. H**, MATRIX RT, 4:10-4:15. After HM was finally handcuffed, Elmore informed Mejia it was safe for him to let go. **Ex. J**, 44:7-14; **Ex. K**, 38:16-39:4;39:5-40:7. After HM fled into the house and struggled with numerous officers, the force options and strength of the additional officers eventually overpowered HM after a **two and a half minute struggle** in the kitchen. *See* **Ex. H**, MATRIX RT, HM enters house with officers at 1:28, struggle ends around 4:05, then finally in handcuffs at 4:23 (radio cord of an officer got stuck in the handcuff at the end).

### D.   Medical Response to HM's Sudden Medical Emergency

Once HM was finally in handcuffs, Mejia removed himself from HM and Elmore applied pressure with his right hand to the side of HM's head and put his knee on HM's upper back to hold him down and deter him from further violence. **Ex. K**, 48:1-7. The majority of Elmore's weight was on his left hand, on a nearby piece of furniture, and his left foot was extended and supporting his weight. **Ex. K**, 57:18-58:2. Palma squatted over HM's torso and used his knees to prevent a further struggle by HM. **Ex. J**, 46:5-17. At this point, Elmore was holding down the upper part of HM's body, Palma was squatting over HM's torso and Berhan was closer to HM's legs. **Ex. J**, 44:15-23; **Ex. K**, 48:1-7. Since HM was secured, Elmore radioed that no further police assistance was needed and called for medical personnel to respond to the scene (Code 2) due to the Taser being used. **Ex. K**, 48:8-19; **Ex. H**, MATRIX 4PLEX-SYNC+2, 0:58.[4]

---

[4] This is another matrix of videos that essentially starts at the point in time after handcuffing and up and through all the CPR efforts and transport of HM from the scene.

Approximately thirty seconds after calling for medical assistance, all of the officers who secured HM on the ground stood up and no longer applied any force or contact. **Ex. L**, 53:5-13. Elmore bent down and checked HM's breathing and **confirmed he was still breathing**. **Ex. J**, 51:21-24; **Ex. K**, 60:21-23; **Ex. H**, MATRIX 4PLEX-SYNC+2, 1:53-2:02.   Next, Elmore and Palma searched HM's pockets for weapons while was HM was on his stomach and pulled up his boxer shorts. **Ex. J**, 52:23-53:4; **Ex. H**, MATRIX 4PLEX-SYNC+2, 2:10-2:45.   After completing the search for weapons, Elmore noticed that HM's face was beginning to turn purple. **Ex. J**, 51:14-52:15; **Ex. K**, 59:10-60:24; **Ex. L**, 53:14-54:3; **Ex. H**, MATRIX 4PLEX-SYNC+2, 2:46. HM was immediately rolled onto his side and the handcuffs were removed while officers assessed his condition. **Ex. J**, 53:3-4; **Ex. K**, 60:24-61:4.   Elmore and arriving PPD Ofc. Smith began life saving efforts by performing cardiopulmonary resuscitation (CPR), including compressions and breaths, until the paramedics arrived. **Ex. K**, 61:5-14, 66:7-12; **Ex. H**, MATRIX 4PLEX-SYNC+2, 2:46-.   It should be noted that PPD officers also cleared the residence of other occupants and located a very young girl in a back bedroom. **Ex. H**, Source Videos-Body Camera Video-Waite, 6:00-6:30.

American Medical Response (AMR) ambulance personnel, Juarez and Lopez, arrived on scene at approximately 2:48 p.m. **Ex. M**, Juarez Depo, 28:10-12; **Ex. N**, Lopez Depo, 14:25-15:2. While on route, the emergency medical units were informed that they needed to respond in an emergency fashion. **Ex. M**, 10:3-7; **Ex. N**, 12:3-13:4.   AMR took over CPR and began performing other life saving measures on HM. **Ex. M**, 9:20-11:18.   Contra Costa County Fire medical personnel arrived a short time later and assisted in the treatment of HM. *Id.* HM showed some signs of life, including regaining a pulse, so he was transported by ambulance to John Muir Hospital in Concord, arriving around 3:30 p.m. **Ex. M**, 42:20-23; **Ex. O**, Manzeck Depo, 40:21-41:1.   Despite the efforts of emergency room personnel, HM was pronounced dead at 4:13 p.m. on July 26, 2016. **Ex. O**, 71:2-15; **Ex. P**, Dr. Ogan Depo, 142:15-25.

E. **Coroner's Report and Findings**

Dr. Ogan conducted HM's autopsy on July 27th, and also prepared an autopsy report. **Ex. P**, 5:8-15,9:16-10:21,12:5-12; **Ex. Q**, Autopsy Report.   Dr. Ogan was informed that HM was

McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

involved in a struggle with officers, but was not given details of the struggle. **Ex. P**, 20:10-20. At death, HM was obese as he was **six foot two inches tall and weighed 286.5 pounds**. **Ex. P**, 51:3-20. At autopsy, Dr. Ogan found evidence of blunt force injuries of HM's head, neck, torso, and extremities; evidence of mechanical obstruction of respiration; evidence of deployment of two taser devices; drug intoxication (methamphetamine and amphetamine); low levels of alcohol; complications of chronic alcohol abuse; morbid obesity; and atherosclerotic and hypertensive cardiovascular disease. **Ex. Q**, Autopsy Report, Pgs. 1-2. Ultimately, Dr. Ogan found the <u>cause of HM's death</u> to be probable mechanical obstruction of respiration complicated by carotid sinus reflex stimulation due to carotid choke hold deployed during arrest.[5] **Ex P**, 68:2-17, 74:7-15; **Ex. Q**, Autopsy Report, pg. 2. Dr. Ogan found evidence of injuries to the neck, such as a fractured thyroid cartilage and associated bleeding, which indicated that force was applied to that area (Defendants do not dispute force was applied by Mejia to the neck). **Ex. P**, 34:1-12, 36:2-37:13. Dr. Ogan believed the airway was obstructed for four to six minutes. **Ex. P**, 128:2-129:3. Dr. Ogan described that blunt force injuries mean when any blunt force is applied to a body whether it be from an object (fist, bat), an altercation, a fall, or other causes. **Ex. P**, 122:10-124:6.

Dr. Ogan explained that he is aware of a poorly understood condition where death occurs in individuals on stimulant drugs (such as methamphetamine) who have had the carotid hold applied on them, but the exact mechanism of the death is not completely understood and there are various contributing factors especially in this case including drug use, the Taser, obesity, cardiac symptoms and overall poor cardiac health of HM. **Ex. P**, 73:12-74:6. Additionally, HM's physical resistance exacerbated the contributing factors of his poor health. *Id.*, 134:22-135:6.

Per Dr. Ogan, toxicological testing showed ***significant*** levels of methamphetamine in HM's blood, along with its by product, amphetamines, and a low level of alcohol. **Ex. P**, 61:20-62:21,65:6-16,69:7-21,84:1-85:14; **Ex. Q**. Dr. Ogan relied upon the toxicology report which indicated that HM's level of methamphetamine had been associated with people who exhibited violent and irrational behavior and such high doses can also elicit restlessness, confusion,

---

[5] For the purposes of this motion ***only***, Defendants accept the cause of death so that this cause of death is not disputed herein. Defendants will dispute that cause of death at trial, if necessary.

McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

1   hallucinations, circulatory collapse and convulsions.  **Ex. P**, 88:20-89:10; **Ex. Q**.  Dr. Ogan found

2   that HM was not a healthy person and significant evidence of heart disease and alcoholism was

3   discovered at autopsy.  **Ex. P**, 52:17-54:9,60:1-24, 69:7-21,92:12-93:14.   Despite the fact that

4   HM was found to be obese, had elevated cholesterol, had physical exertion in the struggle which

5   required the heart to pump fast and that this fed into the situation, Dr. Ogan ultimately <u>found the</u>

6   <u>cause of death to be obstruction of respiration due to the neck injury</u>.  **Ex. P**, 54:10-56:7.

7   Dr. Ogan found two Taser probes in the left thigh of HM, but only evidence of one other

8   probe that had been removed from the left upper buttock area of HM.  **Ex. P**, 71:1-20,139:5-25.

9   Dr. Ogan found that HM had suffered anterior (front of body) rib fractures.  **Ex. P**, 111:20-25.

10  Dr. Ogan was aware that HM received CPR for a significant number of minutes and CPR can

11  cause injury to the ribs and sternum.   Though he does not know when HM's ribs and sternum

12  were fractured and only knows they were present on autopsy, he agreed that the area they were

13  located was consistent with an area of CPR.  **Ex. P**, 105:21-107:7, 109:11-19, 121:24-122:9.

14  **F.     <u>The PPD Had Relevant Use of Force Policies and Procedures That</u>**
15      **<u>Allowed Force Options to Control Resistive and Combative Suspects</u>**

16  The PPD had overlapping use of force policies in effect at the time of HM's arrest that

17  governed the types and extent of force allowed by their officers.  **Ex. R**, <u>PPD Use of Force</u>

18  <u>Policies 300 and 301</u>.  Generally, these policies state that officers are permitted to use reasonable

19  force that is necessary to affect an arrest, to protect others, or to protect themselves from bodily

20  harm and the policies reiterate the *Graham* standards (see *Graham* standards below) and

21  standards from California Penal Code § 835a.  **Ex. R**, Policy 300, 301.1.1(b), 301.1.2 and 301.2.

22  The PPD policies allow for the use of a **<u>carotid hold</u>** on an actively resisting suspect as an

23  intermediate force option.  *Id.*, Policy 301.2.1(b)5., 301.2.5.  Generally, the carotid hold tactic

24  cuts off the blood supply (ie. the oxygen in the blood) to the brain, causing a subject to pass out

25  temporarily so they can be controlled.  **Ex. B**, 32:19-22, 51:25-52:7.  The PPD carotid hold policy

26  specifically indicates that an officer using the hold should insure the hold does not slip into a bar

27  arm, or any hold which applies pressure to the front of the neck, which is prohibited.  *Id.*, **Ex. S**,

28  <u>Baker (PMK #1) Depo</u>, 10:15-11:21.  After the carotid hold has been used, officers are instructed

1    to check the person's vitals to ensure there are no medical issues. **Ex. R**, Policy 301.2.5(b); **Ex.**

2    **S**, 30:7-33:3. Mejia was trained on these specific PPD policies prior to July 26, 2016. **Ex. B**,

3    48:14-50:21; **Ex. S**, 18:10-19:18. In addition, Mejia received extensive training on the use of a

4    carotid hold while in the police academy. **Ex. B,** 31:21-32:22.

5           The use of a Taser and other pain compliance techniques (strikes, kicks, elbows) are also

6    allowed when dealing with a combative and resistive subject like HM. **Ex. R**, Policy 300 and 301

7    (301.2.1, 301.2.3, 301.3). The PPD policies classify the Taser as a non-deadly control device

8    which is intended to temporarily incapacitate a violent and/or physically resistive suspect. **Ex. R**,

9    Policy 301.3. Like the use force of force involving a carotid hold, officers are trained to evaluate

10   a suspect's medical needs and to render the appropriate aid after the deployment of a Taser. *Id.*

11   Additionally, PPD officers are also instructed per their use of force policies on the general theme

12   of only applying a reasonable amount of weight while attempting to control a prone suspect. **Ex.**

13   **T**, Baker PMK #2, 24:21-25:10, 28:5-29:6. This broad theme of being cognizant of how much

14   weight is being placed on someone is used by officers in countless circumstances to avoid a

15   situation where too much weight adversely affects someone's ability to breathe. *Id.*, 51:16-

16   52:10.

17           **G.    The Investigation of the Incident Showed No PPD Policy Violations**

18           When there is a law enforcement related death of a subject who had contact with a PPD

19   officer, PPD investigators along with the District Attorney's Office conduct a LEIFI Investigation

20   (Law Enforcement Involved Fatal Incident) which is a significant and extensive investigation into

21   the whether the involved officer(s) conduct was criminal. **Ex. U**, Chief Addington Depo, 65:17-

22   68:5. The PPD investigators also serve as the administrative investigators for each of the

23   involved officers. *Id.* Here, the results of the LEIFI Investigation did not reveal any policy

24   violations by any involved PPD officer (nor criminal liability). *Id.*

25           **H.    Other Relevant Exhibits In Support of Motion**

26           PPD Sgt. Law, a LEIFI investigator, has authenticated other relevant exhibits for this

27   motion, including **Ex. V**, Det. Sanchez' report of the SCU vehicle, with photographs and a video

28   of that police vehicle. **Ex. C** ¶ 5. He has also authenticated the video evidence from the

McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

surveillance video and body camera videos relied upon by Expert Schott, in **Ex. H**.  **Ex. C** ¶¶ 6-7. He has authenticated the photographs from the kitchen in **Ex. I**.  **Ex. C** ¶ 8.  He has also reviewed and authenticated the dispatch audio and related CAD report pertaining to the incident, which is consistent with the officers' timing and version of events, in **Ex. W**.  **Ex. C** ¶ 10-14.

## IV. **LEGAL ARGUMENTS**

### A. **Legal Standards**

#### 1. Summary Judgment Standards

Summary judgment is properly granted when no genuine and disputed issues of material fact remain, and when, viewing the evidence most favorably to the non-moving party, the movant is clearly entitled to prevail as a matter of law.  FRCP 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  A "genuine" issue of material fact exists if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if it is relevant to an element of a claim or a defense, the existence of which may affect the outcome of the suit.  *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).  Disputes as to immaterial issues of fact do "not preclude summary judgment."  *Lynn v. Sheet Metal Workers Int'l Ass'n*, 804 F.2d 1472, 1478 (9th Cir. 1986).  Nor will uncorroborated allegations and "self-serving testimony" create a genuine issue of material fact.  *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002).  The non-moving party must instead set forth "**significant probative evidence** tending to support the complaint."  *T.W. Elec.*, 809 F.2d at 630-631.  (emphasis added).

Where the moving party does not bear the burden of proof on an issue at trial, the moving party may discharge its burden of showing that no genuine issue of material fact remains by demonstrating that "there is an absence of evidence to support the non-moving party's case."  *Celotex*, 477 U.S. at 325.  The moving party is not required to produce evidence showing the absence of a material fact on such issues, nor support its motion with evidence negating the non-moving party's claim.  *Id.; Bhan v. NME Hospitals, Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991).  If the moving party shows an absence of evidence to support its case, the burden shifts to the opposing party to produce "specific evidence, through affidavits or admissible discovery material,

McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

1   to show that the dispute exists." *Bhan*, 929 F.2d at 1409.  More than the "mere existence of a

2   scintilla of evidence in support of the plaintiff's position" is required, there must be "evidence on

3   which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.  "The more

4   implausible the claim or defense asserted by the non-moving party, the more persuasive its

5   evidence must be to avoid summary judgment." Id.  "A scintilla of evidence or evidence that is

6   merely colorable or not significantly probative does not present a genuine issue of material fact"

7   precluding summary judgment. *Addisu v. Fred Meyer Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000).

8   A complete failure of proof concerning an essential element of the non-moving party's case

9   renders all other facts immaterial. *Celotex*, 477 U.S. at 323.

10              2.     Qualified Immunity Standards

11       "Qualified immunity attaches when an official's conduct 'does not violate clearly

12   established statutory or constitutional rights of which a reasonable person would have known.'"

13   *White v. Pauly*, 137 S. Ct. 548, 551 (2017), citing *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015).

14   To be "clearly established" the law must be " 'sufficiently clear' that every 'reasonable official

15   would understand that what he is doing' " is unlawful, beyond debate. *Ashcroft v. al-Kidd*, 563

16   U.S. 731, 741 (2011); *White v. Pauly*, 137 S. Ct. at 551.  An officer is entitled to qualified

17   immunity unless the Plaintiffs can point to a "robust 'consensus of cases of persuasive

18   authority,'" making it clear that the officers' use of force in the particular factual circumstances

19   was improper. *al-Kidd*, 563 U.S. at 742.  The Supreme Court has repeatedly recognized the need

20   to grant review and correct the erroneous denial of qualified immunity because of the importance

21   of the doctrine to society as a whole (*City and County of San Francisco v. Sheehan*, 135 S. Ct.

22   1765, 1774 n.3 (2015); *White*, 137 S. Ct. at 551-52 and, most particularly, to "protect[ ] the public

23   from unwarranted timidity on the part of public officials." *Richardson v. McKnight*, 521 U.S.

24   399, 408 (1997).  "If an official could reasonably have believed her actions were legal in light of

25   clearly established law and the information she possessed at the time, she is protected by qualified

26   immunity." *Franklin v. Fox*, 312 F.3d 423, 437 (9th Cir. 2002).  Qualified immunity is an

27   extremely deferential standard that "gives ample room for mistaken judgments by protecting "all

28   but the plainly incompetent or those who knowingly violate the law." *Mullenix*, 136 S. Ct. at 308

McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

1    (citing *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).    In essence, qualified immunity gives

2    government officials breathing room to make reasonable but mistaken judgments. *Messerschmidt*

3    *v. Millender,* 132 S. Ct. 1235, 1244-1245 (2012).

4            Qualified immunity also shields an officer from suit when he or she makes a decision that,

5    even if constitutionally deficient, reasonably misapprehends the law governing the circumstances

6    he or she confronted. *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004), citing *Saucier v. Katz*, 533

7    U.S. 194, 206 (2001).    Qualified immunity is more than a mere defense to liability; it is "an

8    entitlement not to stand trial or face other burdens of litigation," and "is effectively lost if a case

9    is erroneously permitted to go to trial." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).    Qualified

10   immunity encourages officials to exercise their discretion without the fear of liability when the

11   state of the law is unclear or their actions are reasonable under the totality of the circumstances.

12   *Carlo v. City of Chino*, 105 F.3d 493, 500 (9th Cir. 1997).    It should be noted that the "standards

13   from *Garner* and *Graham* 'are cast at a high level of generality,' so they ordinarily do not clearly

14   establish rights."    *Isayeva v. Sacramento Sheriff's Dep't*, 872 F.3d 938, 951 (9th Cir. 2017)

15   Rather, it is the facts of particular cases that clearly establish what the law is. *Id.,* citing *White v.*

16   *Pauly*, 137 S. Ct. at 552.    Plaintiff bears the burden of proving that the right allegedly violated

17   was clearly established at the time of the alleged misconduct.    *M.H. v. Cty. of Alameda*, 62 F.

18   Supp. 3d 1049, 1093-94 (N.D. Cal. 2014) (emphasis added).    Overall, the officers are entitled to

19   qualified immunity even if they acted unconstitutionally, as long as a reasonable officer could

20   have believed the conduct lawful. *Alexander v. Cty. of L.A.,* 64 F.3d 1315, 1322 (9th Cir. 1995).

21       **B.        Plaintiffs Cannot Demonstrate that the Officers Violated the Fourth**
              **Amendment by Unlawfully Seizing HM**
22

23           Plaintiffs' first claim under 42 U.S.C. § 1983 alleges that HM was unlawfully seized by

24   the Defendant Officers.    The record is undisputed that HM was driving the Infiniti with an

25   expired registration, failed to yield to a traffic stop, then led officers on a vehicle pursuit through

26   a residential neighborhood and then fled on foot into the residence.    Obviously, Defendant

27   Officers (Mejia, Glasper and Waite) had sufficient reasonable suspicion to detain and/or probable

28   cause to arrest HM as a result of this string of criminal behavior (and there is an argument as to

McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

1    whether HM was ever detained at all until he was in the struggle in the kitchen).  Thus, no issue

2    of material fact exists and Defendants are entitled to judgment as a matter of law on these issues.

3        1.   <u>Officers Had Reasonable Suspicion to Detain and/or Probable</u>
<u>Cause to Arrest HM for the Registration and Other Violations</u>

5          The police can stop and briefly detain a person for investigative purposes if the officer has

6    a reasonable suspicion supported by articulable facts that criminal activity "may be afoot," even if

7    the officer lacks probable cause.  *United States v. Sokolow*, 490 U.S. 1, 7 (1989), citing *Terry v.*

8    *Ohio*, 392 U.S. 1, 30 (1968).  In fact, "if an officer has probable cause to believe that an

9    individual has committed even a very minor criminal offense in his presence, he may, without

10    violating the Fourth Amendment arrest the offender."  *Atwater v. City of Lago Vista,* 532 U.S.

11    318, 354 (2001); *Picket v. Nguyen*, U.S. Dist LEXIS 177752 at *11 (N.D. Cal. 2016).

12          To prevail on a § 1983 claim for false arrest, Plaintiffs must demonstrate that there was no

13    probable cause for his arrest.  *Cabrera v. City of Huntington Park*, 159 F.3d 374, 380 (9th Cir.

14    1998).  "Probable cause to arrest exists when officers have knowledge or reasonably trustworthy

15    information sufficient to lead a person of reasonable caution to believe an offense has been or is

16    being committed by the person being arrested."  *United States v. Lopez*, 482 F.3d 1067, 1072 (9th

17    Cir. 2007).  An officer with probable cause to believe that a motorist has violated the California

18    Vehicle Code (CVC) may stop the vehicle for an investigation and detain its occupants.  *Whren v.*

19    *United States*, 517 U.S. 806, 810 (1996); *United States v. Williams*, 419 F.3d 1029, 1032–33 (9th

20    Cir. 2005); *United States v. Choudhry*, 461 F.3d 1097, 1100 (9th Cir. 2006) ("A traffic violation

21    alone is sufficient to establish a traffic stop."); *People v. Castellon* (1999) 76 Cal.App.4th 1369,

22    1373 (stop allowed solely for expired registration).  In determining probable cause, the court

23    looks to "the totality of the circumstances known to the arresting officers, [to determine if] a

24    prudent person would have concluded there was a fair probability that [the defendant] had

25    committed [or is committing] a crime."  *U.S. v. Smith*, 790 F.2d 789, 792 (9th Cir. 1986).

26          Here, Mejia, Glapser and Waite (all in the same vehicle) had reasonable suspicion to

27    detain and/or probable cause to arrest HM for a violation of CVC 4000(a), driving with an

28    expired registration.  Plaintiffs have conceded that the Infiniti vehicle HM was operating had an

McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

1    expired registration, a fact confirmed by officers via dispatch.  **Ex. B**, 64:20-65:2; **Ex. D**, 53:15-

2    54:8; **Ex. F**, Requests 4-5; **Ex. G**, 40:22-41:20.  Thus, the officers had reasonable suspicion to

3    detain and/or probable cause under the Fourth Amendment to not only conduct a traffic stop of

4    HM, but also to arrest HM solely for the violation of CVC § 4000(a).  *Atwater,* 532 U.S. at 354.

5            Moreover, Defendants can argue that HM was not actually seized until he was in the

6    kitchen, providing further probable cause for arrest due to the observed flight in his car, then

7    flight on foot and then resisting arrest in the garage and the house.  *United States v. Al Nasser*,

8    555 F.3d 722, 729 (9th Cir. 2009) ("the car or individual's freedom of movement [must] end" to

9    constitute a seizure); *California v. Hodari D.*, 499 U.S. 621, 626–28 (1991)) ("Regardless of how

10   unreasonable the officers' actions were, and regardless of how reasonable it was for [the

11   individual] to feel restrained," if an individual was not physically touched by the police and did

12   not actually submit to their authority, there was no seizure, and the Fourth Amendment is not

13   implicated).  Here, HM never was actually seized until he was wrestling and resisting officers in

14   the kitchen.  Therefore, the actions of officers leading up to the struggle in the kitchen <u>do not</u>

15   <u>implicate the Fourth Amendment as HM never submitted to authority and continued to flee</u>.

16   Regardless, Mejia, Glasper and Waite witnessed HM's refusal to pull the Infiniti over, which

17   resulted in a dangerous (albeit brief) speedy pursuit through a residential neighborhood before

18   HM stopped and fled on foot inside the residence.  HM's freedom of movement was not ended

19   until he was inside the kitchen violently resisting the officers.  When HM was finally seized in the

20   kitchen, the involved officers had numerous grounds for probable cause to seize/arrest HM.

21   Plaintiffs cannot prevail on this claim and Defendants are entitled to judgment as a matter of law.

22                    2.      The Officers are Clearly Entitled to Qualified Immunity

23           Even if mistaken as the basis to detain and/or arrest HM, the individual Defendants are

24   entitled to qualified immunity as long as a reasonable officer could have believed the conduct

25   lawful.  *Alexander*, 64 F.3d at 1322.  It was clearly reasonable for the officers to believe they

26   could detain HM for the registration violation and then arrest him once he fled in the vehicle and

27   on foot.  Police officers who "reasonably but mistakenly conclude that probable cause is present"

28   are entitled to immunity.  *Hunter v. Bryant*, 502 U.S. 224, 228 (1991).  There is no controlling

case that would have alerted the officers that their conduct was unlawful.  In fact, a reasonable officer could have understood binding Supreme Court and Ninth Circuit precedent to point in the other direction and actually authorize their conduct in attempting to detain and/or arrest HM. *Atwater v. City of Lago Vista,* 532 U.S. 318, 354 (2001); *U.S. v. Santana,* 427 U.S. 38, 43 (1976); *Edgerly v. City & Cty. of San Francisco,* 599 F.3d 946, 956 (9th Cir. 2010).  Thus, Defendants are also entitled to qualified immunity with respect to Plaintiffs' unlawful detention/arrest claim.

**C.**     **Plaintiffs Cannot Demonstrate that the Officers Violated the Fourth Amendment by Using Unreasonable Force Against HM**

The evaluation of the Fourth Amendment claim of excessive force, the crux of this case, relates to whether the officers acted in an objectively reasonable manner in using force and/or whether the individual officers are entitled to qualified immunity for their uses of force to gain control/handcuff HM during the lawful detention/arrest.  The excessive force and qualified immunity analysis is broken down chronologically by officers and their specific actions.

1.     Plaintiffs Cannot Demonstrate Evidence that the Force Used by Officers was Objectively Unreasonable

The 4th Amendment does not mandate that excessive force was used just because a confrontation came to a tragic end.  *Gregory v. Maui,* 523 F. 3d 1103, 1107 (9th Cir. 2008).  Instead, claims of excessive force are to be judged under the Fourth Amendment's "objective reasonableness" standard.  *Brosseau v. Haugen,* 543 U.S. 194, 197 (2004), citing *Graham v. Connor,* 490 U.S. 386, 388 (1989), the seminal 4th Amendment use of force case.  The authority to arrest "necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham,* 490 U.S at 396.  Officers "are not required to use the least intrusive degree of force possible," but must act within a reasonable range of conduct.  *Id.*  The key question is "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them." *Id.,* at 397 (1989).  "'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers,' . . . violates the Fourth Amendment" as the "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain, and

McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

rapidly evolving — about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-397.

In *Graham*, the Supreme Court adopted an objective reasonableness test that requires an analysis of "facts and circumstances of each particular case, including the (1) severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officer or others, and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight." *Id.* **It should be highlighted that "the reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."** *Id.* (emphasis added). As aptly stated by the 11th Circuit, "from the viewpoint of an officer confronting a dangerous suspect, "a potential arrestee who is neither physically subdued nor compliantly yielding remains capable of generating surprise, aggression, and death." *Menuel v. City of Atlanta*, 25 F.3d 990, 995 (11th Cir. 1994). (emphasis added). Where the undisputed evidence establishes that the force used was objectively reasonable, an officer is entitled to summary judgment. *Scott v. Harris*, 550 U.S. 372, 386 (2007).

Where numerous officers are involved at different times in the struggle, it should be emphasized that an officer is only liable for his own misconduct. *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009). The Ninth Circuit has rejected the "team effort" standard that allows a jury to consider defendants' conduct together; the proper measure is "to base each individual's liability on his own conduct." *Hopkins v. Bonvicino*, 573 F.3d 752, 769-70 (9th Cir. 2009); *Mendez v. Montour*, U.S. Dist LEXIS 39453 at. 3-4 (N.D. Cal. 2014) (Officer involved in the arrest and handcuffing of plaintiff was not an integral participant of another officer's sudden and unprovoked tackling of suspect as there was no evidence the arresting officer authorized, knew in advance, encouraged or had a realistic opportunity to intercede). Here, each Defendant Officer dealt with HM's physical resistance independently of their fellow officers' actions and at different times. Thus, on summary judgment and for qualified immunity, each officer should be judged individually based on their own personal involvement and their basis of knowledge as to when they were involved in the struggle and how they reacted in those tense split seconds.

McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

a.    Mejia and Glasper Used Objectively Reasonable Force

The force used by Mejia and Glasper in response to HM's flight and escalating physical resistance was limited to intermediate force options.  Mejia's force involved: (1) an ineffective Taser deployment as HM fled on foot; (2) attempting to grab and secure HM's wrists/arms inside the kitchen while HM resisted; (3) two closed fist strikes to the face after HM managed to break free from both Mejia and Glasper and turn towards Mejia; (4) wrapping his left arm around HM's upper chest/neck area and pulling HM back to the ground after HM tried to stand up; (5) attempting one carotid hold once Mejia felt he and Glasper were being physically overpowered by HM; (6) holding HM down to the ground after he came to following the carotid hold and while other officers assisted to handcuff HM.  Each use of force by Mejia was justified and in response to HM's escalating violence and continued resistance, most of it in the kitchen.  The video evidence (**Ex. H**, MATRIX RT) shows that HM continued to resist, failed to heed commands to "stop resisting" **and would not allow himself to be handcuffed for over 150 seconds**.

While this incident started with an expired registration, it escalated quickly to evasion in a vehicle and then on foot, resisting arrest and then violently resisting arrest (ie. felony violation of Penal Code (PC) § 69) and later felony PC 245(c) (assaulting Mejia and Glasper), serious felony crimes up to the point in time of the struggle in the kitchen, satisfying the first *Graham* factor.  As to the second and most important factor, HM was clearly an immediate threat to officers due to fact that he was a very large and strong man (286.5 pounds), continued to struggle and assault officers, had not been searched for weapons, defied commands and violently resisted for over two and a half minutes, was nearby at least two knives, and was a threat to the little girl found in a back room of the house, satisfying the second *Graham* factor.  Further, the third factor of *Graham* is also clearly met per the video evidence as HM obviously fled arrest and extensively resisted handcuffing and arrest in the kitchen.  As cautioned, until HM could be handcuffed, he remained "capable of generating surprise, aggression, and death." *Menuel v. City of Atlanta*, 25 F.3d 990, 995 (11th Cir. 1994).  The Supreme Court's definition of reasonableness is "comparatively generous to the police in cases where potential danger, emergency conditions or other exigent circumstances are present" and should "surround the police who make these on-the-spot choices

McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

in dangerous situations with a fairly wide zone of protection in close cases." *Roy v. Inhabitants of City of Lewiston*, 42 F.3d 691, 695 (1st Cir. 1994).

Mejia's force options to get HM under control and into handcuffs escalated from verbal commands, to a missed Taser, to two strikes, to the use of the carotid hold, then simply holding HM until other officers were finally able to overpower HM. Furthermore, if HM was able to get to his feet, he could access the kitchen island where there were two knives that could be used to injure or kill an officer. **Ex. I**. In these split second moments and in the emergency prolonged struggle that Mejia found himself in, as seen on the video (**Ex. H**, MATRIX RT), Ofc. Mejia used force in an objectively reasonable manner to get HM under control.

Similarly, the force used by Glasper was objectively reasonable as well. Glasper's force included: (1) attempting to grab and secure HM's wrists/arms inside the kitchen; (2) attempting to gain control of HM's legs; (3) after being kicked by HM, Glasper struck HM's left torso with 3-5 compliance close fist strikes; (4) after injuring his hand, Glasper transitioned to elbow and knee strikes to HM's left torso. Like Mejia's force, Glasper's force was used to end HM's resistance and get HM in a position so he could be handcuffed. Glasper's intermediate force was per PPD policy, was performed under extremely dangerous and rapidly dynamic circumstances and was necessary to try to get HM into handcuffs. It is logical that the longer the struggle, the more tired an officer can get and the more dangerous a suspect is to the safety of officers. In viewing this situation from the perspective of a reasonable officer, in the shoes of Mejia and Glasper, facing the threat posed by HM, the use of force by Mejia and Glasper was objectively reasonable.

Furthermore, these two officers are entitled to qualified immunity for their split second decisions in the tense, dynamic and extensive struggle in the kitchen. There is simply no case law that would have put any reasonable officer on notice that the use of these force options against an actively resisting, large and violent suspect, violated the Fourth Amendment. *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015). Either way, Mejia and Glasper are entitled to summary judgment.

b.   Officer Waite's Limited Force was Appropriate

Notably, while Waite was in the garage, the struggle was still occurring in the kitchen between HM and Mejia and Glasper until Waite was called in to assist. (*See* Footnote 3). When

McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

1   inside the kitchen, Waite used minimal force against HM, consisting only of attempting to grab

2   and secure HM's wrists and arms while HM vigorously resisted. Waite was unsuccessful due to

3   HM's size, strength and continued violent resistance. Like the other officers, there was a clear

4   legitimate law enforcement interest of gaining control of the resistive HM and to do so quickly.

5   Waite assisted by creating a two pair chain of handcuffs to attempt to secure HM's hands, but this

6   failed due to HM's resistance. **Ex. E**, Pg 46:8-18; **Ex. H**, MATRIX RT, 3:15-3:33. <u>The record is</u>

7   <u>undisputed that Waite never struck, punched, kneed, elbowed, Tased, or used any type</u>

8   <u>bodyweight pressure on HM during the struggle.</u> **Ex. E**, Pg. 47:9-18. Using limited force to

9   handcuff an arrestable subject cannot be excessive. *Graham*, 490 U.S. at 396; *Moore v. City of*

10  *Berkeley*, U.S. Dist. LEXIS 142710 (N.D. Cal. 2016) (summary judgment granted to officers for

11  force used in handcuffing a resisting suspect who was high on drugs); *Arpin v. Santa Clara Valley*

12  *Transp. Agency,* 261 F. 3d 912, 922 (holding that officers did not use excessive force in "using

13  physical force to handcuff" an unarmed suspect who resisted by stiffening her arm).

14          Even if it can be argued that Waite's limited force in the middle of the struggle was not

15  objectively reasonable, he is entitled to qualified immunity on the issue as he had to make split

16  second decisions in the face of the resistive HM, during a prolonged struggle, about the amount

17  and type of force to use to assist in getting HM in handcuffs. Plaintiffs cannot point to any case

18  law that suggests that qualified immunity is not appropriate for Waite. As such, either the force

19  used by Waite was objectively reasonable or he is entitled to qualified immunity from this claim.

20                  c.      <u>Officer Elmore's Use of Force Was Appropriate</u>

21          Like Waite, Elmore arrived on the scene during the prolonged struggle and entered the

22  kitchen when Mejia, Glasper and Waite were still actively trying to get HM in handcuffs. With

23  that context, the force used by Elmore when he entered was limited to: (1) attempting to grab and

24  secure HM's wrists/arms in the kitchen; (2) after HM bit Mejia, Elmore delivered several closed

25  fist strikes to HM's lower back/torso area; (3) holding HM's hands behind his back and

26  completing the handcuffing process; (4) using his knee to apply some pressure to HM's upper

27  body to ensure HM did not continue to resist or attempt to bite an officer after being handcuffed.

28          Similar to the other officers who arrived during the active struggle (ie. Palma and Berhan),

McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

1   Elmore knew that HM fled from police in a vehicle, then on foot and was now in an extensive
2   struggle with officers in the house, that he was large, but did not know if he was armed.  In that
3   kitchen area, HM could have been able to access a weapon like the nearby knives on the island.
4   Elmore's actions were swift and per policy and training, to try to overpower HM and get him in
5   handcuffs.  Eventually, Elmore, Palma and Waite were finally able to get HM's hands under
6   control and him in handcuffs, ending the struggle.  No force was used on HM after he was
7   handcuffs, only Elmore and Palma assisting to keep HM somewhat stationary on the ground to
8   calm down.  Elmore's force was objectively reasonable, as seen in the video evidence, and/or he
9   is entitled to qualified immunity for his split second decisions in the middle of the struggle.

10            d.      Officer Palma's Limited Force Was Justified and Lawful

11       Like Elmore, Palma entered the house during the prolonged struggle and used only
12   minimal force against HM, including: (1) trying to control HM's wrists/arms; (2) holding HM's
13   hands behind his back for handcuffing; (3) using his knees in a squatting position with a minimal
14   amount of body pressure on HM's buttocks and left shoulder to ensure HM did not continue to
15   resist after being handcuffed.  Palma never struck, punched, kneed, elbowed, Tased, or used any
16   type of force on HM, besides verbal commands and the force necessary to control HM
17   wrists/arms for handcuffing.  Officer Palma's use of minimal force to effectuate the arrest and
18   bring HM's resistance to an end, as well as his use of limited pressure to keep HM on the ground,
19   was objectively reasonable and/or he is also entitled to qualified immunity for his actions in the
20   middle and at the conclusion of this violent and lengthy struggle.

21            e.      Officer Berhan's Taser Deployment was Justified and
22                    Lawful

23       Berhan came in with Palma and Elmore, during the struggle.  The force used by Berhan in
24   response to HM's resistance was limited to: (1) a five second Taser deployment to HM's left
     thigh after entering and seeing HM actively resisting multiple officers.  **Ex. H**, MATRIX RT,
25   3:46.  This force option seems to have been effective to the extent that within about twenty
26   seconds of that deployment, HM's arms are finally controlled for handcuffing.
27
28       The use of a Taser in dart mode qualifies as a non-lethal intermediate level of force, which

McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

"must be justified by a strong government interest that *compels* the employment of such force." *Bryan v. MacPherson*, 630 F.3d 805, 825 (9th Cir. 2010). Courts looks to the non-exhaustive list of factors in *Graham* as stated above, along with examining the "totality of the circumstances and consider whatever specific factors may be appropriate in a particular case, whether or not listed in *Graham*." *Bryan*, 630 F.3d at 826.

At the point of the use of the Taser, HM had been actively resisting officers for over two minutes. Berhan saw that HM was not controlled when he entered and was not handcuffed as of yet despite the fact that the struggle with numerous officers had been going on for some time. HM posed a threat to Berhan and other officers as had not been searched for weapons, was nearby weapons in the kitchen, was big and strong, continued to struggle and fight officers and his motives were unknown. Berhan and the other officers had a legitimate interest in ending HM's physical resistance as quickly as possible. Additionally, Berhan used the Taser only once, for a five second normal cycle, to seek gain compliance. Not only was the government's interest in the use of the Taser reasonable, but it was necessary to attempt to end the prolonged resistance by HM and danger to officers. Even if the use of the Taser briefly can be said to be arguably unreasonable, Berhan is clearly entitled to qualified immunity for its use under the totality of the circumstances he faced and the violent resistance he walked into when he entered the kitchen. Given all these circumstances, it was reasonable for Berhan to believe that deploying his Taser was lawful and could end the prolonged struggle (indeed it ended 20 seconds later).

**D.    Plaintiffs Cannot Demonstrate A Claim for Wrongful Government Interference with Familial Relationship (14th Amendment)**

There is a Fourteenth Amendment substantive due process right to familial relationships. *Lee v. City of Los Angeles,* 250 F.3rd 668, 685 (9th Cir. 2001). In order for Plaintiffs to prevail on their Fourteenth Amendment familial companionship claim, they must show the officers acted "with a purpose to harm" HM that was "unrelated to legitimate law enforcement objectives." *Johnson v. Bay Area Rapid Transit Dist.,* 724 F.3d 1159, 1168-69 (9th Cir. 2013), citing *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008). Due to the rapidly developing physical struggle caused by HM's flight and continued resistance, clearly the "purpose to harm" standard would

control (as opposed to the deliberate indifference standard when time for deliberation).

Legitimate law enforcement objectives include, among others, arrest, self-protection and protection of the public. *A.D. v. Cal. Highway Patrol*, 712 F.3d 446, 454 (9th Cir. 2013). On the other hand, a police officer lacks such legitimate law enforcement objectives when the officer had any ulterior motives for using force against the suspect, or to bully or get even with a suspect, or uses force against a clearly harmless or subdued suspect. *Zion v. County of Orange*, 874 F.3d 1072, 1077 (9th Cir. 2017); *Gonzalez v City of Anaheim*, 747 F.3d 789, 793 (9th Cir. 2014); *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010). Here, officers had probable cause to arrest HM for various violations. Detaining a non-complaint, resisting, and potentially armed suspect is a legitimate law enforcement purpose. Plaintiffs cannot demonstrate that any of the officers' actions lacked any legitimate law enforcement purpose. No significant force was used on HM following handcuffing, other than two officers keeping him still and on the ground. Thus, Plaintiffs Fourteenth Amendment claim fails.

**E.**     **Plaintiffs Cannot Demonstrate a Viable *Monell* Claim Against the City of Pittsburg or Chief Addington**

To establish *Monell* liability, Plaintiffs must show (1) they possessed a constitutional right that they were deprived of; (2) "that the municipality had a policy"; (3) that this policy amounts to deliberate indifference to the plaintiff's constitutional right; and, (4) that the policy is the moving force behind the constitutional violation." *Plumeau v. Sch. Dist. No. 40 Cnty. of Yamhill*, 130 F.3d 432, 438 (9th Cir. 1997); *Monell v. Dep't of Soc. Servs. of the City of New York*, 436 U.S. 658, 694 (1978). Here, Plaintiffs cannot prove these *Monell* claims.

1.     Plaintiffs Cannot Show a Custom or Policy Led to Any Constitutional Violation (Count 2(a)(g)-(j))

In order for Plaintiffs to succeed on their *Monell* claims, they must demonstrate that the City of Pittsburg's customs or policies caused the alleged Constitutional violation. *Monell*, 436 U.S. at 690-91. A custom is a widespread practice that, although not authorized by law or express city policy, it is so permanent and well-settled that it applies with the force of law. *Id.* A single incident of unconstitutional activity is not sufficient to impose liability under *Monell*. *City of*

McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

*Okalahoma City v. Tuttle,* 471 U.S. 808, 823-24 (1985). A plaintiff "may attempt to prove the existence of a custom or informal policy with evidence of repeated constitutional violations for which the errant municipal officials were not discharged or reprimanded." *Gillette v. Delmore*, 979 F.2d 1342, 1349 (9th Cir. 1992). To be sufficient to establish municipal liability under *Monell*, the challenged action must be the "standard operating procedure" of the municipality. *Clouthier v. County of Contra Costa*, 591 F.3d 1232, 1249 (9th Cir. 2010)

Here, Plaintiffs makes a conclusory allegations that the City of Pittsburg has customs or policies that: (1) tolerate the use of excessive force; (2) cover-up constitutional violations; (3) encourage a "code of silence"; (3) tolerate inadequate procedures for dealing with complaints of officer misconduct. **Ex. A**, pg. 20. The City does not have a formal written policy supporting any of these allegations. Thus, Plaintiffs must show that the City has unconstitutional customs that led to any violation here. However, Plaintiff also has no evidence to show the City maintained customs that led to any constitutional violations. Plaintiffs' only support for their claims comes from bootstrapping the facts of the incident in question, which is not sufficient to impose liability. *Oklahoma City v. Tuttle*, 471 U.S. 808, 823-24 (1985). In fact, the evidence demonstrates that the City had lawful and adequate use of force policies that governed force in the field. **Ex. R**. These policies cover the very force options deployed in this case and Chief Addington reiterated the investigation and review of officer involved fatal incidents, including this incident, which was within policy. **Ex. R**; **Ex. U**. No action or policy by the City can be shown to be the moving force behind any constitutional violations, so this claim fails.

2.   Plaintiffs Cannot Show a Failure to Train Led to Any Constitutional Violation (Count 2(b)-(f)(j))

Plaintiffs also assert a *Monell* claim for alleged failure to train and instruct officers regarding (1) the proper use of force; (2) the proper use of carotid hold; (3) the dangers of positional asphyxia; and (4) the Taser's effect of causing a person to require more oxygen. **Ex. A**, pg. 20. Generally, inadequacy of police training may serve as the basis for § 1983 liability only where the "failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388 (1989).

McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

1   Assuming plaintiff has shown that the training received by employees was inadequate, the

2   question then becomes whether inadequate training can be justifiably called municipal policy. *Id.*

3   at 389-90.  Not only must Plaintiffs show the deprivation of a constitutional right and a training

4   policy that amounted to deliberate indifference, but also that the constitutional injury would have

5   been avoided had the City properly trained those officers. *Blankenhorn v. City of Orange,* 485

6   F.3d 463, 484 (9th Cir. 2007). "Evidence of the failure to train a single officer is insufficient to

7   establish a municipality's deliberate policy" because it does not show that the municipality made a

8   deliberate or conscious choice. *Id.* at 484-85.  Thus, Plaintiffs must point to "a pattern of similar

9   constitutional violations by untrained employees." *Board of the County Comm'rs v. Brown*, 520

10  U.S. 397, 409 (1997).  In *Ayala v. City of S. San Francisco*, Judge Alsup was similarly tasked

11  with determining whether a plaintiff had sufficiently stated a claim for *Monell* liability on a

12  failure to properly train officers regarding the use of a carotid hold and the claimed dangers of

13  positional asphyxia.  *Ayala v. City of S. San Francisco*, U.S. Dist. LEXIS 54051 at 32-33 (N.D.

14  Cal. 2007).  Judge Alsup granted summary judgment on plaintiffs *Monell* claims, reasoning:

15          Plaintiffs have not come forward with evidence that the failure to
16          train was part of a pattern or practice. At most, they have merely
            shown that a [specific officer] lacked training in using the carotid
17          hold. . . . Plaintiffs can point to no similar incidents involving the use
            of the carotid hold. Similarly, with positional asphyxia, plaintiffs
18          have found no other incidents related to the alleged failure to train.
            Viewing the facts in the light most favorable to plaintiffs, defendants
19          have shown that there are no remaining triable issues of fact as to
            whether there was a pattern or practice that was the moving force
20          behind Ayala's injuries. Accordingly, defendants' motion for
            summary judgment is granted. *Id.*

21          Here, Mejia received training at the police academy regarding the use of a carotid hold, as

22  well as with the PPD on that hold, and the City's use of force policies covered the various force

23  options used in this case.  **Ex.'s S, T, U**.  PPD officers are trained on all of the appropriate legal

24  standards needed to safety and effectively do their jobs within constitutional limits, as covered in

25  the policies.  Id.  Further, PPD policies also train officers on the general theme of issues related to

26  placing bodyweight on a prone suspect.  **Ex. T**.  As in *Ayala*, Plaintiffs cannot point to any similar

27  incidents involving PPD officers and training deficiencies that would indicate a widespread

28  pattern of a failure to train.  Summary judgment should be granted for this *Monell* claim.

McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

3.   <u>Plaintiffs' Ratification Theory Fails As Well (Count 2(g)-(i))</u>

Here, Plaintiffs assert a *Monell* claims on the theory that the City and Chief Addington ratified the alleged unconstitutional detention and use of force of officers by endorsing their actions and failing to discipline them. **Ex. A**, pg. 20.  Under a ratification theory, a plaintiff must show that "authorized policymakers approved a subordinate's decision and the basis for it." *City of St. Louis v. Praprotnick,* 485 U.S. 112, 127 (1988).  Plaintiffs must show that the decision maker, here the Chief of Police, made "a deliberate choice from among various alternatives to follow a particular course of action." *Gillette v. Delmore,* 979 F.2d 1342, 1348 (9th Cir. 1992).  "A policymaker's knowledge of an unconstitutional act does not, by itself, constitute ratification.  Instead, ratification requires the authorized policymaker to make a "conscious, affirmative choice." *Gillette*, 979 F.2d at 1347.  It should be noted that the failure of a police department to discipline in a specific instance is not an adequate basis for municipal liability.  *Aleghretti v. City & County of San Francisco*, U.S. Dist. LEXIS at 30-31 (N.D. Cal. 2014); *Santiago v. Fenton*, 891 F.2d 373, 382 (1st Cir. 1989).  Accordingly, the fact that the City did not discipline the Officers for this incident does not establish that City policymakers "made a deliberate choice to endorse" an officer's actions.  *Gillette*, 979 F.2d at 1348.  "Finding that an officer acted within policy does not alone amount to *Monell* ratification." *Weishaar v. Cnty. of Napa*, 2016 U.S.Dist.LEXIS 173833, at *37 (N.D. Cal. 2016).

Chief Addington was not present during the struggle with HM and had no personal involvement in the incident (therefore no supervisory liability as well).  Via the LEIFI Investigation, no policy violations were found by involved officers.  **Ex. U**.  Plaintiff has no evidence of ratification and no viable *Monell* theories.

**F.   Plaintiffs' Related State Law Claims Also Fail**

Here, because Plaintiffs have not and cannot proffer evidence establishing that the officers used unreasonable force on HM, Plaintiffs' state law claims for the Bane Act, Negligence, and Battery, fail as well.  When a plaintiff "asserts no California right different from the rights guaranteed under the Fourth Amendment, . . . the elements of the excessive force claim under § 52.1 are the same as under § 1983." *Montez v. City of Stockton*, 2017 U.S. Dist. LEXIS 94180, at

McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

1   15-16, citing *Cameron v. Craig*, 713 F.3d 1012, 1022 (9th Cir. 2013).   Here, Plaintiffs' Third

2   Cause of Action for violation of California Civil Code § 52.1 "is premised entirely on the alleged

3   violation of the Fourth Amendment." *Id;* **Ex. A**, ¶¶ 72-78.   Because Plaintiffs' Fourth

4   Amendment claim fails, "so too does their § 52.1 claim." *Montez,* 2017 U.S. Dist. LEXIS at 16.

5          In terms of Plaintiffs' negligence claim, "[i]n order to prove facts sufficient to support a

6   finding of negligence, a plaintiff must show that the defendant had a duty to use due care, that he

7   breached that duty, and that the breach was the proximate or legal cause of the resulting injury."

8   *Hayes v. Cnty. of San Diego*, 57 Cal. 4th 622, 629, 160 (2013).   As "long as an officer's conduct

9   falls within the range of conduct that is reasonable under the circumstances, there is no

10  requirement that he or she choose the 'most reasonable' action or the conduct that is the least

11  likely to cause harm and at the same time the most likely to result in the successful apprehension

12  of a violent suspect, in order to avoid liability for negligence." *Brown v. Ransweiler,* 171 Cal.

13  App. 4th 516, 537-538 (2009).   As established above, regardless of whether or not officers'

14  actions here caused HM's death, the officers' conduct here was reasonable "under the

15  circumstances" to which the officers' faced.   Thus, Plaintiffs' cannot demonstrate any negligence

16  and Defendant Officers are entitled to judgment as a matter of law as to that claim as well.

17         In terms of Plaintiffs' battery claim (Plaintiffs have agreed to abandon their "assault

18  claim"), "it is clear that a battery claim against a police officer requires that unreasonable force be

19  established." *Nelson v. City of Davis*, 709 F. Supp. 2d 978, 992 (E.D. Cal. 2010).   Because the

20  undisputed facts here establish that officers acted reasonably, Plaintiffs' cannot prove their state

21  law battery claim.   All Defendants are entitled to judgment as a matter of law as to these claims.

## V. **CONCLUSION**

23         Based on the foregoing, Defendants are entitled to judgment as a matter of law as to all of

24  Plaintiffs' claims in this action and/or partial summary judgment, as well as the officers are

25  entitled to qualified immunity for the constitutional claims.

26  Dated:  January 3, 2019          MCNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP

27                                   By: _____

28                                   Noah G. Blechman/Cameren N. Ripoli
                                     Attorneys for Defendants,CITY OF PITTSBURG, et al.