1   NOAH G. BLECHMAN (State Bar No. 197167)
    noah.blechman@mcnamaralaw.com
2   AMY S. ROTHMAN (State Bar No. 308133)
    amy.rothman@mcnamaralaw.com
3   CAMEREN N. RIPOLI (State Bar No. 318045)
    cameren.ripoli@mcnamaralaw.com
4   McNAMARA, NEY, BEATTY, SLATTERY,
    BORGES & AMBACHER LLP
5   3480 Buskirk Avenue, Suite 250
    Pleasant Hill, CA 94523
6   Telephone: (925) 939-5330
    Facsimile:  (925) 939-0203

7

Attorneys for Defendants
8   CITY OF PITTSBURG, CITY OF PITTSBURG POLICE
    CHIEF BRIAN ADDINGTON, PITTSBURG POLICE
9   OFFICERS ERNEST MEJIA, JASON WAITE, WILLIE
    GLASPER, GABRIEL PALMA, JONATHAN ELMORE,
10  PATRICK BERHAN

11              UNITED STATES DISTRICT COURT

12              NORTHERN DISTRICT OF CALIFORNIA

13

14

15  HUMBERTO MARTINEZ, Deceased,        Case No. C17-04246 RS
    through his Co0Successors in Interest,
16  H.R.M., Jr., a minor through his mother and   **REPLY BRIEF IN SUPPORT OF**
    Next Friend Priscilla Sandoval         **DEFENDANTS' MOTION FOR**
17  Vanarendonk, individually and as successor  **SUMMARY JUDGMENT / PARTIAL**
    in interest for HUMBERTO ROSARIO       **SUMMARY JUDGMENT**
18  MARTINEZ, Deceased, and A.M., a minor,
    through her mother and Next Friend Tina   Date:   February 7, 2019
19  Anglin, individually and as successor in   Time:   1:30 p.m.
    interest for HUMBERTO ROSARIO         Dept:   Courtroom 3, 17th Fl. (USDC-SF)
20  MARTINEZ, Deceased; and JAMIE ANN      Judge:  Hon. Richard Seeborg
    COX, individually,
21                                          Trial Date:    May 6, 2019
            Plaintiff,
22
        vs.
23
    CITY OF PITTSBURG, et al,
24
            Defendant.
25

26

27

28

# TABLE OF CONTENTS

MEMORANDUM OF POINTS AND AUTHORITIES IN REPLY ...................................1

I. INTRODUCTION ..................................................................................................1

II. REPLY ARGUMENTS ..........................................................................................2

    A.    Plaintiffs Do Not Provide Legal Arguments To Counter Reasonable Suspicion to Detain and/or Probable Cause to Arrest HM .........................2

    B.    Plaintiffs Do Not Sufficiently Oppose the Point That Defendants Had the Lawful Right to Chase the Fleeing HM Into the Garage and House ....................2

    C.    No Fourth Amendment Violation for Excessive Force Has Been Shown and, Regardless, All Officers Are Entitled to Qualified Immunity ....;...............3

        1.    The Force By Officers Was Objectively Reasonable From Their Perspective and Based Upon the Totality of Circumstances They Faced ................................................................................................3

        2.    Qualified Immunity Is Appropriate for The Individual Officers Under the Totality of the Circumstances They Faced ......................7

        3.    Waite Cannot Be Held Responsible As an Integral Participant or Failing to Intervene ...............................................................................7

        4.    Limited Force Used After HM Was Handcuffed was Objectively Reasonable and/or Qualified Immunity is Appropriate ..............................8

    D.    Plaintiffs Cannot Show That Defendant Officers Acted Without a Legitimate Law Enforcement Purpose......................................................9

    E.    The City and Chief Are Entitled to Summary Judgment on All *Monell* Claims ................................................................................................10

        1.    Carotid Claims ...............................................................................11

            a.    Plaintiffs Cannot Show the City's Carotid Policy was Deliberately Indifferent and the Moving Force Behind the Alleged Constitutional Violation ......................................11

            b.    Plaintiffs Cannot Show the City had a Policy of Failing to Train Officers on the Application of the Carotid Hold.................13

        2.    Positional Asphyxia Claims...........................................................14

            a.    Plaintiffs Cannot Show the City's Policy Manual was Deficient Because it Does Not use the Term Positional/Restraint/Compression Asphyxia ................................14

McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5530

        b.     Plaintiffs Cannot Show Constitutional Violations were a Highly Predictable Consequence of the Absence of the Term Positional/Restraint/Compression Asphyxia From the City's Policy Manual ....................................................................15

III. OBJECTIONS TO PLAINTIFFS' PROFERRED EVIDENCE..................................17

IV. CONCLUSION...........................................................................................................17

McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

## **TABLE OF AUTHORITIES**

**Cases**

*A.D. v. Cal. Highway Patrol*, 712 F.3d 446, 454 (9th Cir. 2013) .....................................................10

*Alegrett v. City & County of San Francisco*, 2014 U.S. LEXIS 65835 at 28-29 (N.D. Cal. 2014)14

*Arizmendi v. City of San Jose*, 2010 U.S. Dist. LEXIS 145082 at 38 (N.D. Cal. 2010) ................11

*Atwater v. City of Lago Vista,* 532 U.S. 318, 354 (2001) ....................................................................2

*Ayala v. City of S. San Francisco*, 2007 U.S. Dist LEXIS 54051 at 32-33 (N.D. Cal. 2007) ..11, 12

*Bird v. W. Valley City*, 832 F.3d 1188, 1194 n.1 (10th Cir. 2016) ......................................................2

*Brady v. Maryland*, 373 U.S. 83 (1963) ............................................................................................12

*Burns v. City of Redwood City*, 737 F. Supp 2d 1047, 1063-64 (N.D. Cal. 2010) .........................13

*Castro v. County of Los Angeles*, 833 F.3d 1060, 1076-77 (9th Cir. 2016) .....................................16

*City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 (1989) ...............................................................13

*City of Oklahoma v. Tuttle*, 471 U.S. 808, 823-24 (1985) ..........................................................11, 12

*Connick v. Thompson*, 563 U.S. 51, 61 (2011) .....................................................................12, 15, 16

*Evans v. Bakersfield*, 22 Cal. App. 4th 321, 331 (1994).....................................................................6

*Gonzalez v City of Anaheim*, 747 F.3d 789, 793 (9th Cir. 2014)......................................................10

*Graham v. Connor*, 490 U.S. 386, 396 (1989) ...................................................................................3

*In re Lavoyne M.* (1990) 221 Cal.App.3d 154, 159 ............................................................................3

*Lolli v. County of Orange*, 351 F. 3d 410, 417-18 (9th Cir. 2003) ....................................................8

*Long v. County of Los Angeles*, 442 F3d. 1178, 1188 (2006)............................................................16

*Marsh v. County of San Diego*, 680 F.3d 1148, 1159 (9th Cir.2012)................................................14

*Mendez v. Montour*, U.S. Dist LEXIS 39453 at *3-4 (N.D. Cal. 2014) ............................................7

*Menuel v. City of Atlanta*, 25 F.3d 990, 995 (11th Cir. 1994) ...........................................................5

*Monell v. Dep't of Soc. Servs. of the City of New York*, 436 U.S. 658, 694 (1978) ..................10, 14

*Navarro v. Block*, 72 F.3d 712, 714 (9th Cir. 1995) .........................................................................12

*Neuroth v. Mendocino Cty.*, 2018 U.S. Dist LEXIS 149492 at 55-56 (N.D. Cal. 2018)......8, 15, 16

*People v. Lloyd* (1989) 216 Cal.App.3d 1425, 1430 ..........................................................................3

McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

*Plumeau v. Sch. Dist. No. 40 Cnty. of Yamhill*, 130 F.3d 432, 438 (9th Cir. 1997) ....................10

*Springfield v. Kibbe*, 480 U.S. 257, 268 (1987)..................................................13

*Stanton v. Sims*, 571 U.S. 3, 10-11, 134 S.Ct. 3, 7 (2013) ..........................................3

*Tamburri v. Suntrust Mortg., Inc.*, No. 11-cv-02899-JST, 2013 U.S. Dist. LEXIS 105944, at *2 (N.D. Cal. 2013) .................................................................1

*Thompson v. City of Los Angeles*, 885 F. 2d 1439, 1444 (9th Cir. 1989).......................12

*United States v. Johnson*, 256 F.3d 895, 907 (9th Cir. 2001) ..........................................3

*Welsh v. Wisconsin*, 466 U.S. 740, 753 (1984).....................................................3

*Wilkinson v. Torres*, 610 F.3d 546, 553 (9th Cir. 2010) ..........................................7, 10

*Zion v. County of Orange*, 874 F.3d 1072, 1077 (9th Cir. 2017) ....................................10

**Statutes**

42 U.S.C § 1983 ..................................................................15

McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

# MEMORANDUM OF POINTS AND AUTHORITIES IN REPLY

## I. INTRODUCTION

At the outset, Plaintiffs' Opposition to the pending Motion for Summary Judgment ("Opp.") surreptitiously violates various Local Rules in terms of spacing, giving Plaintiffs' an unfair briefing advantage on this Motion. Defendants object to the Opp. as a whole and move to strike it.[1] Plaintiffs are experienced counsel. Therefore, this appears willful and is clearly unfair.

Should the Court consider the faulty Opp., it should be noted that Plaintiffs take great liberty with the facts and evidence in their insufficient attempt to defeat this motion or counter the strong qualified immunity arguments of Defendants. Plaintiffs give short shrift to the open, obvious and extensive resistance of HM to being handcuffed, as is clear on the videos submitted by Defendants (matrixes and stand alone videos per **Ex. H**). In addition, numerous officers were involved at different times in this arrest event and each individual is entitled to a specific qualified immunity analysis, as opposed to being lumped together as a group per Plaintiffs' improper vicarious liability type arguments for the Fourth Amendment claims. Qualified immunity should protect these officers from trial for their reasonable efforts to get HM into handcuffs. The limited pressure and positioning of Palma and Elmore after handcuffing was also objectively reasonable and/or qualified immunity attaches. Plaintiffs did not set forth evidence of any Fourteenth Amendment violation, nor sufficient evidence to support any *Monell* theory.

---

[1] Defendants object and move to strike Plaintiffs' Opp. as it is 30 substantive pages long, but most, if not all, of the pages have 30+ lines per page, in violation of Local Rules (L.R. 3-2(c)(2), 7-3(a), 7-4(b)) and federal rules requiring motions to be double spaced with no more than 28 lines per page. Plaintiffs' Footnote 5 is 32 lines of text, essentially a full page or more of text in and of itself, not to mention Plaintiffs' use of various extended single spaced tables. <u>Adding this up, Plaintiffs have exceeded the page limit by at least three pages, if not more.</u> Plaintiffs' cannot show good cause for their failure to request leave as they never asked Defendants to stipulate to such excess or obtained a Court order. In fact, the Court limited Plaintiffs, like Defendants, to 30 pages. ECF 56. This impropriety is similar to *Tamburri v. Suntrust Mortg., Inc.*, No. 11-cv-02899-JST, 2013 U.S. Dist. LEXIS 105944, at *2 (N.D. Cal. 2013). The Court should either strike Plaintiffs' Opp. altogether, or order Plaintiffs to adjust their Opposition to conform to 28 lines per page, in accordance with the Local Rules. See also Judge Tigar's Order in *C.R. et al. v. City of Antioch et al.*, C16-03742 JST, ECF 59, striking an Opposition. Otherwise Plaintiffs will have the unfair advantage of additional pages. *See Tamburri* FN, 1. Defendants' Motion fully complied with the page limits and spacing requirements per painstaking editing.

McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

It should also be highlighted that <u>Plaintiffs did not object to any submitted evidence of Defendants</u> so all of Defendants evidence are ripe for consideration by the Court. *Bird v. W. Valley City*, 832 F.3d 1188, 1194 n.1 (10th Cir. 2016). Defendants do object to some of Plaintiffs evidentiary submissions, per the chart at the end of this Reply. In short, Defendants' moving arguments are still persuasive, as bolstered by the clear video evidence, entitling Defendants to summary judgment and/or partial summary judgment.

## II. REPLY ARGUMENTS

### A. Plaintiffs Do Not Provide Legal Arguments To Counter Reasonable Suspicion to Detain and/or Probable Cause to Arrest HM

While Plaintiffs provide contentious arguments in the facts section and other sections of their Opp. to try to persuade the Court that HM was not really subject to detention or arrest, Plaintiffs do not provide any legal arguments in the "Argument" section of their Opp. to counter Defendants' submissions on this point. See ECF 62, ECF pgs. 26-38 of 38. Plaintiffs' first argument is about excessive force. *Id.* In fact, Plaintiffs seem to concede that Defendant officers had probable cause to stop the vehicle for the expired registration. ECF 62, pg. 10 of 39, lines 9-11. At that point in time, HM was clearly subject to arrest. *Atwater v. City of Lago Vista,* 532 U.S. 318, 354 (2001) ("if an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment arrest the offender."). Then HM flees in his vehicle, regardless of the short duration, then stops and flees on foot, committing other Vehicle and Penal Code violations in the process. In short, it is undisputed that HM was subject to arrest by Defendants and Defendants are entitled to judgment as a matter of law on that issue.

### B. Plaintiffs Do Not Sufficiently Oppose the Point That Defendants Had the Lawful Right to Chase the Fleeing HM Into the Garage and House

Similar to the arguments in Section A above, Plaintiffs also make passing comments about the legality of the Defendants' entry into the house to effect HM's arrest. Again, Plaintiffs do not provide legal arguments on these issues. Regardless, there is no evidence that this was HM's house, that HM had any expectation of privacy in the house or that the Defendants needed a

McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

search warrant to enter the premises to effect the lawful arrest of HM.

Secondly, Defendants were entitled to enter the home without a warrant while in hot pursuit of HM (all of which is seen on the videos, **Ex. H**). "The hot pursuit exception to the warrant requirement only applies when officers are in "immediate" and "continuous" pursuit of a suspect from the scene of the crime, such as the case here. *United States v. Johnson*, 256 F.3d 895, 907 (9th Cir. 2001), citing *Welsh v. Wisconsin*, 466 U.S. 740, 753 (1984). In addition, hot pursuit entries are not precluded for misdemeanor crimes and, indeed, the law is not clearly established on that point, meaning qualified immunity would apply here regardless. *Stanton v. Sims*, 571 U.S. 3, 10-11, 134 S.Ct. 3, 7 (2013). Moreover, California law does not limit application of the exigent circumstances doctrine to instances only where felonious misconduct is suspected. *People v. Lloyd* (1989) 216 Cal.App.3d 1425, 1430; *In re Lavoyne M.* (1990) 221 Cal.App.3d 154, 159. Furthermore, exigency existed as well to prevent harm to any persons inside the home, including the young girl later found inside (and the people in the garage) and to prevent HM's escape or the destruction of any evidence on his person (which would motivate him to run away from officers).

Moreover, Mr. Wachtler, not HM, was the homeowner and he is not a party to this case. Plaintiffs and HM have no standing to challenge the hot pursuit entry, nor have they legally or persuasively argued such in their favor. As such, Defendants are entitled to judgment as a matter of law on the hot pursuit entry to lawfully arrest HM who was clearly subject to arrest.

C. **No Fourth Amendment Violation for Excessive Force Has Been Shown and, Regardless, All Officers Are Entitled to Qualified Immunity**

    1.     The Force By Officers Was Objectively Reasonable From Their Perspective and Based Upon the Totality of Circumstances They Faced

As it is undisputed, and legally determined, that Defendants had the lawful right to arrest HM and chase him into the garage and house, the Defendants also had the lawful right to use some degree of physical force[2] to effect the lawful arrest. *Graham v. Connor*, 490 U.S. 386, 396

_____

[2] Plaintiffs try to describe the force here as "deadly force" which is improper and incorrect. Essentially, deadly force is the use of a firearm, or force that has a reasonable likelihood of

McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

1    (1989) (The authority to arrest "necessarily carries with it the right to use some degree of physical

2    coercion or threat thereof to effect it."). It should be highlighted here that the video evidence

3    (with its audio portions) is undisputed and uncontroverted that **the involved Defendants had one**

4    **goal in their force efforts, to get HM into handcuffs**. This is easily seen in the various

5    statements by Mejia and Glasper to "stop resisting" and for HM to give up his hands, the similar

6    statements by other arriving officers and in the videos of the focused force of grabbing and

7    striking HM with the body weapons of officers to get HM's hands under control. In fact, inside

8    the house, other than body weapons by officers, the only force related tool used by officers was

9    Berhan's brief use of the Taser in the probe mode for one five second cycle at the end of this

10   struggle event, to HM's left hip, which clearly and directly led to officers finally overpowering

11   HM and getting him in handcuffs after two and a half minutes of struggling to control him. The

12   video clearly shows officers using force and reassessing whether or not the force effected or

13   distracted HM enough to overcome his drug induced power to get him into handcuffs. No

14   gratuitous or retaliatory force can be seen at any time on the videos, both to get HM into

15   handcuffs, or after HM is in handcuffs.

16       Furthermore, this force event is not legally viewed through the lens of body cameras or

17   from the perspective of HM, but rather it is viewed from the perspective of these involved PPD

18   officers who are simply trying to handcuff the large, intoxicated and highly resistive HM. *Id.*, at

19   396-397 ("the reasonableness of a particular use of force must be judged from the perspective of a

20   reasonable officer on the scene, rather than with the 20/20 vision of hindsight."). Moreover, the

21   Court's reasonableness evaluation should provide leeway when these Defendants are acting in

22   circumstances that were clearly tense, uncertain and rapidly evolving and circumstances requiring

23   split second decisions about the various force options to be used. *Id.* Even if some people would

24   viscerally believe the force was not appropriate at points, not "every push or shove, even if it may

25   later seem unnecessary" when viewed in Your Honor's chambers, violates the Fourth

26

27   causing death or serious physical harm. Moreover, none of the force used here is characterized
     by PPD policy, nor the law, as deadly force. For example, the carotid hold restraint is an

28   intermediate force option, as were all the other body weapons used. See ECF 60-4, pg. 42 of 86.

McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

1   Amendment. *Id.* Rather, viewed from the perspective of these officers, the fleeing and violently

2   resistive HM, who was "neither physically subdued nor compliantly yielding," remained "capable

3   of generating surprise, aggression, and death." *Menuel v. City of Atlanta*, 25 F.3d 990, 995 (11th

4   Cir. 1994).

5        Mejia and Glasper were the first two officers to have to physically struggle with the 286.5

6   pound, drug intoxicated HM. It is undisputed that HM did not give up his hands and did not

7   allow himself to be handcuffed (likely as he knew he was going to jail for the outstanding warrant

8   and methamphetamine in his system). It is undisputed that officers had no opportunity to confirm

9   whether or not HM had any weapons on his person. It is undisputed that there were knives in

10  plain view (**Ex. I**) and accessible in the kitchen island and a logical inference is that there are

11  accessible knives and other weapons in the kitchen area where this struggle occurred. While

12  Plaintiffs imagination and hypothetical statements in their Opp. are interesting about what was

13  occurring, <u>Plaintiffs have not provided admissible evidence</u> to dispute Mejia and Glasper's

14  versions of events about what happened in the kitchen, what happened when Mejia's body camera

15  was inadvertently shut off due to the violence of the struggle (HM went limp and then after one

16  handcuff was placed, he woke up and continued the struggle), or what happened when other

17  officers started to arrive to assist. The officers all testified about their various use of body

18  weapons to get HM under control and there are no significant or extensive inconsistencies there.

19  It should also be stressed that due to the vigor of the struggle and HM's size, Glasper and Mejia

20  were getting tired and that could have led to them being overpowered by the much larger HM, or

21  seriously injured or killed by him if he was armed. On the other hand, HM continued to show no

22  signs of slowing down or giving up. **Ex. B**, 97:22-98:16; **Ex. D**, 87:17-88:4. In fact, HM was

23  trying to get to his feet and was lifting Mejia off the ground in those attempts. The struggle was

24  so extended, Glasper injured his hand so had to transition to other force options to gain control.

25       It was only after the Mejia and Glasper tired and other force options failed when Mejia

26  attempted the carotid hold (while only Mejia and Glasper were in the kitchen). While Plaintiffs

27  try to downplay HM's conduct in the kitchen, in addition to preventing himself from being

28  handcuffed, the undisputed evidence is that **<u>HM was head-butting Mejia's chest and chin area,</u>**

**then later bit Mejia**. **Ex. B**, 102:25-103:6, 111:6-112:24; **Ex. D**, 108:15-22; *see also picture of Mejia's bite injury* (Plaintiffs' Ex. 16). While the carotid seemed to work initially, allowing one handcuff to be placed, HM quickly came to and continued his violent resistance. This occurred after Mejia's camera was disabled and is the time when Waite was called inside to assist (and one handcuff can be seen on HM's left wrist when Waite entered, corroborating Mejia and Glasper on this key point). **It is undisputed on this record that HM resisted the entire time up until the point in time when his hands were finally controlled for handcuffing** (though it was briefly delayed due to the radio cord getting stuck in the handcuff). Waite's only involvement was limited to trying to control one of HM's hands so he could be fully handcuffed (with both hands). In fact, Plaintiffs essentially concede Waite's force was lawful as they fail to mention his force in their extensive force/admissions chart, only his observations, then discuss him on the failure to intervene/integral participant theories. ECF 62, pg. 28 of 38.

When Waite could not assist Mejia and Glasper to gain full control of HM, it was at that point that Elmore, Palma and Berhan enter, knowing an extensive struggle had been occurring and was still occurring, elevating the danger to officers for a prolonged physical struggle with an arrestable subject who had not been searched for weapons. The perspective of these three officers should allow for even more room for reasonable force as they are only coming in to assist in the prolonged struggle, not knowing what occurred prior other than this large man was not yet handcuffed, forced to make split second decisions on the type and amount of force needed.

It cannot be stressed enough that HM was the one that escalated this situation from potentially a simple traffic stop to a high speed pursuit through a residential neighborhood and then a prolonged physical altercation inside of an unknown residence. Inside, HM did not allow himself to be handcuffed, but continued to prevent himself from being controlled, even after he already had one handcuff on his wrist. While Plaintiffs attempted to argue HM's right to resist a claimed use of excessive force, by citing to *Evans v. Bakersfield*, 22 Cal. App. 4th 321, 331 (1994), this argument is a concession of continued resistance by HM in the kitchen (as is confirmed from the video evidence). From the perspective of reasonable officers, a suspect who is violently resisting arrest or violently resisting behavior the suspect believes was over the top

REPLY BRIEF IN SUPPORT OF DEFENDANTS' MOTION 6
FOR SUMMARY JUDGMENT / PARTIAL SUMMARY
JUDGMENT, C17-04246 RS

appears only as violent resistance to officers, especially in conjunction with HM fleeing the traffic stop, fleeing into the garage and then fleeing into the house. The officers conduct was escalating with their force in line with HM's continued resistance and the danger of continuing a prolonged struggle in an area known to house potential weapons (kitchen). The Fourth Amendment does not require officers to be "omniscient" and absolute certainty of harm need not precede an officer's act of self-protection or the protection of their fellow officers. *Wilkinson v. Torres*, 610 F.3d 546, 553 (9th Cir. 2010). The video evidence (**Ex. H**) shows proof positive that this was a rapidly evolving and tense situation for officers, expanding the allowance of objectively reasonable force options, as was the case here.

> ### 2. Qualified Immunity Is Appropriate for The Individual Officers Under the Totality of the Circumstances They Faced

Moreover, qualified immunity should protect these officers who were simply using trained law enforcement tactics, in a measured and forceful manner, to gain compliance from HM (and get him in handcuffs). In addition, each individual officer is entitled to a qualified immunity determination as different officers were involved at different times and used different force and tactics, as laid out in detail in the main Motion and herein. These officers are entitled to breathing room for any force used under these dynamic and tense conditions, if any of it was deemed to be potentially inappropriate in hindsight. Qualified immunity protects these officers from trial.

> ### 3. Waite Cannot Be Held Responsible As an Integral Participant or Failing to Intervene

While Plaintiffs' concede Waite's force was limited and reasonable, they try to keep him in the case per a theory of integral participation and failing to intervene, both of which fail. Waite came into the house approximately 75 seconds after the struggle in the house began. See ECF 60, Footnote 3; **Ex. H**. Even if Plaintiffs can show other officers, in the remaining second half of the struggle, committed excessive force, Waite is not vicariously liable for such force by others. There is no evidence that Waite authorized, planned, encouraged, or assisted any of the alleged Constitutional violations by any of the other officers. *Mendez v. Montour*, U.S. Dist LEXIS 39453 at *3-4 (N.D. Cal. 2014) (Officer who had no knowledge or involvement in his partner's take-down and slamming of plaintiff was entitled to summary judgment). Plaintiffs

McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

1  unpersuasively cite to *Lolli* to support their integral participant argument. *Lolli v. County of*

2  *Orange*, 351 F. 3d 410, 417-18 (9th Cir. 2003). However, in *Lolli*, the plaintiff was unable to

3  identify which defendant officers struck him with a foot, hand, or baton during the struggle.

4  Here, Waite's actions during the struggle were limited, captured on body camera and it is

5  undisputed that he only used the amount of force reasonable to grab and secure HM's wrists and

6  arms for handcuffing while HM vigorously resisted. Plaintiffs have not demonstrated that any

7  force by Waite led to any injury of HM.

8      Additionally, Plaintiffs argument that Waite had a duty to intervene also fails. There is no

9  evidence that Waite could perceive how much force was applied by Mejia and Glasper or others

10  during the active struggle or that Waite believed Mejia was involved in a carotid hold at all.

11  Waite testified that he could see Mejia attempting to control HM's upper body (**Ex. E**, 39:25-

12  40:25, 42:2-7), but there is no evidence he believed a carotid hold was being used nor evidence he

13  knew how long it was being applied or how much pressure was being applied. *Neuroth v.*

14  *Mendocino Cty.*, 2018 U.S. Dist LEXIS 149492 at 55-56 (N.D. Cal. 2018) (officers did not have a

15  reasonable opportunity to intercede because they could not perceive how much force was being

16  applied by officers involved in the struggle). Thus, because Waite entered the room to an

17  ongoing physical struggle and had no knowledge or involvement in the other officers' use of

18  force decision making, he was not an integral participant, nor did he have a realistic opportunity

19  to intercede so summary judgment should be granted as to him on these bogus theories.

20      4.  Limited Force Used After HM Was Handcuffed was Objectively
21          Reasonable and/or Qualified Immunity is Appropriate

22      Obviously, after a prolonged struggle (over two and a half minutes), where the suspect

23  was biting an officer and it took an extended period of time to get the person under control, it is

24  reasonable for officers to keep the person in their arrest position (on their stomach) and maintain

25  some limited physical contact with the suspect to continue to assert a dominant position, to deter

26  further resistance and violence and ensure the officer(s) is in a position where he can quickly

27  respond to further violence or resistance. Such was the case here with Palma and Elmore post-

28  handcuffing (Berhan had put his Taser device onto HM's back as a further deterrent to further

McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

1    violence, but the Taser was not activated or being cycled, only in position to be used if need be).

2    Video and other evidence (**Ex. H**) shows that Palma's position was not impeding ventilation of

3    HM, nor can Plaintiffs show that Elmore's positioning did either.

4         Moreover, Dr. Ogan, the coroner, attributed HM's death to the carotid restraint (see ECF

5    60, Footnote 5 (Defendants accept the cause of death for purposes only of this Motion)) and

6    Plaintiffs have not provided any evidence that Palma and/or Elmore's post-handcuffing actions

7    caused any injury or death to HM.   Dr. Ogan did not conclude that HM died due to being

8    suffocated by the body weight of officers, but attributed the death to the carotid hold (by Mejia).

9    Nor did Plaintiffs provide any expert testimony or evidence that HM's death was caused, in

10   whole or in part, due to the physical positioning of Palma and Elmore post-handcuffing.   Nor did

11   Plaintiffs provide evidence that HM would not have died had he been placed on his side prior to

12   officers noticing him having a medical problem.   In fact, Elmore was monitoring his HM's

13   breathing post-handcuffing when Elmore bent down and checked HM's breathing and **confirmed**

14   **he was still breathing**.   **Ex. J**, 51:21-24; **Ex. K**, 60:21-23; **Ex. H**, MATRIX 4PLEX-SYNC+2,

15   1:53-2:02.   Plaintiffs' speculation and conjecture, unsupported by admissible evidence, does not

16   support a claim of excessive force and/or cannot defeat qualified immunity for the actions of

17   Palma and Elmore following the handcuffing of HM.

18   **D.    Plaintiffs Cannot Show That Defendant Officers Acted Without a**
     **Legitimate Law Enforcement Purpose**
19

20        Plaintiffs argue, without evidence, that Defendant Officers acted without a legitimate law

21   enforcement purpose.   In support their argument, Plaintiffs specifically point to the actions of

22   Mejia and Glasper and claim they acted without a legitimate law enforcement purpose when they

23   used force to detain a non-complaint, resisting, and potentially armed suspect.   Plaintiffs'

24   repeated representations that the officers escalated this situation are incorrect.   HM is the one who

25   led the officers on a dangerous vehicle pursuit through a residential neighborhood, fled on foot

26   into an unknown home and violently resisted the officers for a prolonged period of time, all of

27   which is undisputed.   Mejia and Glasper were merely attempting to perform the most basic

28   purpose of law enforcement officers, to detain a subject who is under arrest in handcuffs.

McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

1     Legitimate law enforcement objectives include, among others, arrest, self-protection and

2     protection of the public. *A.D. v. Cal. Highway Patrol*, 712 F.3d 446, 454 (9th Cir. 2013). On the

3     other hand, a police officer lacks such legitimate law enforcement objectives when the officer had

4     any ulterior motives for using force against the suspect, or to bully or get even with a suspect, or

5     uses force against a clearly harmless or subdued suspect, none of which was involved here. *Zion*

6     *v. County of Orange*, 874 F.3d 1072, 1077 (9th Cir. 2017); *Gonzalez v City of Anaheim*, 747 F.3d

7     789, 793 (9th Cir. 2014); *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010). Moreover,

8     Plaintiffs only mention Mejia and Glasper mean they concede that there is a total lack of evidence

9     for this claim for Waite, Palma, Elmore, or Berhan. As Plaintiffs have submitted no evidence of

10     any ulterior motives or gratuitous force, etc. for Mejia and Glasper (or any officer), all of the

11     Defendant Officers are entitled to summary judgment for this Fourteenth Amendment claim.

12     **E.**     **The City and Chief Are Entitled to Summary Judgment on All *Monell***

13     **Claims**

14     Defendants' Opening Brief identified multiple *Monell* claims raised in Plaintiffs'

15     Complaint. In Opposition, Plaintiffs appear to abandon many of their alleged *Monell* claims per

16     their Opp. arguments and are only proceeding on their *Monell* claims based on: (1) the City's

17     carotid hold policy is deficient and the City failed to properly instruct their officers on the

18     application of the carotid hold; and (2) the City's failure to include the terms

19     positional/compression/restraint asphyxia amount to an unconstitutional policy and PPD officers

20     were not properly trained on issues related to positional asphyxia. All of these arguments fail, for

21     the reasons below, and the City and Chief Addington are entitled to summary judgment on all

22     remaining *Monell* claims.

23     To establish that there is a policy based on a failure to preserve constitutional rights, the

24     Plaintiffs must show, (1) a constitutional violation, (2) that the City's policy amounts to deliberate

25     indifference to the Plaintiffs constitutional rights, and (3) that the policy was the moving force or

26     caused the violation, in the sense that the City could have prevented the violation with an

27     appropriate policy. *Plumeau v. Sch. Dist. No. 40 Cnty. of Yamhill*, 130 F.3d 432, 438 (9th Cir.

28     1997); *Monell v. Dep't of Soc. Servs. of the City of New York*, 436 U.S. 658, 694 (1978).

McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

1.   Carotid Claims

    a.   <u>Plaintiffs Cannot Show the City's Carotid Policy was Deliberately Indifferent and the Moving Force Behind the Alleged Constitutional Violation</u>

Here, Plaintiffs cannot demonstrate that the City's carotid hold policy was deliberately indifferent to HM's rights or that it was the moving force behind the alleged application of unconstitutional force. *City of Oklahoma v. Tuttle*, 471 U.S. 808, 823-24 (1985) (where the policy relied upon is not itself unconstitutional, considerably more proof than a single incident will be required to establish deliberate indifference, and the casual connection between the policy and constitution deprivation). Contrary to Plaintiffs' conclusory claim, the City's carotid hold policy properly instructs officers on application and recovery techniques involving the carotid hold, and explicitly prohibits the exact bar arm type "choke hold" injury alleged by Plaintiffs. *See* ECF 60, 12:22-13:4; **Ex. R** (Policies). Nor can Plaintiffs produce any evidence that the City was aware or put on constructive notice that their carotid policy was deliberately indifference due to a pattern or practice of similar carotid related violations. *Tuttle*, 471 U.S. 808, 823-24 (1985); *Ayala v. City of S. San Francisco*, 2007 U.S. Dist LEXIS 54051 at 32-33 (N.D. Cal. 2007). Plaintiffs have submitted no evidence of any other carotid related serious incidents or deaths.

Plaintiffs also attempt to support their deliberate indifference argument with the unsupported opinion their police procedures expert, Mr. Ryan. Plaintiffs' retained expert concludes the City's policy demonstrates deliberate indifference because it does not prescribe the proper duration of the carotid hold or how much pressure to apply, ludicrous assertions by Mr. Ryan and they belie logic that such restrictions could be placed in any such policy. Plaintiffs claim the absence of the appropriate duration and force in the City's carotid hold policy is "contrary to generally accepted policies and practices." However, Plaintiffs' conclusory statements, regardless if they are made by an expert, are not supported by any facts demonstrating the City, or Chief Addington, had notice of the alleged substantial risks of such omissions in the carotid policy. *Arizmendi v. City of San Jose*, 2010 U.S. Dist. LEXIS 145082 at 38 (N.D. Cal. 2010) (The testimony of a single sergeant taken out of context by plaintiff's expert cannot create a triable issue as to whether San Jose has a practice of not disciplining officers for unlawful

McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

1    searches). Additionally, Ryan's suggestion that the City's policy is improper because it does not

2    discuss the appropriate "levels of pressure" is equally preposterous and unsupported. The City

3    trains officers generally on the use of reasonable force and the need to adjust the level of force

4    depending on the circumstances. It is implausible to suggest the policy must delegate the exact

5    amount of appropriate force in every possible scenario, including how long an officer can use

6    such a hold or how much pressure can be applied. *Connick v. Thompson*, 563 U.S. 51, 61 (2011)

7    (holding that county's failure to train prosecutors regarding *Brady v. Maryland*, 373 U.S. 83

8    (1963), did not constitute obvious deficiency because attorneys had attended law school and were

9    charged with knowing the law). No policy can realistically designate parameters on such issues.

10    Thus, the portion of the City's use of force policies, two of them, which contain the carotid hold

11    portion of the policy, have not been shown to be constitutionally deficient.

12        Further, Plaintiffs attempt to show that the City's carotid policy was the moving force

13    behind the alleged constitutional violations relies entirely on their interpretation of Mejia's

14    application of the carotid hold and his subsequent statements (use of the term "choke hold,"

15    which is parlance for a carotid hold by law enforcement, Plaintiffs' Ex. 11, pg. 24:19-25:25) to

16    demonstrate that the City's policy was somehow deficient. Even accepting Plaintiffs' incorrect

17    characterization of Mejia's actions and statements as true, at best this evidence only demonstrates

18    that an individual officer lacked full retention of the City's carotid hold training, not that the

19    policy itself was deficient or the City deliberately indifferent. *Tuttle*, 471 U.S. 808, 823-24

20    (1985) (plaintiff cannot prove the existence of an unconstitutional municipal policy based solely

21    on a single incident of unconstitutional conduct); *Thompson v. City of Los Angeles*, 885 F. 2d

22    1439, 1444 (9th Cir. 1989) (Proof of random acts or isolated events are insufficient to establish

23    policy); *Navarro v. Block*, 72 F.3d 712, 714 (9th Cir. 1995); *Ayala v. City of S. San Francisco*,

24    2007 U.S. Dist LEXIS 54051 at 32-33 (N.D. Cal. 2007) (officer failing to recall the last time he

25    received training on the carotid hold did not indicate deliberate indifference by the city's policy).

26    Thus, there is no evidence to support Plaintiffs' conclusion that the City's carotid hold portion of

27    the policy was the moving force behind the alleged Fourth Amendment constitutional violation.

28    Ultimately, the Plaintiffs present no triable issue of fact that the City and/or Chief was aware or

McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

1    should have been aware of the alleged deficiencies in the carotid policy or that the deficiencies

2    were the moving force behind the alleged constitutional violation. This claim fails.

3            b.   <u>Plaintiffs Cannot Show the City had a Policy of Failing to Train Officers on the Application of the Carotid Hold</u>

4

5           As discussed above, Defendants carotid hold policy is constitutional as written and

6    Plaintiffs' argument is not advanced by claiming that PPD officers were not sufficiently trained

7    on the use of the carotid hold. The Supreme Court in *City of Canton* further explained that, "the

8    focus must be on adequacy of the training program in relation to the tasks the particular officers

9    must perform." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 (1989). "That a particular

10   officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the

11   officer's shortcomings may have resulted from factors other than a faulty training program." *Id.*

12   at 390-91, citing *Springfield v. Kibbe*, 480 U.S. 257, 268 (1987). "Neither will it suffice to prove

13   that an injury or accident could have been avoided if an officer had had better or more training,

14   sufficient to equip him to avoid the particular injury-causing conduct," as "[s]uch a claim could

15   be made about almost any encounter resulting in injury. *Id.* at 391; *See also, Burns v. City of*

16   *Redwood City*, 737 F. Supp 2d 1047, 1063-64 (N.D. Cal. 2010).

17          The facts relating to Mejia's training have not been disputed by Plaintiffs with contrary

18   evidence. As such, it is undisputed on this record that the City trained its officers on their carotid

19   hold policy and that Mejia received that training. **Ex.'s S, T, U**. Plaintiffs argue that Mejia

20   received "very little training" and could have been trained longer or more often. However,

21   similar to Your Honor's ruling in *Burns*, the very fact that Mejia's actions can be measured

22   against an official policy taught to him at some point in his training suggests the City was not

23   deliberately indifferent to the need for training.[3] *Burns*, 737 F. Supp 2d 1065 (N.D. Cal. 2010)

24   (summary judgment granted because despite the lack of a written policy on handling diabetic

25   emergencies, the officers did receive general first aid training which included a video on diabetic

26   shock). Further, Plaintiff argues that Mejia lacked proper training to distinguish between a

27   ─────────────

28   [3] In addition to all the training on the use of the carotid while with PPD, Mejia received extensive training on the use of a carotid while in the police academy. See ECF 60, **Ex. B**, 31:21-32:22.

carotid hold and an arm bar type choke hold. Once again, it is undisputed that Mejia was trained on the City's policy which described and clearly prohibited the use of an arm bar hold and only allowed a carotid, which is what was applied here. *See* ECF 60, 12:22-13:4; **Ex. B**, 48:14-50:21; **Ex. R**. Plaintiffs misrepresent Mejia's statements regarding the arm bar hold. Mejia states he was not trained to apply an arm bar hold and that an arm bar hold occurs when an arm would be blocking the front part of the neck. See ECF 60, **Ex. B**, 48:23-49:15.

Certainly, Plaintiffs may raise an issue of whether Mejia followed the City's policy, but this does reflect any indifference on behalf of the City who had a constitutional policy and trained its officers to follow its requirements. *Marsh v. County of San Diego*, 680 F.3d 1148, 1159 (9th Cir.2012) (holding that practice must be "widespread" and proof of single inadequately-trained employee was insufficient). Thus, Plaintiffs cannot show that the City's training on their carotid policy was deliberately indifferent to create a factual issue to preclude summary judgment. Accordingly, summary judgment should be granted as to the City and Chief Addington because Plaintiffs cannot show deliberate indifference.

    2.   <u>Positional Asphyxia Claims</u>

        a.   <u>Plaintiffs Cannot Show the City's Policy Manual was Deficient Because it Does Not use the Term Positional/Restraint/Compression Asphyxia</u>

At the outset, **asphyxia is a medical term** and law enforcement officers and police departments are not charged with including all medical terms in their policy manual. Here, Plaintiffs make misleading and conclusory arguments that because the City does not use the terms positional/restraint/compression asphyxia in their policy manual, that the policy manual is deliberately indifferent to well known issues of life and death. Plaintiffs support their deliberate indifference argument with the fact that Chief Addington is generally aware of term positional asphyxia and related issues, but yet failed to include the specific term in the City's policy manual. However, to create a triable issue of fact Plaintiffs must do more than a simple word search of the City's policy manual. *Alegrett v. City & County of San Francisco*, 2014 U.S. LEXIS 65835 at 28-29 (N.D. Cal. 2014). In *Alegrett*, plaintiff argued that the city should be liable under *Monell* because they lacked written policies regarding the use of force with respect to mentally ill

McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

individuals. *Id.* However, the city did have a general use of force policy that required reasonable force and it also had a policy providing officers with training on recognizing signs and symptoms of mental illness. *Id.* Based on these general policies, the court found no deliberate indifference on behalf of the city and granted summary judgment. *Id.*

Similarly, Plaintiffs cannot simply point to the lack of a written policy and must specifically identify the substance of the policies they believe are omitted, causing and demonstrating a constitutional deficiency. Here, the City instructed officers on the general theme of only applying a reasonable amount of weight while attempting to control a prone suspect. *See* ECF 60, 20:11-16. PPD Detective Baker stated during his PMK deposition that officers are trained about the broad theme of being cognizant of how much weight is being placed on someone is used and applied by officers in a variety of different situations to avoid a situation where too much weight adversely affects an individual's ability to breathe. *Id.* Regardless of what term Plaintiffs want the City to use, the bottom line is that the policy manual and training procedures have instructions on how to avoid the dangers posed by using restraint techniques that may injure or harm arrestees. The fact that the policy manual does not use the medical term "asphyxia" is of no import or culpability. Plaintiffs' Opposition fails to identify any actual substance missing from the City's policy manual and only points out superficial missing terms. Thus, the City and Chief Addington are entitled to summary judgment.

b.   Plaintiffs Cannot Show Constitutional Violations were a Highly Predictable Consequence of the Absence of the Term Positional/Restraint/Compression Asphyxia From the City's Policy Manual

"In limited circumstances, a city's decision not to train certain officers about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). Although a deliberate indifference in a failure to train claim generally requires a plaintiff to show a pattern of similar constitutional violations, such a showing may not be required where a "violation of federal rights is a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations." *Neuroth v. Mendocino Cty.*, 2018 U.S. Dist LEXIS 149492

McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

at 57 (N.D. Cal. 2018) (quoting *Long v. County of Los Angeles*, 442 F3d. 1178, 1188 (2006)). "Deliberate indifference" requires objective proof that a municipal actor disregarded a known or obvious consequence of his action. *Connick*, 563 U.S. at 61 ("[W]hen city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program."); *see also Castro v. County of Los Angeles*, 833 F.3d 1060, 1076-77 (9th Cir. 2016) (en banc).

Plaintiffs rely on *Neuroth* to for the proposition that the City was deliberately indifferent to highly predictable consequences of a failure to include law enforcement officers with specific tools to handle recurring situations. As discussed above, the undisputed evidence demonstrates that the City had a combination of policies that dealt with the general issue related to arrests, including reasonable force and positioning, and they trained their officers accordingly. In *Neuroth*, Your Honor had a number of facts to show that the county was on notice of their deliberately indifferent policy. Every witness testified that it was common for the Mendocino County jail to receive individuals who are suffering from some combination of drug intoxication and mental illness. Thus, Your Honor found a reasonable jury could find that a mentally ill inmate under the influence of drugs would likely end up in an altercation with custodial staff, and injury is a highly predictable results of inadequate training. *Neuroth* is distinguishable on its face as the inmate was in handcuffs, there was inconclusive evidence as to the weight applied to him and by whom, and there was evidence that deputies left him unattended after he was placed in the cell in the safety smock, while in a compromising position.

However, in this case, Plaintiffs presented zero evidence that HM's death was the result of any asphyxiation by body positioning, only rather it related to the use of the carotid restraint (covered in detail in the use of force polices and via training). Further, there is no evidence in the record that positioning of officers during altercations, leading to medical issues or death, was a reoccurring situation that the City was on notice about and the injury was a highly likely predictable consequence of a claimed failure to train. It is undisputed that Plaintiffs presented no evidence of any other instances of serious injuries or deaths during a significant struggle. Thus,

McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

because Plaintiffs have failed to present any evidence that the circumstances of HM's resistance and altercation was a reoccurring situation in which the City failed to adequately train its officers to deal with, the City and Chief Addington are entitled to summary judgment.

## III. OBJECTIONS TO PLAINTIFFS' PROFFERED EVIDENCE

Defendants' object and request this Court strike the following Exhibits of Plaintiffs:

| Evidence | Objection by Defendants |
|---|---|
| Exh. 4, Jack Ryan's Rule 26 Report; Exh. 22, Dr. Freeman's Rule 26 Report; Exh. 25 Dr. Wohlgelernter Rule 26 Report | Defendants object to Plaintiffs' use of the entire Rule 26 expert reports, even though they cite to only small portions of the reported in their Opposition. (Ryan's Report: ¶'s 57; 59; 76; 78; 94-97; 104; 132; 106; 172-175; 199-200; 224-25; 227-33; 235; 237-38 241; 256-59.; Freeman's Report: Pg. 5; 13-14; 16;Wohlgelernter's Report: Pg. 5.). Per FRE 401-403, the portions of the Rule 26 Report submitted to the court which the Plaintiffs' do not rely upon in their Opposition are irrelevant, prejudicial and waste judicial economy under FRE 401-403. |
| Exh. 4, Jack Ryan's Rule 26 Report (¶227-33; and Opp, 35:23-26.) | Defendants object to Ryan's unfounded and completely speculative opinion that PPD's carotid policy is contrary to "generally accepted policies and practices because it does not include a time limit on the duration of restraint and does not discuss levels of pressure." Ryan's only support comes from the LVNR program and there is no foundation that the proprietary LVNR system is "generally accepted policy and practice." Thus, this opinion should be excluded as speculative per FRE 602, irrelevant and prejudicial per FRE 401-403 and an improper expert opinion per FRE 702. |
| Exh. 4, Jack Ryan's Rule 26 Report (¶257-59; and Opp, 22:23-24; 23:7-9.) | Defendants object to Ryan's unfounded opinion that "[A]ll of law enforcement" has trained on issues of positional, compression, restraint asphyxia dating back "at least two decades." Ryan offers no foundation to support his claim nor does he support the assertion such training has gone back two decades. This opinion should be excluded as speculative per FRE 602, irrelevant and prejudicial per FRE 401-403 and an improper expert opinion per FRE 702. |

## IV. CONCLUSION

All in all, Defendants are entitled to judgment as a matter of law as to all claims and/or partial summary judgment on this record.

Dated: January 24, 2019

McNAMARA, NEY, BEATTY, SLATTERY,
BORGES & AMBACHER LLP

By: _____

Noah G. Blechman/Amy S. Rothman/Cameren Ripoli
Attorneys for Defendants

McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330