UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HUMBERTO MARTINEZ, et al., <br><br> Plaintiffs, <br><br> v. <br><br> CITY OF PITTSBURG, et al., <br><br> Defendants. | Case No. 17-cv-04246-RS <br><br> **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

**I. INTRODUCTION**

This action arises from the death of Humberto Martinez during an arrest by the City of Pittsburg Police Department ("PPD"). Martinez fled during a traffic stop and later engaged in a physical struggle with officers which resulted in his death. Martinez's family members subsequently filed suit, both individually and on behalf of the decedent, against the City of Pittsburg; Chief of Police Brian Addington, in both his individual and official capacities; several PPD officers;[1] and Does 1-10 (collectively, the "Pittsburg Defendants" or "Defendants"). Plaintiffs allege violations of the First, Fourth, and Fourteenth Amendments and advance state law claims for negligence, battery, and violation of the Bane Act, Cal. Civ. Code § 52.1. The Pittsburg Defendants now move for summary judgment or, alternatively, partial summary judgment.

For the reasons set forth below, the motion is granted in part and denied in part. Summary

---

[1] The defendant officers are Patrick Berhan, Jonathan Elmore, Willie Glasper, Ernesto Mejia, Gabriel Palma, and Jason Waite.

judgment is granted with respect to Plaintiffs' First and Fourteenth Amendment theories for relief. Summary judgment is also granted to the extent that Plaintiffs' Fourth Amendment claim relies upon a lack of probable cause to arrest Martinez. Defendants' motion for summary judgment is otherwise denied.

## II. BACKGROUND[2]

### A. Attempted Traffic Stop and Subsequent Pursuit

While on patrol in a residential neighborhood, Officers Mejia, Glasper, and Waite observed a car parked on the street in a residential neighborhood. A person was leaning through the passenger side window, apparently talking to the driver of the car. Moments later, Martinez, who was the driver of the vehicle, pulled away from the curb and drove down the street. The officers followed. One of the officers called dispatch requesting a records check for the vehicle and was informed that the car's registration was expired. Mejia activated the patrol car's emergency lights and sirens; however, Martinez did not pull over. The subsequent car chase lasted approximately one to two minutes and covered an eighth of a mile.

The brief vehicle pursuit ended in front of the same house where the officers originally observed Martinez's vehicle. Martinez ran from his car toward the half-opened garage door of the house. Mejia yelled for Martinez to put his hands up and deployed his taser just before Martinez reached the garage. The taser had no effect, however, because only one of the probes reached Martinez. Mejia and Glasper followed Martinez into the garage, ducking under the half-opened door. Inside, they saw Martinez on the ground scooting backwards away from them. There were two other individuals in the garage as well. Mejia pulled out his firearm and commanded Martinez and the two other occupants not to move. Instead, Martinez dashed through the door leading into the house. Mejia re-holstered his firearm as he and Glasper gave chase.

### B. The Fight in the Kitchen

A struggle ensued in the kitchen. Mejia and Glasper attempted to gain control of

---

[2] The following facts are undisputed, except where noted.

ORDER RE MOTION FOR SUMMARY JUDGMENT
CASE NO. 17-cv-04246-RS

2

Martinez's hands so they could handcuff him, but Martinez repeatedly pulled away. At some point all three of them ended up on the floor, where Martinez continued pulling away from the officers and trying to evade capture. Glasper testifies that at some point during the commotion, Martinez kicked him in the legs.

Unable to secure Martinez's hands, Mejia punched him once or twice in the face. Glasper also struck Martinez three to five times in the torso with a closed fist. According to Mejia, Martinez then attempted to stand up—at which point Mejia wrapped his arms around Martinez's neck and chest and pulled him back to the ground. According to Mejia, Martinez then head butted him in the chest and chin area using the back of his head.[3] Around this time, Mejia decided to attempt either a carotid hold or a choke hold. While Mejia testifies that he intended to perform a carotid hold, he initially described the move as a "choke hold" to his sergeant and subsequently described it during the coroner's inquest as a maneuver designed to "cut off the airway to the person's brain." Mejia Dep. 104:16-105:25. Mejia also avers that Martinez bit his free hand. The alleged bite resulted in a small cut which caused some bleeding. Plaintiffs, however, dispute whether Martinez intentionally bit Mejia, noting that Mejia did not receive any medical treatment for the alleged bite.

The officers were eventually able to handcuff one of Martinez's wrists, however they were unable to secure his other hand. At some point during the struggle, Glasper transitioned from striking Martinez with his fists to delivering strikes with his elbows and knees. Glasper testifies that he was forced to make this change because he injured his hand during the struggle,[4] however he previously stated during the coroner's inquest that he started using his elbows to "raise my level of striking." Coroner's Inquest 61:21-62:18. Glasper also admitted in an interview with the

---

[3] Plaintiffs do not concede that Martinez either attempted to stand up or struck Mejia with his head. They argue that a reasonable jury could disbelieve Mejia's testimony regarding this sequence of events.

[4] There is some dispute about the exact cause of this injury. While Glasper testified that he could not recall exactly how he injured his hand, he previously stated that he injured his hand while delivering strikes.

District Attorney's investigator that he "delivered strikes with [his] foot" by "kicking in a downward motion at [Martinez's] torso and leg area." Glasper Dep, 106:21-25. Glasper eventually called for Waite, who was standing in the garage monitoring the two bystanders, to come help subdue Martinez. Upon arriving in the kitchen, Waite attempted to string multiple handcuffs together in order to handcuff Martinez's free hands but did not strike Martinez.

### C. Arrival of Officers Elmore, Palma and Berhan

Officers Elmore, Palma, and Berhan arrived on the scene within moments of each other, having received radio communications that officers were involved in a physical altercation with a suspect. Berhan immediately tased Martinez in the thigh while Palma attempted to secure one of Martinez's arms. Elmore, Palma, and Berhan testify that they heard Mejia say Martinez was biting him, at which point Elmore struck Martinez's torso seven times with a closed fist. Plaintiffs, however, dispute whether any such statement was made, pointing out that the statement is not audible in the body camera footage. Shortly thereafter, the officers succeeded in rolling Martinez onto his stomach and handcuffing his hands behind his back. Upon hearing from the other officers that Martinez was secured, Mejia released his hold on Martinez's neck. The entire struggle, beginning when Mejia and Glasper pursued Martinez into the kitchen, lasted approximately two and a half minutes.

### D. Martinez's Death

Once Martinez was secured, Elmore radioed that no further back up was required, but continued to apply pressure to the side of Martinez's head and kept his knee on Martinez's upper back for approximately 30 seconds. At the same time, Palma was squatting next to Martinez and pressing his knees into Martinez's back and lower buttocks. The parties agree that Palma remained in that position for at least thirty seconds, however Plaintiffs contend Palma in fact maintained this position for over two minutes. The parties also disagree about how much of the officers' weight was placed on Martinez's back while he was handcuffed. Eventually, one of the officers noticed that Martinez was turning purple, at which point they rolled him to his side and removed the handcuffs. After assessing Martinez's condition, the officers performed CPR until the paramedics

arrived. The paramedics transported Martinez to the hospital where he was pronounced dead within an hour of his arrival.

### E. Coroner's Report and Findings

Dr. Ikechi Ogan, the coroner responsible for performing the autopsy, found evidence of blunt force injuries to Martinez's head, neck, torso, and extremities. The examination revealed fractured cartilage at the top of the neck, hemorrhaging and bruising in the neck, sixteen fractured ribs, a fractured sternum, and bruising to the lungs and liver. The doctor also found that Martinez had "flail chest," which is described as three or more consecutive ribs that are fractured in two or more places and can interfere with respiration. Although Dr. Ogan did not opine on the precise cause of the rib fractures, he did not believe they were caused by CPR. He ultimately concluded the cause of death was mechanical obstruction of respiration, complicated by carotid sinus reflex stimulation due to the use of a carotid hold. More specifically, the doctor believed Martinez's neck injury obstructed his airway.[5] He estimated Martinez's airways had been obstructed for four to six minutes and found that "the injuries on both sides of the neck, on the upper chest, the fractured ribs, [and] the hemorrhages into the airway" confirmed airway obstruction. Ogan Dep, 128:2-19.

### F. Municipal Policy

PPD policy allows for the use of a carotid hold as an intermediate force option against a suspect who is resisting arrest. Accordingly, new officers generally receive one hour of training on carotid holds during their orientation. Officers also receive training in the police academy regarding the use of this hold. PPD's carotid hold policy specifically instructs officers to ensure the hold does not slip into a "bar arm" or any hold that applies pressure to the front of the neck. Plaintiffs' expert opines that this policy is contrary to "generally accepted [law enforcement] policies and practices" because it does not specify the appropriate duration or level of pressure for

---

[5] The Pittsburg Defendants do not dispute Dr. Ogan's conclusion regarding cause of death for the purposes of this motion, however they reserve the right to dispute the cause of death at trial.

ORDER RE MOTION FOR SUMMARY JUDGMENT
CASE NO. 17-cv-04246-RS

5

the maneuver. Ryan Report ¶ 227-33.[6] He also avers that the carotid hold is a perishable skill, that is, one that must be maintained through practice and training. *Id.* ¶ 230.

PPD officers are also advised to apply only a reasonable amount of weight when attempting to control a suspect to avoid interfering with the person's ability to breath. While PPD provides some training about the dangers of interfering with a suspect's breathing, none of the defendant officers were familiar with the terms restraint, positional, or compression asphyxia.[7] Chief Addington was familiar with these concepts but was unable to point to any specific policy addressing these types of asphyxiation. Plaintiffs' expert ultimately concluded that PPD's training on this issue is out of step with norms within the law enforcement community, which he contends involve specifically training officers about the danger of placing pressure on a person's back while they are prone and handcuffed, particularly if the suspect is overweight.[8]

### III. LEGAL STANDARD

#### A. Summary Judgment Standard

Under the Federal Rules of Civil Procedure, a court must grant a motion for summary judgment if, viewing the evidence in the light most favorable to the nonmoving party, there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Valandingham v. Bojorquez*, 866 F.2d 1135, 1137 (9th Cir. 1989). Courts must ultimately decide "whether the 'specific facts' set forth by the nonmoving party, coupled with undisputed background or contextual facts, are such that a rational or reasonable jury might return a verdict in its favor based on that evidence." *T.W. Elec. Serv. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987). When making this evaluation, courts draw all reasonable inferences in favor of the nonmoving party. *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 520-21

---

[6] The Pittsburg Defendants' objection to this portion of the expert report is overruled.

[7] The parties refer to restraint, positional, and/or compression asphyxia throughout their briefing. For the purposes of this order, these associated terms will simply be shortened to "compression asphyxia."

[8] The Pittsburg Defendants' objections with respect to this portion of the Ryan Report is overruled.

(1991).

## B. Qualified Immunity Standard

The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The Supreme Court previously established a sequential two-step process for evaluating qualified immunity whereby a court must decide: (1) whether, viewing the facts in the light most favorable to the plaintiff, the government actor violated the plaintiff's constitutional rights; and (2) whether these constitutional rights were clearly established at the time of the violation. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). In *Pearson v. Callahan*, the Court reconsidered this process, and held that "judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first." 555 U.S. 223, 236 (2009).

With regard to the second prong of the inquiry, "clearly established law [is not to be defined] at a high level of generality." *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011). In deciding whether a constitutional right was clearly established at the time of the alleged violation, courts must ask "whether the violative nature of particular conduct is clearly established." *Id.* (emphasis added). This inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Saucier*, 533 U.S. at 201 (emphasis added). To be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). A case directly on point is not required, "but existing precedent must have placed the statutory or constitutional question beyond debate." *al-Kidd*, 563 U.S. at 741.

## IV. DISCUSSION

### A. Fourth Amendment: Unlawful Seizure and Excessive Force

#### 1. Lawfulness of the Seizure

Plaintiffs concede that the arresting officers had probable cause to stop Martinez. Accordingly, summary judgment is granted with respect to the lawfulness of the initial seizure.

## 2. **Excessive Force**

### a. *Integral Participant Standard*

In general, an officer who is merely a bystander to his colleague's unlawful conduct may not be held liable for that conduct. *Hopkins v. Bonvicino*, 573 F.3d 752, 769-70 (9th Cir. 2009). By contrast, an officer who is an integral participant in unlawful conduct may be held liable even if the officer's isolated actions do not rise to the level of a constitutional violation. *Blankenhorn v. Cty. of Orange*, 485 F.3d 463, 481 n.12 (9th Cir. 2007). For example, where multiple officers collectively beat an individual, all of them may be held liable for contributing to the overall use of excessive force. *Lolli*, 351 F.3d at 417-18. Similarly, an officer who stands outside a residence "armed with [a] gun, while other officers conduct [an unlawful] search" qualifies as an integral participant in that search. *Hopkins*, 573 F.3d at (quoting *Boyd v. Benton Cnty.*, 374 F.3d 773, 780 (9th Cir. 2004).

All the officers named in this suit were actively involved in the struggle to restrain Martinez. The undisputed facts show that each of the named officers struck, tased, or otherwise attempted to restrain Martinez during the confrontation. There is evidence that even Officer Waite, who was arguably the least involved in the scuffle, helped restrain Martinez's arms while the other officers delivered strikes and, in the case of Officer Mejia, applied an alleged choke hold. The Pittsburg Defendants' argument that "each Defendant Officer dealt with [Martinez's] physical resistance independently of their fellow officers' actions and at different times" is unpersuasive. The entire struggle lasted approximately two and a half minutes and body camera footage shows that the officers' involvement overlapped substantially. Viewing the evidence in the light most favorable to Martinez, a reasonable fact-finder could conclude each officer was an integral participant in the overall use of force. Accordingly, for the purpose of this summary judgment order, the named officers will each be considered integral participants in the altercation.

### b. *Collective Use of Force*

The central inquiry in a Fourth Amendment claim for excessive force is whether the defendant's actions were "objectively reasonable in light of the facts and circumstances

confronting them." *Graham v. Connor*, 490 U.S. 386, 397 (1989). Courts specifically consider the "(1) severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officer or others, and (3) whether the suspect is actively resisting or attempting to evade arrest by flight." *Id.* This calculus must take into account "the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396-97. Because this analysis requires a balancing of interests, however, summary judgment should be granted sparingly in excessive force cases. *Lolli v. Cty. of Orange*, 351 F.3d 410, 415–16 (9th Cir. 2003) (quoting *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir.2002)).

Considering the record as a whole, a fact-finder could reasonably conclude based on Martinez's level of resistance, the rather minor nature of the underlying offense, and the overall circumstances of the struggle, that the officers' use of force was excessive. Moreover, until a fact-finder determines how much force was actually used, a court cannot decide whether that particular use of force violated clearly established law. *Santos v.* Gates, 287 F.3d 846, 855 (9th Cir. 2002); *See also Neuroth v. Mendocino*, No. 15-cv-03226, 2018 U.S. Dist. LEXIS 149492, at *28 (N.D. Cal. 2018).

Here, there is a dispute regarding the amount of pressure applied to Martinez's back while he was lying handcuffed on the floor. *Drummond v. Cty. of Anaheim*k, 343 F.3d 1052 (9th Cir. 2033), and its progeny have held that pressing one's body weight down on a prone and restrained suspect who is no longer resisting violates clearly established law. *Id.* at 1057; *Abston v. Cty. of Merced*, 506 Fed. Apx. 650, 653 (9th Cir. 2013) ("It is clearly established that defendants' use of body compression to restrain a prone and bound suspect, who was in no position to offer any meaningful resistance, would violate the rule established by *Drummond*"). Therefore, the duration of any such compression and the amount of weight placed on Martinez's back will ultimately determine whether the officers' actions violated clearly established law. Accordingly, qualified immunity is not appropriate.

Material disputes of fact regarding Mejia's alleged us of a prohibited choke hold and the degree to which Martinez resisted arrest also prevent the Pittsburg Defendants from obtaining the

benefit of qualified immunity. The parties dispute whether Mejia deployed a choke hold that cut off Martinez's air supply, and duration of any such choke hold. They similarly contest the degree to which Martinez lashed out at the arresting officers during the struggle. The Pittsburg Defendants, however, make no attempt to argue that prolonged use of a choke hold that cut off Martinez's air supply would have been reasonable under either version of events. Indeed, PPD's own policies forbid this maneuver. Instead, they attempt to dispute whether Mejia in fact deployed the alleged choke hold. This dispute of fact cannot be resolved in Defendants' favor at the summary judgment stage. A reasonable jury could conclude that, although he resisted arrest, Martinez did not deliberately strike the arresting officers, yet the officers delivered strikes that broke sixteen ribs and deployed a prohibited choke hold that crushed the cartilage in his neck resulting in his death. Accepting these facts as true, and taking into account the relatively minor underlying offense, no reasonable officer would believe this use of force complied with the Fourth Amendment. For this reason as well, the officers are not entitled to qualified immunity at the summary judgement stage.

### B. First and Fourteen Amendments: Right to Familial Association

Plaintiffs argue that their First and Fourteenth Amendment rights to familial association with Martinez were violated by the defendant officers. *See Lee v. Cty. of Los Angeles*, 250 F.3d 668, 685-86 (9th Cir. 2001). The parties agree that, to prevail on this claim, Plaintiffs must show the Pittsburg Defendants "acted with a purpose to harm [the decedent] that was unrelated to legitimate law enforcement objectives."[9] *Porter v. Osborn*, 546 F.3d 1131, 1136-39 (9th Cir. 2008). For example, officers who act with an intent to bully or "get even" with a suspect lack a legitimate law enforcement purpose. *Zion v. Cnty. Of Orange*, 847 F.3d 1072, 1077 (9th Cir. 2017). Ultimately, the conduct at issue must be so egregious as to "shock the conscience." *Id.* at 1136-39.

Plaintiffs contend that both Mejia and Glasper engaged in conscience shocking behavior.

---

[9] The parties agree that the "purpose to harm" standard rather than the "deliberate indifference" standard applies here. *See Porter*, 546 F.3d at 1137.

In their view, Mejia's prolonged use of a forbidden choke hold was conscience shocking and suggests an intent to harm Martinez rather than merely subdue him. Plaintiffs' expert further opines that "hard hand strikes" are considered a serious use of force and that strikes to the head and face are disfavored. He further contends that Glasper's use of strikes escalating from closed fist punches to elbow and knee strikes was "far outside the bounds of law enforcement training and practice." Ryan Report ¶ 224.

While Plaintiffs clear the summary judgment hurdle on the claim the officers' use of force was excessive, they fail to adduce sufficient evidence to support the conclusion that the officers were motivated by a "purpose to harm" that was "unrelated to legitimate law enforcement objectives." *Porter*, 546 F.3d at 1136-39. It is undisputed that the officers had probable cause to detain Martinez, but that he nonetheless fled and resisted arrest. Furthermore, the officers' use of force—even if excessive—was at all times consistent with the aim of subduing and detaining a suspect who was resisting arrest. Once Martinez was subdued, the officer immediately stopped striking him and Mejia released his hold on Martinez's neck. Even viewing the evidence in the light most favorable to Plaintiffs, there is simply not enough evidence for a fact-finder reasonably to conclude that Officers Mejia and Glasper were motivated by a nefarious purpose rather than a desire to subdue Martinez and end the struggle. Accordingly, the motion for summary judgment is granted with respect to these two officers. Because Plaintiffs appear to abandon their First and Fourteenth Amendment argument with respect to the remaining officer, summary judgment is granted with respect those defendants as well.

**C. *Monell* Liability**

To establish liability against a municipality, plaintiffs must show (1) they were deprived of a constitutional right, (2) the municipality had a policy or custom that amounted to deliberate indifference to the violation of their rights, and (3) the policy was the "moving force" behind the constitutional violation. *Long v. Cnty. of Los Angeles*, 442 F.3 1178, 1186 (9th Cir. 2006). As previously discussed, Plaintiffs have adduced sufficient evidence to enable a reasonable jury to conclude the arresting officers violated Martinez's Fourth Amendment rights. Therefore only the

second and third prongs of this test need be discussed here.

### *a. Municipal Policy Amounting to Deliberate Indifference*

Plaintiffs attempt to establish a municipal policy based on PPD's alleged failure to maintain adequate policies or provide proper training regarding the carotid hold and of the dangers of compression asphyxia. Inadequate police training may serve as the basis for municipal liability under section 1983 only if "the failure to train amounts to deliberate indifference to the rights of the person with whom the police come into contact." *Cty. of Canton v. Harris*, 489 U.S. 378, 388 (1989). While failure to train claims typically require plaintiffs to show a pattern of similar violations, this showing is not required where "a violation of federal rights may be highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations." *Long*, 442 F.3d at 1188.

According to Plaintiffs, PPD's policies and training regarding the use of the carotid hold and the dangers of compression asphyxia were inadequate. Plaintiffs point to testimony by Chief Addington that PPD has no written policy to prevent compression asphyxia and that PPD's lead trainer was not familiar with the term. Plaintiffs also contend PPD's training regarding the carotid hold was inadequate, as evidenced by Mejia's apparent confusion about the difference between a carotid hold and a potentially deadly choke hold and the lack of any guidance about the proper duration and amount of pressure to use during a carotid hold. Officers typically receive training on this maneuver at the police academy and at new officer orientation. Plaintiffs' expert opines, however, that the carotid hold is a perishable skill and that this limited training was therefore inadequate. Ryan Report ¶ 227-33. He also contends that PPD's training is deficient because it does not specify the proper duration or amount of force to use when deploying a carotid hold. *Id.*

Based on these facts, a reasonable fact-finder could conclude that PPD's failure to provide more robust policies and training regarding the use of the carotid hold and the dangers of compression asphyxia amounted to deliberate indifference. While the Pittsburg Defendants note Plaintiffs' inability to point to any other serious incidents or death involving compression asphyxia or PPD's use of the carotid hold, Plaintiffs need not make such a showing if the constitutional

violation was a "highly predictable consequence" of the failure to train. *Long*, 442 F.3d at 1188. It is beyond dispute that police officers are often required to subdue suspects and handle them while they are handcuffed. Therefore, a jury could reasonably conclude it is highly foreseeable that PPD's failure to provide guidance on the proper duration and amount of force to apply during a carotid hold, or to teach officers not to apply force to the back of a prone and handcuffed suspect, would result in an excessive use of force.

*b. Causation*

As explained above, a plaintiff seeking to establish liability based on a failure to train must not only establish that the training was inadequate, but also that this deficiency caused the unconstitutional application of force in that particular instance. *Chew v. Gates*, 27 F.3d 1432, 1444 n.12 (9th Cir. 1994). The Pittsburg Defendants argue that any improper use of the carotid hold was simply due to a lack of retention by Mejia rather than any deficiency in the training. Viewing the evidence in the light most favorable to Plaintiffs, however, a jury could easily reach the opposite conclusion. Therefore, the Pittsburg Defendants' request for summary judgment with respect to *Monell* liability must be denied.

**D. State Law Claims**

The Pittsburg Defendants also seek summary judgment with respect to Plaintiffs' three state law claims. First, they argue Plaintiffs' Bane Act claim fails because it relies exclusively upon the alleged violation of the Fourth Amendment. As explained above, however, Plaintiffs have raised material disputes of fact that defeat Defendants' motion for summary judgment with respect to the Fourth Amendment violation. Therefore, Defendants' request for summary judgment with respect to the Bane Act claim must also fail. The Pittsburg Defendants similarly seek to defeat Plaintiffs' negligence and battery claims by relying on their Fourth Amendment arguments regarding the reasonableness of the officers' use of force. These arguments are unavailing for the reasons discussed in Part A. Accordingly, the motion for summary judgment is

1 denied with respect to Plaintiffs' state law claims.

### E. Motion to Seal

The parties dispute whether portions of Officer Glasper's deposition testimony and Plaintiffs' opposition brief relating to the officer's medical records should be maintained under seal. While medical records are generally the proper subject of a sealing motion, the information at issue here relates solely to Officer Glasper's past statements regarding how he injured his hand during the altercation. The Pittsburg Defendants have provided no persuasive reason why this particular statement should be kept from the public. Accordingly, the limited portion of the deposition testimony and of Plaintiffs' brief that refer to this statement may not be sealed. All other information relating to Officer Glasper's medical records will, however, be maintained under seal.

### F. Compliance with Local Rules

The Pittsburg Defendants have pointed out that Plaintiffs' briefing on this motion does not comply with the civil local rules. While Plaintiffs' use of a footnote to provide a string cite and summarization of information using a sparsely worded single-spaced table are not of great concern, Plaintiffs' inclusion of additional lines of text in the body of their brief was inappropriate. Going forward, Plaintiffs are expected to comply with all rules governing the length and formatting of briefs and to avoid *any appearance* that they are attempting to gain an unfair advantage in this litigation. Both parties are also reminded that e-filed documents must include text search capabilities unless the filer only has access to a paper, or otherwise nonsearchable, copy of the document. Civ. Local R. 5-1(e)(2). This helps conserve Court resources and increase the accuracy of decisions.

## V. CONCLUSION

For the reasons set forth above, summary judgment is granted with respect to Plaintiffs' First and Fourteenth Amendment theories for relief. Partial summary judgment is also granted to the extent that Plaintiffs' Fourth Amendment claim relies upon a lack of probable cause to arrest Martinez. Summary judgment is denied with respect to all remaining claims and theories for relief.

**IT IS SO ORDERED**.

Dated: March 8, 2019

_____
RICHARD SEEBORG
United States District Judge